In the United States District Court
Southern District of Ohio
Eastern Division

| | | |
|---|---|---|
| United States of America, | | Emergency Motion for |
| | *Plaintiff* | Pre-Sentence Release:18 USC |
| *vs* | | 1345(c) |
| | | Docket № 2:19-cr-174 |
| Michael T. Sutherin, | | |
| | *Defendant* | |

On behalf of the defendant, Michael Sutherin, for the reasons set forth in the attached memorandum, the undersigned attorneys move this Court for emergency release of the defendant, pursuant to 18 U.S.C. § 1345(c), on reasonable conditions pending sentencing.

Dated: April 17, 2020

/s/ Mark J. Mahoney

David H. Thomas
Kathryn S. Wallrabenstein
TAFT STETTINIUS & HOLLISTER, LLP
Ohio Supreme Court No. 0071492
P: (614) 220-0238
F: (614) 221-2007
dthomas@taftlaw.com
kwallrabenstein@taftlaw.com

Mark J. Mahoney, Esq.
HARRINGTON & MAHONEY
70 Niagara Street, 3rd Floor
Buffalo, NY   14202-3407
P: 716-853-3700
F: 716-853-3710
mjm@harringtonmahoney.com

*(Attorneys for Michael T. Sutherin )*

In the United States District Court
Southern District of Ohio
Eastern Division

United States of America,
        *Plaintiff*

                                    Memorandum in Support of
        *vs*                        Emergency Motion for
                                    Pre-Sentence Release:18 USC
                                    1345(c)

Michael T. Sutherin,
        *Defendant*                 Docket №2:19-cr-174

Dated: April 17, 2020

                                    /s/ Mark J. Mahoney

        David H. Thomas             Mark J. Mahoney, Esq.
        Kathryn S. Wallrabenstein   HARRINGTON & MAHONEY
        TAFT STETTINIUS & HOLLISTER, LLP   70 Niagara Street, 3rd Floor
        Ohio Supreme Court No. 0071492     Buffalo, NY  14202-3407
        P: (614) 220-0238           P: 716-853-3700
        F: (614) 221-2007           F: 716-853-3710
        dthomas@taftlaw.com         mjm@harringtonmahoney.com
        kwallrabenstein@taftlaw.com

        *(Attorneys for Michael T. Sutherin )*

Contents

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Michael Sutherin meets the preliminary conditions for release pending sentencing . . . . . 4

    A.    There is no cognizable risk of flight . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    B.    Michael Sutherin's release does not present any danger to the community . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        1.    *The initial detention determination did not have the benefit of accurate information about the role of autism in the determination* . . . . . . . 7

        2.    *The expert psychological evaluations* . . . . . . . . . . . . . . . . . . . . . . . 10

            Dr. McConnell . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

            Dr. Peterson . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        3.    *ASD generally is a "social learning disability"* . . . . . . . . . . . . . . . 17

        4.    *"High functioning" autism does not mean socially competent* . . . 18

        5.    *ASD mitigates any risk of violating conditions of release or future offending* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        6.    *Michael's parents will supervise him closely and capably* . . . . . . 23

        7.    *Michael will comply with conditions of release* . . . . . . . . . . . . . . 24

Exceptional reasons warrant granting presentence release . . . . . . . . . . . . . . . . . . . . . . . . 25

    A.    Personal safety concerns amid Covid-19 coronavirus pandemic . . . . . . . . 25

        1.    *Jails are susceptible to outbreaks, and have inadequate means to respond to them.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

    B.    Michael may be particularly vulnerable . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

        1.    *The young are getting sick (and dying), too* . . . . . . . . . . . . . . . . . 34

        2.    *Increased risk of victimization as jail conditions deteriorate* . . . . . 35

    C.    An outbreak in the jail would exacerbate Michael's suffering, even if he did not catch the virus or become seriously ill from it . . . . . . . . . . . . . . . . . . . 35

            The prison experience of those with ASD generally . . . . . . . . . . . 36

            Michael's experiences in pretrial detention    . . . . . . . . . . . . . 38

            Ordinary Jail Conditions and Stimuli    . . . . . . . . . . . . . . . . . 39

i

The Court has the authority to grant release pending sentencing . . . . . . . . . . . . . . . . . . 40

    A.    Policy makers recognize the need to reduce jail populations to protect prisoners and the public . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

    B.    Courts have recognized that local jails may not be able to provide adequate assurance of inmate safety . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

        *1.*    *Pretrial release* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

        *2.*    *Initial Bail decisions* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

        *3.*    *Presentence release* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

        *4.*    *Mid-sentence release, compassionate release* . . . . . . . . . . . . . . . 46

        *5.*    *Extending time for surrender* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

        *6.*    *Suspending confinement* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Available conditions of release . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

# Introduction

On February 19, 2020 (Doc. 39), defendant Michael Sutherin entered a guilty plea before the Magistrate Judge to charges of solicitation, 18 U.S.C. §§ 2422(b), and Receipt of Child Pornography, 18 U.S.C. §2252(a)(2).  If his plea is accepted pursuant to Rule 11(c)(1)(C), he will be sentenced to 12 years in prison.  Michael is being held in the Delaware County Jail, where he has been detained for over 10 months.

Three reasons justify Michael's pre-sentence release under 18 U.S.C. § 1345(c).

**First**, as recognized by a tidal wave of judicial release orders (discussed below at p. 43 to 50) the Covid-19 coronavirus pandemic presents an immediate threat to the lives of inmates, people who work in jails and prisons,  and the communities surrounding jails and prisons.  The pandemic is far beyond the ability of any local jail to cope, a fact which many courts have already recognized in granting similar motions. Despite his young age,[1] Michael will be particularly vulnerable as the virus hits the jail, and we believe that the risks are even higher for Michael due to his Autism Spectrum Disorder (ASD).

**Second**, Michael presents zero risk to the community if released and zero risk that he will fail to appear for any proceeding, including sentencing.

**Third**, Michael Sutherin suffers from ASD, which affects him severely. Michael has only a childlike-level of emotional development and social understanding. Those with ASD are easily and predictably victimized under ordinary circumstances; this is especially true in jails and prisons.  Michael has been the victim of constant, traumatic abuse, both physical

---

[1]  Younger Adults Make Up Big Portion of Coronavirus Hospitalizations in U.S." *The New York Times,* pub. Mar. 18, 2020. Available online at: https://www.nytimes.com/2020/03/18/health/coronavirus-young-people.html. "20-Somethings Now Realizing That They Can Get Coronavirus, Too." *The New York Times,* March 24, 2020. Available online at https://www.nytimes.com/2020/03/23/nyregion/nyc-coronavirus-young.html. According to this article, since the outbreak reached the U.S., "38 percent of those hospitalized were between the ages of 20 and 54. Nationally, 12 percent of the intensive care patients were between the ages of 20 and 44." 3 people under the age of 44 have died in New York City since the pandemic started. A 34 year-old man who underwent cancer treatment several years ago recently died in California. *See* "A California man who died from COVID-19 went to Disney World, Universal, reports say." *Miami Herald,* March 19, 2020. Available online at https://www.miamiherald.com/news/coronavirus/article241348121.html.

and psychological, from other inmates during his detention. Jail personnel have done nothing to protect him from this. Also, Michael's sensory processing issues due to his ASD make him exceptionally sensitive to loud sounds, lights, textures, and different kinds of foods. This makes the jail environment torturous. Having suffered in jail now for so many months, on his way to a certain decade of further confinement, Michael has not had meaningful contact with his family. Humanitarian concerns compel us to ask for time with his family to recover from this trauma, free of fear of life-threatening contagion, and to prepare for a lengthy confinement.

Together, these reasons—which are greater than what has been found to warrant pre-sentence release in other cases—present "exceptional reasons" for release in this case.

# Michael Sutherin meets the preliminary conditions for release pending sentencing

Aside from the specific factors posed by the coronavirus pandemic, which we address below, there is clear and convincing evidence that Michael Sutherin will appear when required, and that he will comply with conditions, if released. Michael, by virtue of his ASD, was unable to understand the wrongfulness and potential harmfulness of his behavior at the time it happened. He is not antisocial or "deviant" in his sexual interests (*i.e.* he has clinically normal adult male sexual interests and is not diagnosable with a paraphilic disorder). While his ASD made him vulnerable to offending, his ASD is now a risk-reducing factor. He has also pleaded guilty and has accepted responsibility. He now understands the wrongfulness of his behavior, which he acknowledges, and he will never repeat it.

This has been a horrific experience beyond anything he or his family could have imagined, and yet he is aware of how much worse it could be if he were to fail to comply with conditions while released. This constitutes clear and convincing evidence that he will appear when required, and not present a danger in any respect to the community.

4

## A.    There is no cognizable risk of flight

There is no risk of flight for Michael Sutherin.  Flight was not raised as a concern at the original detention hearing.  Nothing has occurred in the meantime to make this a concern. Michael is entirely reliant on his parents on a day-to-day basis. Michael is not capable of living independently.[2] He can barely drive a vehicle, and only on rehearsed routes. When he drove before being arrested, Michael would have to plan his travel route not based on the shortest distance but the safest way for him (*i.e.,* fewer left turns, making turns at a traffic light, avoiding narrow or tricky sections of the road, etc.). Michael's parents would have to check on his location and driving performance through a smartphone app. Michael would often brake hard, due to his inability to anticipate even easy stops.  Similarly, with public transportation, he would only go on rehearsed routes, and if he got confused, he would immediately get off the bus and call his parents for help, even if it meant actually stranding himself.

In the low-level, menial jobs which Michael has held, he has needed "job coaches," provided by disability services, to help him get through.  He simply does not have the life skills needed to even contemplate running away. Michael has no money, no personal resources, no connections elsewhere, and lacks the guile or the executive functioning to become a fugitive. Given that the country is largely shut-down due to the pandemic, Michael would have nowhere to go, even if he had the resources and the mental facilities to flee. As such, he has neither the will nor capacity to abscond.  All Michael wants to be with his family and in his own bed.

---

[2]  Only about 17 percent of young adults on the spectrum ages 21 to 25 have ever lived independently. By comparison, nearly 34 percent of their peers with intellectual disability have. Anderson, K. A., Shattuck, P. T., Cooper, B. P., Roux, A. M., & Wagner, M. (2014). "Prevalence and correlates of postsecondary residential status among young adults with an autism spectrum disorder." AUTISM, 18(5), 562–570. The DSM-5 states: "Only a minority of individuals with autism spectrum disorder live and work independently in adulthood; those who do tend to have superior language and intellectual abilities and are able to find a niche that matches their special interests and skills. In general, individuals with lower levels of impairment may be better able to function independently. However, even these individuals may remain socially naive and vulnerable, have difficulties organizing practical demands without aid, and are prone to anxiety and depression."

The hypothetical risk that anyone could flee is not enough to show risk of flight. "Mere opportunity for flight is not sufficient grounds for pretrial detention." *United States v. Himler*, 797 F.2d 156, 162 (3rd Cir. 1986). And one can not judge actual risk of flight as if it were a cost-free decision. Where, as here, Mr. Sutherin's parents are willing to post bond or bail, and so expose themselves to real financial consequences were he to fail to appear, Mr. Sutherin would be making a choice to seriously and irreversibly harm those he is utterly reliant on by absconding, in addition to compounding his legal difficulties.

In fact, nonappearance is the rarity. For example, in the Southern District of Ohio in the past 10 years, searching on PACER, there are only three cases in which a defendant was accused of nonappearance.[3] None involved a charge of child pornography or a developmentally disabled defendant.

Daily contact with Pretrial Services, electronic monitoring, varying degrees of pretrial supervision, and the posting of a bond by his parents could absolutely ensure Michael's appearance.

The Court should also consider the current "stay-at-home" advisories in the face of the pandemic as additional assurance that the defendant is not going to leave his home. If Michael did leave, he would expose himself to the very risk of infection that this motion seeks to neutralize.

---

[3] In the three failure to appear cases within the past ten years, none of them were for child pornography related offenses. In *United States v. Ealy*, No. 3:15-cr-80 (TMR), Dkt. No. 2, 40, 41 (S.D. Ohio), the defendant was facing fraud related charges and failed to appear for a portion of his trial due to mental health strain, his appearing pro se, and communication issues with his probation officer. He was ultimately returned to court and the trial was completed. In *United States v. Farris*, No. 3:15-cr-00129-TMR-1, Dkt. No. 3, 12 (S.D. Ohio), the defendant was convicted of drug manufacturing and distribution charges, which carry a maximum statutory punishment of life in prison, and failed to appear for sentencing in August of 2017 until the following month. In *United States v. Phillips*, No. 1:09-cr-00041-SJD, Dkt. No. 2, 17, 18 (S.D. Ohio), the defendant failed to surrender for service of his one-year sentence imposed on his supervised release violation of an underlying identity theft conviction relating to his stealing the identity of a military officer.

## B.   Michael Sutherin's release does not present any danger to the community

Michael's lack of deviant sexual interest, his understanding of the wrongfulness of his past behavior, his tendency as a person with ASD to follow rules that are made effectively clear to him, and the catastrophic consequences of any kind of misbehavior while on release, all support a finding that his release does not pose a danger to the community.

### 1.   The initial detention determination did not have the benefit of accurate information about the role of autism in the determination

The detention hearing in this case illustrated some of the questions and misunderstandings that arise with cases involving defendants with ASD in the criminal justice system. While those with ASD are a protected class under federal law, the participants in the criminal justice system–whether defense lawyers, prosecutors, investigators, or judges–are usually not knowledgeable enough about this condition to provide that protection. In Michael's case, as in so many others like his, misunderstandings about ASD, and legitimate questions posed by the Magistrate Judge about the impact of ASD on behavior went substantialy unaddressed.

At the detention hearing, defense counsel proceeded with nothing to "proffer" except the Pretrial Services report, despite being reminded by the Magistrate Judge of the ability to come back more prepared at a later time. Tr. of Det. Hn'g, Dec. 19, 2019, at 3. In making his initial argument, defense counsel did not mention Michael's ASD at all. *Id.* at 7-9. AUSA Shimeall acknowledged "the extenuating circumstances" in the case, but without specifics. *Id.* at 8, 10. Later, Mr. Burke referred to Michael's ASD together with other diagnoses, without any effort to bring it to bear on the issue. Mr. Shimeall, seeming to have more insight into the problem ("we were not unsympathetic" at 19-20), said:

> But Mr. Sutherin is high functioning. He works. He takes some college classes. He drives by himself. I don't think that that is an excuse for his conduct here. It's my sense that Mr. Sutherin knows the difference between right and wrong.

*Id.* at 20. Later, Mr. Burke made the point that despite being "high functioning" Michael had

"the mentality of a child." The Court asked:

> THE COURT: Sir, are you arguing this makes him more likely to not abide by the conditions, or unable to abide by the conditions? Are you saying it's less likely that he's going to engage in this kind of behavior again?
>
> * * *
>
> THE COURT: It definitely cuts both ways. Your argument cuts both ways. It's a behavioral, psychological condition. I'm assuming that being on the spectrum is immutable. You can't take that away through treatment. So doesn't it cut both ways that if he's more likely to engage in this behavior as a result of his conditions, on release, he'd also be more likely to be a danger to the community?

*Id.* at 21. Defense counsel did not have an answer to these questions.

This exchange reveals a key misunderstanding about ASD: the defendant is intelligent, and therefore his ASD is "not an excuse," and he should "know right from wrong." The Court's questions legitimately raise the question of whether, if ASD had a role in the offense, and  if one cannot be cured of ASD, then won't the defendant repeat his behavior?

Thousands of ASD professionals–special education teachers, clinicians, researchers, and advocates–know the answers to these questions. Lawyers, generally, do not. A starting point for defense counsel could have been to provide the Court with the letter from Dr. John P. Sotos, dated May 8, 2019.[4] What Dr. Sotos wrote would have addressed the misunderstanding that persons with ASD who are "high functioning" are socially capable:

> Although people with Asperger's [*i.e.* "high-functioning" autism] have a higher functioning language capability than others on the spectrum, they still struggle with social interactions, recognizing social cues and body language and processing the various nuances and contextual inputs in relation

---

[4]  Although we understand that defense counsel did not have that letter in hand at the hearing, because it had not been retrieved from the doctor's office, had counsel taken up the Court's suggestion that the hearing could be delayed a bit, the letter surely would have been obtained and could have been offered.

> to what is being said. They are very much concrete thinkers and have difficulty grasping sarcasm and abstract thoughts and ideas. Like others with Autism they don't understand/ recognize personal space/ boundaries and have much difficulty comprehending when they've "gone too far" or recognizing social norms. Patients with Asperger's can at first glance appear "normal" due to their increased language abilities and thus be unfairly judged as having "normal" processing abilities in the aforementioned realms of social interaction when they most certainly do not. . . . Due to his previously mentioned behavioral makeup caused by his Autism and ADHD one can easily understand how a sexual impulse/curiosity, not recognized as wrong, becomes a preoccupation followed by compulsively seeking out this stimulation. Seeking it on a medium, the internet, that doesn't thwart or rebuff his advances in any way.

Dr. Sotos observes that claims of "high functioning" ASD can be very misleading. The title of a recent research report tells it all: "The misnomer of 'high functioning autism': Intelligence is an imprecise predictor of functional abilities at diagnosis."[5] The authors conclude, on the basis of a large, controlled sample, that overall intelligence is not a predictor of functional abilities, "*particularly for those without intellectual disability*." (Emphasis added). Earlier research confirms this. *See* Celine A. Saulnier, Ami Klin, "Brief Report: Social and Communication Abilities and Disabilities in Higher Functioning Individuals with Autism and Asperger Syndrome", J AUTISM DEV DISORD (2007) 37:788–793. ("Individuals with higher functioning autism (HFA) fail to translate their cognitive potential into real-life adaptation, and the severity of their symptoms is considerable despite their intellectual ability"); *see also* Barry M. Prizant, "High- and Low-Functioning Autism: A False (Harmful?) Dichotomy?" AUTISM SPECTRUM QUARTERLY 31-33 (2012)(discussing severe impairments in those with "high-functioning" autism).

Every therapist who deals regularly with adults with ASD can describe patients with college degrees in math who cannot drive a car, who cannot remember to bathe without prompting from their parents, who are incapable of having an adult, romantic relationship, or who fail to understand many other socially determined concepts and activities that are not

---

[5] Alvares, Bebbington, Cleary, et al., AUTISM, 2020, Vol. 24(1) 221–232.

based on explicitly taught rules or easily managed with "yes/no" thinking. This is part of what makes ASD such a difficult disability, because from some perspectives, the person seems very capable and the rest of their disability may be hidden.

Dr. Sotos' letter, intended for the Court, makes the point that despite being intelligent, those with ASD can have difficulty intuiting social norms. In other words, despite "knowing the difference between right and wrong" in the sense that one ought to do the one and not the other, knowing *what* is right and *what* is wrong, in terms of implicit social norms and taboos, is the kind of social intuition that those with ASD lack. It is not a function of inherent intelligence, but rather a function of social comprehension, which is precisely what those with ASD lack.

Dr. Sotos also makes the point that, unaware of important social norms to begin with, in the internet milieu there is nothing to "thwart or rebuff" the pursuit of "sexual impulse/curiosity, not recognized as wrong" by those like Michael. We attach Dr. Sotos' letter as **Exhibit A** .

More thorough reports obtained since the detention hearing by defense counsel go further in responding to the understandable concerns raised about Michael by the prosecutor and the Court. These are addressed in the next section.

## 2.    *The expert psychological evaluations*

The reports present strong clinical and empirical proof that there is no danger to the community upon Michael's release pending sentencing. The defense engaged Dr. Frederick Peterson, in Dayton, to do a sexual evaluation, and, Dr. AJ McConnell, with Forum Ohio, LLC, in Columbus, to do the primary autism evaluation.

Their reports will be filed under seal as separate exhibits to this motion. *See* **Exhibits B & C (sealed).**

### Dr.  McConnell

Dr. McConnell reviews Michael's developmental history in detail.  This is important because, when it comes to diagnosing developmental disabilities, it is essential to review the life history for the typical symptoms which begin in infancy. In Michael's case, the symptoms of autism were all over the place and persistent throughout his childhood, the most

salient of which was his aversion to maintaining normal eye contact. Ex. B at 10. Eye contact, the seeking of the feelings and intentions of others, is the essential component of social competence, social acceptance, and social survival. It tells us the meaning of social interactions. "This capacity—social visual engagement—shapes typical infant development from birth and is pathognomonically [*i.e.* characteristically] impaired in children affected by autism." Constantino, *et al.* "Infant viewing of social scenes is under genetic control and is atypical in autism," *Nature* (2017).

Dr. McConnell traces the other problems in Michael's life, all typical of those with autism: communication and socialization problems, being engrossed in areas of special interest, learning difficulties, anxiety, picking at his skin, depression, speech problems, repetitive body motions, difficulty understanding directions, sensory sensitivities that can be debilitating, socially inappropriate response to situations, social isolation, bullying, and victimization. Early mis-diagnoses resulted in a delayed recognition of Michael's autism until he was 15. This slew of missed diagnoses is also very typical for those with autism.

Most important, Dr. McConnell reports that Michael's "sexual interests are normal for adult males," a fact which Dr. McConnell notes is confirmed in Dr. Peterson's evaluation and testing. Michael is sexually naive, consistent with individuals in the borderline range of intellectual functioning, and, consistent with his autism, had difficulty recognizing or explaining sexual boundaries. Ex. B at 50.

Dr. McConnell reports that Michael

> did not purposefully plan to engage in deviant behavior and that there was a combination of social naivete and lack of sexual knowledge that was associated with his behavior. Michael reported that he did not know he could possibly get in trouble if two underage individuals engage in sexual behavior. Michael's rigid and concrete thinking style, which is common in individuals with an Autism Spectrum Disorder, indicates that he will need explicit instruction on sexual boundaries and appropriate sexual behavior.

*Id.* at 53. Importantly, Michael is amenable to instruction – he wants to know the "rules":

> He was generally found to be disclosing on testing which should carry over into treatment. He says he has committed a sex

11

offense and now acknowledges engaging in inappropriate
behavior. He reported he feels guilty about his behavior. He
says he needs help because he is not able to control his sexual
behaviors. His history of interpersonal difficulties, rigid
thinking, and being bullied and victimized by others should also
receive special attention throughout treatment.

Dr. McConnell connects his offense behavior to Michael's autism, and begins to fram
the answer to the Magistrate Judge's "cuts both ways" question:

Michael has substantial deficits in his social communication. He
has struggled with communication and understanding the social
nuances of everyday life, ranging from his interactions with
others at school, work, and in the community. Simultaneously,
he has struggled in developing, maintaining, and understanding
interpersonal relationships, both in person and online. . . . It is
likely that Michael continued to have difficulty understanding
the context and consequences of engaging in highly sexualized
online communication that is associated with his current legal
charges.

Similar to other individuals with and without an Autism
Spectrum Disorder, Michael is interested in computers and
video games. However, unlike those without a
neurodevelopmental disability, individuals with an Autism
Spectrum Disorder are still vulnerable when using technology,
including social media, as they still lack social understanding.
Given his lack of social- and sexual knowledge in some critical
areas, Michael was vulnerable to engaging in illegal activity by
accessing child pornography without fully understanding how
this was wrong or appreciating the abuse and harm to the
children depicted or with whom he communicated.
Unfortunately, this is becoming a severe problem for this
population due to their lack of social understanding, the ease of
access to material on the intent, and an internet environment in
which others are seeking sexual experiences but in which many
young men with ASD try to participate but they simply lack the
social judgment to understand the bounds of appropriateness as
they become chronologically older than persons they feel are
their peers. Michael now understands that his actions are wrong.
Appropriate treatment can assist him in obtaining further
education on appropriate sexual behavior and boundaries.

12

*Id.*

Sexual behavior therapy appropriate to ASD is highly successful. Dr. McConnell points to the signal difference between the therapy needed by those like Michael, with a social learning problem, and those who indeed are pedophiles or predators. In the latter category, great effort is needed to address patterns of arousal or antisocial tendencies and cognitive distortions. Those may be difficult to change. By contrast, appropriate therapy for those with ASD involves providing the express sexual and social education that is acutely lacking in that population.

In the many cases Mr. Mahoney has tracked similar to Michael's, where there was a correct diagnosis and appropriate therapy, there is a 0% recidivism rate. Dr. McConnell explains the importance of understanding Michael's ASD in order to assess his culpability and risk of re-offending. Arrangements have been made for Michael to do appropriate therapy with Dr. Peterson and/or Dr. McConnell consistent with the current pandemic restrictions, should he be released.

A key part of Dr. McConnell's report goes beyond the traits and difficulties of ASD in general, and directly to the severity of the deficits that Michael has that are directly connected to his conduct in this case. This is very important, and too often overlooked in cases of this nature, because it is not the mere diagnosis of ASD that convinces us that someone like Michael was truly not aware of seriousness of his behavior. What is most important is the *severity* of his social learning difficulties. In this realm, Dr. McConnell administered the Vineland Adaptive Behavior Scales (VABS-3). This is a widely used and standardized method of assessing the strengths and deficits of persons with intellectual and developmental disabilities in the three domains of communication and language, daily living skills, and social skills. Extensive research establishes that Vineland scores are a reliable indicator and predictor of social competence.[6]

Michael's "composite" score for his overall social skills is a 48. The normative mean for the Vineland is 100, just like for IQ tests. So, Michael's overall social functioning, or social competence, compares to an average person like the intelligence of a person with a 48

---

[6] Discussed above at p. 9.

13

IQ compares to a person of average intelligence with an IQ of 100. This comparison alone reflects serious impairments. However, the results most related to social competence appear in the domain sub-scales, particularly "receptive communication," and "interpersonal relationships." Here, Michael's **scores have the "age equivalent" of a small child of about 3 years old.** This does not mean he acts like a child, though he is extremely immature for his age. Rather, it means that he has mastered the interpersonal social skills only to the level of a typically developed three or four year old child. Put simply, despite seeming otherwise fairly "normal," Michael understands and learns from social situations no better than a small child. While this result is shocking, in samples of persons with ASD who are not involved with offending behavior, these scores are typically no better than ¼ of their chronological age to begin with.

This metric shows what is true of so many with ASD who get caught up in these online offenses: the source of their behavior is not deviance, antisocial personality, or mental illness, but rather extreme naivete even to severely enforced social taboos.  So, the "risk" to others posed by Michael and defendants like him is not comparable to those who are typically developed individuals.

### Dr.  Peterson

Dr. Peterson, using the widely accepted Abel Assessment for Sexual Interest (AASI-2), demonstrates that **Michael does not have deviant sexual interests**.

> The results of the AASI-2 confirm that Mr. Sutherin's self-reported sexual interests are primarily toward adult and adolescent females. He also demonstrated some interest towards adult men. Objective measures of Mr. Sutherin's sexual interest pattern demonstrate an absence of sexual interest in any prepubescent females. This sexual interest pattern reflects a pattern of sexual interest typical for adult males. There are no indications or evidence that Mr. Sutherin has sexual interests in prepubescent children.

> Statistically, sociologically and biologically; it is normal for adult men to have sexual interest in teenagers, but it is illegal for men to pursue their interest to the point of attempting to have physical contact. Because of both the age of this young man and his history of autism spectrum disorder, it is especially within

14

> normal limits (if not expected), that Mr. Sutherin would demonstrate sexual interests in adolescent females.

It is typical for those with ASD to engage in the behavior charged here without understanding the significance of their behavior and without the deviant mental state that we would presume on the part of a typically developed offender.

Dr. Peterson echoes what Dr. McConnell has asserted, about the vulnerability of those with autism to engage in inappropriate sexual behavior because of the failure to intuit social norms:

> People with ASC[7] frequently have behaviors associated with inappropriate sexual behavior which are related to reduced social and coping skills, learning problems, obsessive thinking, following others, and more limited impulse control (Stokes, Newton & Kaur, 2007; Attwood 2013; O'Sullivan and Thompson, 2014). All these behaviors listed are very common among people with ASC and, therefore, people with ASC are at an increased risk of engaging in inappropriate sexual behavior for reasons other than pedophilia. Individuals with ASC sometimes engage in sexually inappropriate behavior for reasons different from typical sex offender motivations and are therefore more likely to be misdiagnosed and prosecuted for a sex crime when they may not have intent to offend and simply do not understand social and sexual norms (Griffiths, 2007).

Dr. Peterson also made a number of important additional observations. Neither Dr. Peterson nor Dr. McConnell felt it appropriate to examine Michael with respect to uncharged conduct. However, aware of the report of statements by Michael to investigators about contact with his niece, Dr. Peterson addressed the issue of what is called "age discordant sex play" - a term familiar to sex therapists. This is when fairly typical sexual experimentation ( "you show me mine now showed me yours" or "you touch mine and I'll touch yours"), which occurs most commonly between the ages of six and 12, may occur at a later age for those with intellectual and developmental disabilities, who are typically five years behind their peers in terms of sexual interest. Because those with ASD are really not capable of

---

[7] Dr. McConnell notes in his report that he refers to ASD as "ASC," "Autism Spectrum Condition" as a more neutral, less stigmatic, label for the condition.

interacting with their chronological age peers, they are more comfortable with younger children who are not critical of their lack of social skills, and often perceive them as more childlike, like themselves.

Dr. Peterson writes:

> There is nothing inherent in having ASC that makes a person predisposed to having sexual interests in children or make a person more inclined to sexual deviance of any kind. However, because ASC is a neurodevelopmental disorder of the brain that causes developmental delays, including social maturation, teens and young adults with ASC are typically delayed five years in their development and can often engage in behavior seen as inappropriate by others (including touching others) (Ashley, 2007). Because of the inherent deficit in social skills, often these behaviors are engaged with younger children who are seen as peers by the individual with ASC (Ashley, 2007) and parents of teens with ASC are encouraged to repeatedly educate their child about inappropriate touch in order to avoid "becoming either a unwitting sexual offender or vulnerable to sexual victimization" (Mesibov, Shea & Adams, 2001).

> General research findings on adolescent sexuality also applies to Mr. Sutherin. It is widely accepted across the fields of medicine and psychology that sexual experimentation during childhood and adolescence is quite normal (and even considered necessary) in terms of typical sexual development into a healthy adult (Levay, Baldwin & Baldwin, 2015). As an example, the Mayo Clinic identifies healthy sexual exploration as part of normal development in their special section on "Teen Sexuality" within the Mayo Clinic Family Health Book (Litin, 2009).

> However, the increased access to explicit images on the internet has unfortunately lead to the unusual circumstances of pornography becoming a misleading (yet common) form of sex education for youth (Cooper, 2002; Peterson, Bley & Frabotta, 2019) and can lead to further risk of learning maladaptive sexual behaviors that become problematic (Bancroft 2006).

> . . . . In addition, adolescent boys are more likely to engage in sexually "experimental" behavior that is not considered motivated by predatory or pedophilic interests (Dubin, Henault, & Attwood, 2014; Wurtele & Kenny, 2011).

16

This is a poignant reminder that autism is a pervasive developmental disorder and cannot be overlooked in evaluating every aspect of the behavior of those affected by it.

As to the uncharged behavior arising from Michael's admissions to investigators, we also note that Pretrial Services Office was aware of this information and nevertheless recommended to the Magistrate Judge that Michael be granted release on his own recognizance, with conditions. See Pretrial Services Report, **Exhibit D** (also filed under seal).  Moreover, Michael's sister and parents wholeheartedly support his release, as made evident by the attached affirmation of his sister, Elizabeth. **Exhibit E**.  Michael's sister moved out of the family home to enable Michael's release at that time.

### 3. *ASD generally is a "social learning disability"*

ASD is not a personality disorder. It is a neurological disorder which radically affects how those with this condition experience the world and learn from the world. Those previously diagnosed with Asperger's, or "high functioning" ASD, are distinguished from those most severely affected with ASD by having average or even above average intelligence and good language skills. Because of this the individual, though often odd in many ways, and despite possibly having very severe deficits in many ways, may appear to be "normal" from many perspectives. They might attend school, and even college, and may have a romantic relationship with a person and children and manage certain employment situations. Most are still not capable of living independently.

Indeed, in a recent NPR report on the challenge of informing the developmentally disabled about how to protect themselves and others in the time of this pandemic, this same point was made by pediatric neurologist David Black:

> From people who are college professors to people that have not and will not develop the capacity to live independently. The commonality among all of that is some difficulty making sense of an aspect of the social world - so their ability to think, reason, problem-solve and execute in a social situation.[8]

---

[8]

https://www.npr.org/2020/03/24/820542927/how-to-talk-about-covid-19-with-people-who-have-autism

As noted above, the fact that Michael has average intelligence hardly shows that he understood his behavior at the time he committed the offense, because this conduct is precisely the area in which his intelligence is specifically impaired. Rather, only now that he has been educated by this harrowing experience can he appreciate the social taboos at issue here. As Nobel Prize winner Daniel Kahneman observes, the social intuition he describes as "fast" thinking, so essential to social survival, is based on the perception of the intentions and feelings of others. But he offers this caveat: "The perception of intention and emotion is irresistible; *only people afflicted by autism do not experience it*."[9] This is because ASD, by inhibiting that "social visual engagement," blinds persons with the disorder to the social world.[10]

4.     *"High functioning" autism does not mean socially competent*

Someone like Michael might be referred to as "high functioning," as was done by the prosecutor in the detention hearing. This is a very relative term, which is meant to compare to those with ASD who are unable to communicate, have lower intelligence, and have serious difficulties taking care of themselves. However, 75% of those with ASD have intact intelligence and have the ability to use language and communicate and maintain, to degrees, personal hygiene and self care. Still, despite intelligence, many of these individuals do not intuitively learn from social interactions about what behavior is appropriate, about social taboos, about things like the age of consent, or social rules about age difference. Because they cannot discern the feelings or attitudes of others, they are mentally blind to the feelings of others. While they do things that appear deviant, they do not engage in this behavior with deviant or antisocial intentions. This has been referred to as "counterfeit deviance."[11] This

---

[9]  Thinking, Fast and Slow, p. 76 (Farrar, Strauss and Giroux 2011)(emphasis added).

[10]  Simon Baron-Cohen, "Mindblindness" (MIT Press 1997)

[11]  Hingsburger, D., Griffiths, D., and V. Quinsey.  "Detecting Counterfeit Deviance: Differentiating Sexual Deviance from Sexual inappropriateness."  THE HABILITATIVE MENTAL HEALTHCARE NEWSLETTER.  10 (1991) : 51-54.  Counterfeit deviance occurs when an individual engages in behavior that "topographically look[s] like a Paraphilia but lack[s] the recurrence of and the pathological use of sexual fantasies, urges, or behavior."Instead the behavior is explained

directly relates to Michael's case, because the usual inferences that would be drawn from the charged behavior do not apply automatically to one with ASD.

Also, because they are blind (though not uncaring) to the feelings of others, it does not always occur to those with ASD of any severity that a child depicted in a sexual pose or in sexual contact with an adult, etc., is there involuntarily or is a victim of abuse. Research has established that individuals with ASD simply do not read into images or scenes in the world around them the social meaning that is evident to most others.

On the internet, those with ASD sometimes encounter adolescents who, at a shockingly young age, are seeking sexual experience in the anonymity and boundlessness of that environment. Being so socially immature themselves, and, because of their condition, being more comfortable with people older or younger than themselves, they tend to see much younger persons as their peers and seek to engage in the same conduct these typically developed children are engaging in. But, critically, they are unaware of how this interaction is viewed primarily because of chronological age difference, even though they are likely to be less socially mature than these children they are talking to.

---

by "experiential, environmental, or medical factors rather than of a Paraphilia." Dorothy Griffiths, et al., *Sexual and Gender Identity Disorders*, *in* DIAGNOSTIC MANUAL-INTELLECTUAL DISABILITY: A TEXTBOOK OF DIAGNOSIS OF MENTAL DISORDERS IN PERSONS WITH INTELLECTUAL DISABILITY 424, 427 (2007).  The fourth edition of the DSM acknowledges that in certain individuals with ASD  "there may be a decrease in judgment, social skills, or impulse control that, in rare instances, leads to unusual sexual behavior" that is distinguishable from Paraphilia and considered a differential diagnosis.  However, the DSM-IV does not officially adopt any name for this differential diagnosis.

Like those with ID, individuals with ASD are more likely to be victims than victimizers, and also have difficulty understanding the social cues and emotions that are all around them. Klin, Ami *et al.*, "Defining and Quantifying the Social Phenotype in Autism." 59 Am J Psychiatry 59:6 (2002), at 899; Mesibov, Gary B., Victoria Shea, and Lynn W. Adams, "Understanding Asperger Syndrome and High-Functioning Autism." The Autism Spectrum Disorders Library 1.  Kluwer Academic / Plenum Publishers (2001) at 10.  This overlap makes the concept of counterfeit deviance equally applicable to both ID and AS because the person's IQ has no real bearing on this adaptive deficit. Griffiths, Dorothy and J. Paul Fedoroff. "Persons With Intellectual Disabilities Who Sexually Offend." *Sex Offenders: Identification, Risk Assessment, Treatment and Legal Issues*. Ed. Fabian M. Saleh, et al. New York: Oxford University Press, 2009. 353-378. At 362; .Denise Kellaher, Sexual Behavior and Autism Spectrum Disorders: an Update and Discussion, in CURRENT PSYCHIATRY REPORTS, 2015:17:25

Those who have doubts about this generally rely on the assumption that it is merely our intelligence which teaches us what is right and wrong. Decades of research and clinical experience with ASD teach us that this is not true. In fact, the diagnostic criteria for ASD specifically state that the awareness of social norms is not tied to intelligence. Almost half of those with ASD have average intelligence or higher, but the diagnostic criteria for *all* of those with ASD (Diagnostic Criteria 299.00, DSM-5 APA 2013) includes "Persistent deficits in social communication and social interaction across multiple contexts" including "Deficits in social-emotional reciprocity" with the specific example of "abnormal social approach."

In the explanatory text for this diagnosis, DSM-5 contains comments which illuminate the point that the deficits of ASD are independent of intelligence:

> "Even those with average or high intelligence have an uneven profile of abilities. The gap between intellectual and adaptive functional skills is often large."
>
> \* \* \*
>
> "Cultural differences will exist in norms for social interaction, nonverbal communication, and relationships, but individuals with autism spectrum disorder are markedly impaired against the norms for their cultural context."
>
> \* \* \*
>
> "Many individuals with autism spectrum disorder, even without intellectual disability, have poor adult psychosocial functioning."

The mistaken belief that those with ASD who are intelligent must automatically know that certain sexual behaviors are wrong can obviously lead to tragic consequences. But in the diagnosis itself, and in the specific, clinical description of Michael in this case, there is no basis to conclude that Michael will violate any conditions of his release or pose a risk of harm to others.

## 5. *ASD mitigates any risk of violating conditions of release or future offending*

At the detention hearing, the Magistrate Judge posed a common sense question: if ASD was in any way the cause of the defendant's misconduct, and it is not curable, then how

is the defendant not in danger of repeating his misconduct or similar misconduct in the future? How does the fact of ASD not "cut both ways," *i.e.* while it may make one less morally blameworthy, does it not make him persistently at risk for the same behavior? While this is a question easily answered by those who work regularly with individuals with ASD, defense counsel had no answer for the Magistrate Judge.

The primary clinical reason why ASD does not pose a risk of re-offense this is that those with ASD who are impaired in intuiting rules for appropriate social behavior very much desire to be part of the social world and tend to rigidly adhere to the social and moral "rules" that are explained to them. While they may have difficulty understanding how such a rule applies in different situations, it is a diagnostic trait to inflexibly and even blindly follow understood rules. This is a pertinent trait in both domains of DSM-5 Diagnostic Criteria 299.00. "Diagnostic Features" for Criterion A include "insistence on playing by very fixed rules," and, for Criterion B, "insistence on adherence to rules."

Additionally, one of the most common characteristics identified for individuals who reoffend, especially in the area of sex offenses, is antisocial features. Persons with ASD are the very opposite of persons with antisocial features or antisocial personalities. Although both can be described as having problems with empathy, the actual concern over empathy is quite different. The person with ASD lacks "cognitive empathy." This means that the person with ASD does not intuit the feelings and emotions of others from their behavior or nonverbal cues as to mood, pain, etc. However, when specifically informed that another person is sad, or hurt, or not well, etc., the person with ASD will respond with "emotional empathy," even if it is not always appropriately expressed. They *do* care about how people feel once it comes to their attention. Antisocial people are the opposite. They know very well what the feelings and emotions are of others, and take advantage of that knowledge to get what they want, not caring at all about how that make the other person feel.[12] They lack emotional empathy.

Research actually shows a different brain structure for those with ASD compared to those with antisocial features. Jessica Wright, "Cognition and behavior: Autism, antisocial

---

[12] Hare, R.D. (1999). Without conscience: The disturbing world of the psychopaths among us. New York: The Guilford Press.

brains differ," SPECTRUM, 1 May 2012;[13] Wallace, Lee, Clasen, et al., "Distinct Cortical Correlates of Autistic versus Antisocial Traits in a Longitudinal Sample of Typically Developing Youth," THE JOURNAL OF NEUROSCIENCE, April 4, 2012: 32(14):4856–4860; Hansman-Wijnands MA, Hummelen JW, "Differential diagnosis of psychopathy and autism spectrum disorders in adults. Empathic deficit as a core symptom," 48(8) TIJDSCHR PSYCHIATR. 2006: 627-36.

Although there is no data officially kept on those with ASD who are involved in the criminal justice system, Mr. Mahoney has collected information about dozens and dozens of cases. While we are still tabulating this data to the current time period, so far, Mr. Mahoney is unable to find any case where a person with ASD, who was actually diagnosed at the time of his arrest, and received appropriate therapy, was ever charged again. Of those rare cases we are aware of where a person with ASD has been arrested twice, they were either not properly diagnosed at the time of the first arrest, or were not given appropriate therapy for their condition, or both. For example they were sent to a standard sex offender treatment program, which is not appropriate or effective for this population.

This phenomenon of 0% recidivism derives from the facts that these individuals, like Michael, are not typically deviant to begin with, and are similarly likely to be "rule bound." Current research amplifies this very important point:

> Youth with ASDs were also less likely to be charged with probation violations. This may be due to several factors, including increase rule adherence in youth with ASD, the fact that youth with ASD are less likely to be prosecuted, and therefore less likely to serve probation, or because youth with ASD may be more closely supervised by adults than youth without a developmental disability.

Cheely, C.A., Carpenter, L.A., Letourneau, E.J., Nicholas, J.S., Charles, J., & King, L.B. "The Prevalence of Youth with Autism Spectrum Disorders in the Criminal Justice System," 42 J AUTISM DEV DISORD (2012): 1856–1862.

Additionally, those with ASD, like the subjects of this 2012 study, are almost always not living independently and are in need of daily supervision from responsible persons such

---

[13] https://www.spectrumnews.org/news/cognition-and-behavior-autism-antisocial-brains-differ/

as parents and siblings, if not the group home. After all the trauma and the shame of an arrest and criminal prosecution and all that follows, these caretakers become, in effect lifetime probation officers.

### 6.  *Michael's parents will supervise him closely and capably*

Following up on this last point, it is necessary to address another issue which arose at the detention hearing. At that hearing, the government presented several exhibits, including reports of unrecorded interviews of the defendant's parents and sister and the interrogation of the defendant, as well as a description of files found on the defendant's phone. *See* Tr. of Det. Hn'g, Dec. 19, 2019, at 3-5.

The first four exhibits were typical example of the explicit sexual role play that so many young adolescents are engaging in. The provocative statements by the others he is communicating with illustrate how difficult the internet is as an environment for one with ASD to appreciate what is appropriate or not.

But then the focus shifted to supposed problems with the parents as prospective "sureties." Gov. Ex. 5  consists of three messages between Michael and his Mom. Gov. Ex. 6  is an FD-302 of an unrecorded interview of Ann and Tom Sutherin, assuring the FBI agents that they were unaware of any inappropriate sexual activity on Michael's part. Gov. Ex. 7 was another FD-302 concerning another unrecorded second interview of Tom Sutherin. See affidavit of Ann Sutherin, attached as **Exhibit G.**

The government argued at the detention hearing that "the presumption has not been rebutted," as if the defendant had an initial  burden of proof rather than a very low burden of coming forward with "*some evidence* contrary to the presumed fact." *United States v. Stone*, 608 F.3d 939, 945-46 (6th Cir. 2010)(emphasis added). The principal argument here did not have to do with any inherent difficulty of assuring that Michael would not return to the same activities, but doubts about the adequacy of the parents to provide oversight. Tr. at 12, 19. It was asserted that Gov. Ex. 5, showing three texts between Michael and his mother "indicates" his mother's "*knowledge of the defendant's activities* with respect to a social media account bearing the name Submissive Tamer 69." Tr. 11 (emphasis added).  All that the text message "indicates" is that the mother  was aware of was Michael's *screen name* of

23

"submissivetamer69." There is nothing to support the truth of the unqualified representation that she was aware of his *activites*.

A similar liberty was taken in reference to Ex.7, the FD-302 of the second interview of Tom Sutherin. At the hearing, it was alleged that Tom "stated he was, in fact, aware that the defendant had molested another family member who was also living in that household who is underage, contradicting their statements from the previous day." The FD-302 by Agent Knight does not say this. All it says is "that he was aware MICHAEL had done things to [the family member] years ago but had no idea that it was still going on." The ambiguity in this statement invites inference that Mr. Sutherin knew of and was enabling the abuse of his own granddaughter, a very grave accusation. This interview with Tom Sutherin was unrecorded, enabling the agent to give his own preferred characterization of what was said. There is no other evidence that Tom Sutherin was aware of any misconduct. Nevertheless, the Court was told, using "in fact" for emphasis, that Tom Sutherin was aware of past molesting behavior.

As set forth in Mr. Sutherin's affirmation, attached as **Exhibit F**, at no point did Mr. Sutherin say that he was aware of past sexual misconduct. All of this was the basis for the government's argument that the presumption had not been rebutted (Tr. at 13-14),[14] and later that there were "no conditions" that could justify release (Tr. at 19) are not entitled to much weight.

### 7. *Michael will comply with conditions of release*

The defendant was severely disabled in his ability to understand the wrongfulness of his behavior. He is not antisocial or deviant. His ASD is a risk-reducing factor at this point. He has pleaded guilty, accepting responsibility, and acknowledging that he now understands the wrongfulness of his behavior. In the middle of this nightmare, he has so much more for him and his family to lose if he were to misbehave while released. This constitutes clear and convincing evidence supporting release.

---

[14] There is no authority we can find for the implicit proposition of the government that arguments against the weight, or even accuracy, of evidence produced by the defendant to rebut the presumption can avoid the government having to bear its burden of persuasion.

While it is necessary to question whether this is absolutely so, repeat offending in this category of offenses is quite low to begin with, contrary to the visceral assumptions of many.[15] When Michael's individual circumstances are added in, the actual risk is not cognizable. While the offenses are inflammatory, they do not objectively fuel more concern for flight or reoffending than other charges on which release is presumptive.

Here there is no actual evidence that undercuts the evidence about Michael and his circumstances that supports release. Indeed, the government has access to mountains of data about the compliance of defendants with release conditions, but rarely, if ever, makes an effort to present such as an objective basis for predicting actual risk of flight or misbehavior. Not only does the government have its internal knowledge of every case, the Probation and Pretrial Services Automated Case Tracking System ("PACTS"), contains complete data about defendants' performance on release, such as those reported in the BJS Report "Pretrial Release and Misconduct in Federal District Courts, 2008-2010." Has anyone similarly situated failed to appear for sentencing or committed a new offense?

## Exceptional reasons warrant granting presentence release

Having demonstrated that there is no cognizable risk that Michael Sutherin will flee, or fail to abide by conditions of release, we turn to the substantial and "exceptional reasons" why he should be released at the present time in anticipation of his sentencing.

## A. Personal safety concerns amid Covid-19 coronavirus pandemic

The circumstances presented by the Covid-19 coronavirus outbreak are a literally once-in-a-lifetime crisis. The United States has not faced a pandemic on this scale since 1918-1919, when the "Spanish flu" outbreak infected over one quarter of the U.S. population

---

[15] Thomas H. Cohen, Michelle C. Spidell, "How Dangerous Are They? An Analysis of Sex Offenders Under Federal Post-Conviction Supervision, Federal Probation, Vol. 80, No. 2 Sept, 2016.

and killed almost 700,000 citizens. Iin the days days we have worked on preparing this motion, the figures in the U.S. have multiplied from 45,000 U.S. citizens have being infected by Covid-19, and almost 600 deaths, to 226,374 infections and over 6,000 deaths by the week of April 3, 2020, to 402,923 confirmed cases, and 13,007 deaths by April 8, 2020.[16] We are now at approximately 650,000 confirmed cases and over 31,000 deaths as of April 17, 2020. On April 16 alone, over 4,100 U.S. citizens died–a figure greater than the number of those killed on 9/11, the 1941 attack on Pearl Harbor, or those killed at the bloodiest battle in U.S. history, Antietam Creek, in 1862.

Ohio now has roughly 8,400 confirmed cases and just under 400 deaths.[17] Recently, there were no outbreaks in Ohio prisons and Jails except FCI Elkton. Now 9 state prisons have 150 cases, including some at FMC in Columbus. One death has been reported at Pickaway CI with the governor authorizing the Ohio National Guard medics and personnel to assist the prison's "beleaguered medical staff."[18] The Franklin Co Jail reported two cases on April 11. Cuyahoga County jail has 9 confirmed and more suspected. Butler County Jail and Lucas County Jail report cases. Delaware County, where Michael is detained, has 96 confirmed cases as of April 13, 2020. *Id.*

The infectiousness of the virus by asymptomatic persons is one of its most serious aspects. Those infected may not show symptoms until after 2-14 days, by which time they have already infected many others. Many people never develop symptoms, but may still transmit the virus. The virus can survive on surfaces for a little as a few hours to as many as a few days, and can be spread through sneezing and coughing. It has recently been suggested that it may also spread through aerosols in breath. Officials with the CDC and other

---

[16] "Mapping the spread of the coronavirus in the U.S. and Worldwide." The Washington Post: https://www.washingtonpost.com/graphics/2020/world/mapping-spread-new-coronavirus/?itid=sf_coronavirus . Note, this page is updated daily as new figures about the virus are gathered. These figures reflect the status of the virus as of the time of this motion.

[17]

[18]

https://www.dispatch.com/news/20200413/coronavirus-in-ohio-dewine-announces-nursing-home-transparency

epidemiological experts have estimate that, in a worst-case scenario, which remains a plausible outcome despite measures, as many as 120-260 million U.S. citizens will be infected,[19] and of that number, anywhere between 1.1-2.2. million will perish.[20] There is at present no cure, and no vaccine. Medical treatments for the disease are at this stage merely experimental.

### 1.    *Jails are susceptible to outbreaks, and have inadequate means to respond to them.*

Reports of outbreaks in closely confined spaces has led to widespread concern, justifying the closure of movie theatres, restaurants, bars, cafes, and most other public spaces in the states of Ohio, New York, California, Washington, Illinois, Michigan, and Florida.[21]

Jails pose a particular threat. A recent report in the *Washington Post* observed that

> As people serving sentences or awaiting trial for minor crimes
> are released from jails, many doctors and advocates still worry
> about what a coronavirus outbreak is going to look like behind
> bars. Thousands of people with more serious convictions and
> charges will remain in jails and prisons, and there is little
> doctors can do to prevent the spread inside crowded correctional

---

[19]  Nicholas Kristof and Stuart A. Thompson. "How Much Worse The Coronavirus Could Get, in Charts" *The New York Times* (Mar. 13, 2020): https://www.nytimes.com/interactive/2020/03/13/opinion/coronavirus-trump-response.html?action=click&module=RelatedLinks&pgtype=Article

[20]  Nicholas Kristof. "The Best-Case Outcome for the Coronavirus, and the Worst: Will we endure 2.2 million deaths? Or will we manage to turn things around?" *The New York Times* (Mar. 20, 2020): https://www.nytimes.com/2020/03/20/opinion/sunday/coronavirus-outcomes.html. More recent estimates peg the projected death toll at 80,000-200,000 nationwide within the next year; *see* https://www.voanews.com/science-health/coronavirus-outbreak/82000-covid-19-deaths-projected-us-early-august

[21]  On March 22, 2020, Ohio Director of Health Amy Acton issued an order requiring all Ohioans in non-essential jobs to stay at home for the duration of the emergency. This will also reduce the risk of flight, re-offending, or failure to appear, as Michael will be at home under close supervision of his parents, and with whatever other monitoring conditions the Court may impose.

27

facilities.[22]

Conditions of pretrial confinement create the ideal environment for the transmission of contagious disease.[23] Inmates cycle in and out of detention facilities without screening from all over the country and the world, as do people who work in the facilities. Incarcerated people have poorer health than the general population, and even at the best of times, medical care is limited. Many people who are incarcerated also have chronic conditions like asthma, diabetes, or HIV, which makes them vulnerable to severe forms of COVID-19.

According to public health experts, incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings."[24] Outbreaks of the flu regularly occur in jails, and during the H1N1 epidemic in 2009, many jails and prisons dealt with high numbers of cases.[25] In China, officials have confirmed the Coronavirus spreading at a rapid pace in Chinese prisons, counting 500 cases.[26] Secretary of State Mike Pompeo has called for Iran to release Americans detained there because of the "deeply troubling" "[r]eports that Covid-19 has spread to Iranian prisons," noting that "[t]heir

---

[22] "'Trapped on Rikers': Jails and prisons face coronavirus catastrophe as officials slowly authorize releases" in *The Washington Post,* Mar. 23, 2020; available online at: https://www.washingtonpost.com/nation/2020/03/23/coronavirus-rikers-island-releases/

[23] Joseph A. Bick, *Infection Control in Jails and Prisons, Clinical Infectious Diseases*, Volume 45, Issue 8 (October 15, 2007), pp. 1047-1055, https://doi.org/10.1086/521910

[24] Greg S. Gonsalves et al., *Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States*, (March 2, 2020), https://law.yale.edu/sites/default/files/area/center/ghjp/documents/final_covid19_letter_from_pu blic_health_and_legal_experts.pdf

[25] Nicole Wetsman, *Prisons and Jails are Vulnerable to COVID-19 Outbreaks*, The Verge (March 7, 2020), https://www.theverge.com/2020/3/7/21167807/coronavirus-prison-jail-healthoutbreak-covid-19-flu-soap

[26] Rhea Mahbubani, *Chinese Jails Have Become Hotbeds of Coronavirus As More Than 500 Cases Have Erupted, Prompting the Ouster of Several Officials*, Business Insider (Feb. 21, 2020), https://www.businessinsider.com/500-coronavirus-cases-reported-in-jails-in-china-2020-2

28

detention amid increasingly deteriorating conditions defies basic human decency."[27] These same considerations pushed by the government abroad must be applied here at home as well. Courts across Iran have granted 54,000 inmates furlough as part of the measures to contain the Coronavirus across the country.[28]

Michael is being housed in a local jail in Delaware County. However, reports suggest that even the federal Bureau of Prisons ("BOP") has been unable to follow the most important health and safety recommendations of the White House.[29] On March 18, 2020, The New York Times reported that at the crowded federal prison complex in Tallahassee, Florida, there are insufficient masks, soap, or hand sanitizer and the sole doctor is out sick.[30] "On Monday, a new inmate arrived and was immediately put into quarantine. And on Tuesday, a bus with almost a dozen inmates from a U.S. Immigration and Customs Enforcement detention center showed up." According to the article, they all had elevated temperatures and were scheduled for quarantine. The BOP recognizes that the densely-packed nature of prisons "creates a risk of infection and transmission for inmates and staff." However, as to

---

[27] Jennifer Hansler and Kylie Atwood, Pompeo Calls for Humanitarian Release of Wrongfully Detained Americans in Iran Amid Coronavirus Outbreak, CNN (Mar. 10, 2020),

https://www.cnn.com/2020/03/10/politics/mike-pompeo-iran-release-detained-americanscoronavirus/index.html

[28] 5 Claudia Lauer and Colleen Long, US Prisons, Jails On Alert for Spread of Coronavirus, The Associated Press (March 7, 2020), https://apnews.com/af98b0a38aaabedbcb059092db356697

[29] Recently, in response to pleas that the DOJ authorize home confinement for more inmates, Attorney General Barr has announced that BOP facilities will continue to take in prisoners so long as they do not display symptoms at the time of intake. This has prompted a response from federal public defenders around the country, who have pointed out that most transmission of Covid-19 occurs asymptomatically or pre-symptomatically, meaning that this response is meaningless. *See* Walter Pavlo, "Federal Defenders Request Attorney General Barr to Act On Inmate Release Re COVID-19," *Forbes,* (Apr. 2, 2020); available online at https://www.forbes.com/sites/walterpavlo/2020/04/02/federal-defenders-request-attorney-general -barr-to-act-on-inmate-release-re-covid-19/#e4797ab53277

[30] Danielle Ivory, 'We Are Not a Hospital': A Prison Braces for the Coronavirus, *The New York Times* (March 18, 2020), https://www.nytimes.com/2020/03/17/us/coronavirus-prisonsjails.html

measures that can be taken, "[m]uch of the advice given by the CDC — such as staying six feet away from others and routinely disinfecting surfaces —  can be nearly impossible to follow behind bars."  Also, prisoners are in regular contact with staff who do not have sufficient protective gear themselves. The prisons and local jails that house those on pretrial detention do not have the Intensive Care facilities that can handle an outbreak. Plus, none of them have ventilators.  The *New York Times* report observed that if inmates succumb to the virus and become critically ill, they will have to be sent to hospitals where hospital officials will have to decide who among the needy, not just prison inmates, will receive treatment.

In fact, charts and graphs recently compiled and updated by the Federal Public Defender for the Southern District of New York[31] show an alarming increase in the rate of infection in BOP facilities.

---

[31]  Available online at https://federaldefendersny.org/. As noted on the website, these figures are taken directly from the BOP itself (via www.bop.gov/coronavirus). Given the exponential rate at which infections and deaths increase each day, the charts are regularly updated.







Percentage of Increase of Infected BOP People (Inmates and Staff)

Since 3/20/2020[2]

| Date | Number of BOP Cases[3] | BOP Percentage Increase Since 3/20/2020 | National Percentage Increase Since 3/20/2020 | Number of National Cases |
|---|---|---|---|---|
| 3/20/2020 | 2 | 0% | 0% | 18,747 |
| 3/21/2020 | 3 | 50% | 31% | 24,583 |
| 3/23/2020 | 6 | 200% | 135% | 44,183 |
| 3/24/2020 | 9 | 350% | 190% | 54,453 |
| 3/26/2020 | 18 | 800% | 355% | 85,356 |
| 3/27/2020 | 27 | 1250% | 451% | 103,321 |
| 3/29/2020 | 38 | 1800% | 651% | 140,904 |
| 3/30/2020 | 52 | 2500% | 772% | 163,539 |
| 3/31/2020 | 59 | 2850% | 892% | 186,101 |
| 4/1/2020 | 94 | 4600% | 1036% | 213,144 |
| 4/2/2020 | 114 | 5600% | 1176% | 239,279 |
| 4/3/2020 | 141 | 6950% | 1379% | 277,205 |
| 4/4/2020 | 174 | 8600% | 1526% | 304,826 |
| 4/5/2020 | 197 | 9750% | 1665% | 330,891 |
| 4/6/2020 | 259 | 12850% | 1897% | 374,329 |
| 4/7/2020 | 313 | 15550% | 1963% | 386,800 |
| 4/8/2020 | 377 | 18750% | 2140% | 419,975 |
| 4/9/2020 | 408 | 20300% | 2349% | 459,165 |
| 4/10/2020 | 481 | 23950% | 2527% | 492,416 |
| 4/11/2020 | 520 | 25900% | 2704% | 525,704 |
| 4/12/2020 | 541 | 26950% | 2860% | 554,849 |
| 4/13/2020 | 589 | 29350% | 2989% | 579,005 |
| 4/14/2020 | 694 | 34600% | 3129% | 605,390 |
| 4/15/2020 | 731 | 36450% | 3274% | 632,548 |
| 4/16/2020 | 752 | 37500% | 3388% | 653,825 |

33

Many leading experts suggest that the situation will become much worse as time goes on, and the virus spreads and our health care facilities will be seriously strained, if not entirely overwhelmed.[32]

It might be supposed that, if sickened, Michael could go to a hospital in Columbus or Cleveland. However, Ohio Department of Health Director Amy Acton has estimated that as many as 100,000 Ohioans have already been exposed to the coronavirus.[33] There is still potential for the virus to similarly explode in Ohio, as it has already exploded across the rest of the United States. If that happens, the chances of Michael having access to proper healthcare while in custody are dramatically lessened.

## B.     Michael may be particularly vulnerable

Michael does not have any pre-existing *physical* health conditions, though he has not had any health examinations in the past several months and was previously considered "pre-diabetic."  However, his ASD puts him in a peculiar risk situation. Michael does not need to contract or die from the virus in order to suffer from it. The stress and upheaval of an outbreak would be unusually severe for him should the Delaware County Jail experience one.

### 1.     *The young are getting sick (and dying), too*

As noted at the outset, being young does not protect Michael from infection or death from COVID-19. Initial reports from China assured some that the great majority of those sickened and killed by the virus were elderly. However, numerous reports are now surfacing nationwide that while at a *lower* risk of death (which is not to say non-existent), people below the age of 40 are still contracting the coronavirus at a great rate, and many still require

---

[32]  See Sheri Flink, Worst-Case Estimates for U.S. Coronavirus Deaths, The New York Times (March 13, 2020),
https://www.nytimes.com/2020/03/13/us/coronavirus-deathsestimate.html

[33]  Peter Sullivan. "Ohio Health official estimates 100,000 people in the state have coronavirus." *The Hill* (Mar. 12, 2020).
https://thehill.com/policy/healthcare/487329-ohio-health-official-estimates-100000-people-in-state-have-coronavirus

serious medical intervention. Reports of the disease are heartbreaking. Most infections are relatively mild, causing uncomfortable flu-like symptoms. But for as many as 1 in 5 cases, the disease causes serious pneumonia, many of which require medical intervention. Some cases become serious. Reports from Italy, where the disease is rampant, tell of even young people struggling to breathe on respirators. As discussed below, while initial reports have spread that the elderly are most affected, many young persons under the age of 40 have died, and as many as 40% of new cases in the United States within the last two weeks are in people aged 18-44.[34] Many have no underlying health conditions. This means that while relatively few people Michael's age are dying, many are still put in life-threatening danger. And some, indeed, are dying anyway.

### 2.    Increased risk of victimization as jail conditions deteriorate

As indicated in Dr.  McConnell's report (p. 11), Michael's history as an adolescent was filled with instances of victimization at the hands of his peers.  Bullying and being taken advantage of are almost always part of the experience of those with ASD, both as children and as adults.  This has continued–and amplified–with Michael in jail. Michael suffers physical and psychological abuse on a daily basis at the hands of other inmates and the indifference of jail staff. This is a certain and predictable consequence of his ASD. We discuss this in some detail below.

In the context of a pandemic, it is inevitable that fellow inmates will make Michael suffer.  They will taunt him with gestures of close contact, coughing, sneezing, if only to play on his obvious fears of germs and infection, which has consumed him in debilitating OCD rituals for most of his life.  Eventually they will see to it that he is among the infected.

## C.    An outbreak in the jail would exacerbate Michael's suffering, even if he did not catch the virus or become seriously ill from it

Incarceration is not designed to be comfortable, and is "no respecter of persons" when it comes to individual preferences, stressors, and tolerances. But ASD is a real and

---

[34]  See fn 1, supra.

meaningful disorder, one which rises to the level of a legal disability, and one which causes real impairments beyond mere preference or taste. Michael is not just "annoyed" or merely "inconvenienced" by loud noises or changes in routine; his disorder means that those things are actually extremely torturous to him, on par with physical pain.

In light of this, the disruptions attendant with an outbreak of Covid-19 at the Delaware County Jail, even if Michael did not personally contract it, would be traumatic for him. If, for example, he were forced into solitary isolation after exposure, even for just two weeks at a time, the effect on him would be far greater than for an ordinary inmate. Disruptions to regular feeding, exercise, and bathing routines would be difficult at best. Michael is extremely immature as a result of his disorder, as noted above at p. ?, and as such is like a young child facing this crisis alone, in a prison, without help from friends or family. The sheer terror that a child that age would face in those circumstances is what now faces Michael.

### The prison experience of those with ASD generally

Michael's parents spent many years trying to help their disabled son navigate the social world and trying to protect him from people and institutions that do not understand his disability. While federal and state statutes require state agencies to accommodate those with disabilities, jails and prisons fall particularly short when it comes to accommodating those who are developmentally disabled. Michael will be no exception.

The same lack of understanding in social situations and difficulty perceiving the feelings and intentions of others, which is a major cause of the offense conduct in this case, poses even greater problems when attempting to figure out the norms and expectations of inmates and guards. For young men with disabilities, bullying and victimization is to be expected in general society; in prison, it is inevitable. Though statistics vary, reported instances of bullying among ASD individuals in the general population ranges from 29% to 94%. Lawrence A. Dubin *et al.*, Caught in the Web of the Criminal Justice System: Autism, Other Developmental Disabilities, and Non-contact Sex Offenses, 49 (Jessica Kingsley, 2017). *Id*. Environmental stimuli which can be unbearable in routine life (sounds, light, smells, and textures) can be excruciatingly amplified in the prison environment. For those with anxiety and depression, which frequently accompany the diagnosis of ASD,

confinement is the opposite of a therapeutic setting, and will invariably worsen their already highly vulnerable mental and emotional states.

Additionally, traits typical of those with ASD can be problematic and even life-threatening in confinement. For example, rigid reliance on formalistic rules, which often provide guidance for these men in otherwise uncomfortable situations, compel ASD inmates to "snitch" on fellow inmates for rule violations. *See Generally*, Simon Baron Cohen, "Mindblindness: an Essay on Autism and Theory of Mind" (1995). These disclosures precipitate a greater degree of "bullying, exploitation, social isolation, and altercations with other inmates." Clare S. Allely, *Autism Spectrum Disorders in the Criminal Justice System: Police Interviewing, the Courtroom, and the Prison Environment*, SMGROUP, Oct. 2015, at 7.

A recent article in The Journal of the American Academy of Psychiatry and the Law highlights the failure of the correctional system to address the needs of this population, and the improper use of solitary confinement as an answer. Isabella Michna & Robert Trestman, Correctional Management and Treatment of Autism Spectrum Disorder, J. Am. Acad. Psychiatry L., 253, 258 (2016).

> An individual with ASD often interacts with correctional staff and other inmates differently than do neurotypical individuals. For instance, persons with ASD are highly suggestible and quick to rationalize their behavior. Their presentation may lack the expected sense of guilt or remorse one would typically expect. Persons with ASD struggle at reading another's face and easily become confused by others. Their tendency to avoid eye contact may be perceived as disinterest or guilt. They may overcompensate with a fixed stare that may be perceived as aggressive. During an interview, persons with ASD may interpret what is being said to them literally and not understand hidden meanings, metaphor, or sarcasm. These behaviors, if not recognized as such by staff or other inmates, put individuals with ASD at risk for serious consequences.

*Id*. The authors warn: "For individuals with ASD who become incarcerated, the failure to provide necessary supports is potentially devastating." *Id*.

Michael's numerous, debilitating issues–bullying, victimization, inability to

37

communicate, and sensory processing issues–will become more serious if he is held during an acute crisis inside an unforgiving and insensitive prison setting.

### Michael's experiences in pretrial detention

Since being held at the Delaware County Jail since early May, 2019, Michael has been and is regularly threatened and assaulted by other inmates. Though terrible for Michael, this should come as no surprise. Michael lives in constant fear of the other inmates. Coupled with his aversion to external stimuli that – as a result of his disorder – manifests in serious anxiety and depression, he is struggling to survive. Michael's ASD identifies him as vulnerable to others, and there is nothing he can do to mask his condition while in the holding center. As such, he has become the easiest of targets. Bullying is commonplace in jail, and for Michael, it is inescapable. Inmates have thrown garbage into his cell, forced him to use corrosive chemical cleaners with his bare hands, and continue to extort him for money that his parents provide. Items that Michael purchases from the commissary, like clothing and toothpaste, are repeatedly stolen from him. Furthermore, he is forced to tolerate inmates who deliberately burp and pass gas on him. However, this bullying, while unacceptable on its own, has escalated to something more sinister.

Michael has been made to endure penises, and the term "Mega Dick," forcibly drawn on his body by other inmates, been sprayed in the face with chemical solvents, received sexually-charged and graphic drawings of his own penis from other inmates, has been propositioned by other inmates, and is suffering from repeated and violent physical attacks by other inmates on a near daily basis. During one incident, Michael's head was slammed into a wall, and he suffered a deep laceration. He's reportedly been kicked, slapped, punched, and has been beaten on his crotch and anus. On several occasions, another inmate has unsuccessfully attempted to sodomize Michael with a broom handle.

Fearing retribution, Michael does not report these assaults, but reports them to his parents.. He has said that various gangs inside the facility have spoken of hurting him because of his charges. When visiting Michael each week, his parents have noticed new bruises and wounds where Michael has been beaten by other prisoners. He has refused medical treatment, and the correctional officers cannot, or will not, do anything to prevent

these assaults from happening. Most disturbingly, there are inmates who have been informed about his charges, and a number of them have encouraged Michael to take a "swan dive," a thinly veiled expression meant to persuade Michael into committing suicide.

The agony that Michael has had to live through for the past several months has been enough for him to periodically be shuffled around the facility and placed in administrative segregation, where, purportedly for his own protection, he is locked in a cell for twenty-three hours each day, with minimal human contact. Administrative segregation is typically a form of punishment for violent or disruptive behavior. Even for a person without an impairment like autism, this treatment is akin to torture. Severe isolation that solitary confinement entails causes anxiety, depression, mental illness, and panic. Aside from the inevitably brutal treatment by the other inmates, Michael's autism makes him especially sensitive to external stimuli, and as such, despite the constant abuse, his confinement has taken an exceptional toll on him.

### Ordinary Jail Conditions and Stimuli

Arguably, the negative experiences of the jail environment are reported by all prisoners. However, these experiences have a potentially greater detrimental impact on individuals with autism compared to individuals without this diagnosis. Hypersensitivity issues can accompany Autism Spectrum Disorder. For example, many people who are on the autism spectrum are hyper-sensitive to bright lights or certain light wavelengths (e.g. from fluorescent lights). Many find certain sounds, smells, and tastes overwhelming. Certain types of touch (light or deep) can feel extremely uncomfortable. The sensitivities that many individuals with autism experience may be compounded in the prison environment. Generally speaking, people with autism are more sensitive to tactile sensory stimulus than people who are not autistic. Michael is no exception.

The way Michael experiences sounds and smells is not the same as how a person without autism experiences them. The noises in jail, like the screaming, the banging doors, the noxious odors from the cell toilets, and the ultra-bright lighting may seem like simple annoyances to a regular person, but to Michael, they are completely overwhelming. Prisoners shout to each other, cell doors slam open and closed, there is a constant smell of cleaning products, and there is minimal natural light. Michael's basic needs, like laundered clothing

39

and adequate plumbing, are often not met; Michael's cell is dirty and he is prevented by the guards from keeping it clean, ventilation is poor, and the toilet frequently does not work, and regularly fills with excrement when other nearby toilets are flushed, unless he flushes at the same time.. Michael's jail environment has lead to the development of a wider range of negative symptoms, including his social withdrawal and sensory abnormalities that drive his anxiety, and depression. There is no solace.

Similarly, food overlaps with many aspects of life that significantly challenge the coping skills of individuals with autism. These can include extreme sensitivity to change and sensory stimuli, as well as an intense focus on texture and strong tastes. While we all have food preferences and most of us find some semblance of comfort in food, these natural tendencies can become exaggerated for a person with autism. In other words, Michael's experience with food in jail – like his other reactions to external stimuli – are particularly intense. Notwithstanding the objective alarm Michael experienced upon discovering maggots in his food on one occasion, his senses can be provoked very quickly as a result of how his autism has shaped his eating habits.

Ultimately, Michael's autism makes him increasingly at risk to being bullied, manipulated, exploited, and sexually abused. Negotiating the hierarchy of the holding center is extraordinarily complex and difficult for Michael. It's not going to get any easier for him. Between his reactions to the jail conditions and his difficulty in interpreting social situations, Michael is at the peak of his vulnerability. He is suffering.

## The Court has the authority to grant
## release pending sentencing

Under 18 U.S.C § 3145©, there is an exception to the usual requirement that a defendant pleading guilty be remanded to custody. The statute states that a person subject to detention under § 3143(a)(2) (the Defendant's position here) may be released where (1) she meets the conditions of release in § 3143(a)(1) (i.e. "clear and convincing evidence" that she will not flee or pose a danger) and (2) "it is clearly shown that there are exceptional reasons why such person's detention would not be appropriate." *See* Federal Benchbook, §2.11 Release or detention pending sentence or appeal (6th Ed. 2013); *United States v. Peterson*, 185 F. 3d 875 (10th Cir. 1999); *United States v. Kinslow*, 105 F.3d 555 (10th Cir. 1997);

40

Exceptional reasons means "being out of the ordinary: uncommon, rare." *United States v. Wages*, 271 F. App'x 726, 727 (10th Cir. 2008). *See United States v. DiSomma*, 951 F.2d 494, 497 (2nd Cir. 1991)(stating that exceptional circumstances are "a unique combination of circumstances giving rise to situations that are out of the ordinary," and finding that a defendant's status as a student, as employed, or as a first-time offender did not constitute exceptional circumstances). "A wide range of factors may bear upon the analysis." *United States v. Garcia*, 340 F.3d 1013, 1018 (9th Cir. 2003).

Despite its exact placement in Chapter 207 of Title 18, this section is applicable to both pre-appeal and pre-sentencing release of a defendant. *See, e.g., United States v. Lippold*, 175 F.Supp.2d 537, 539 (S.D.N.Y.2001) (applying the "exceptional reasons" analysis to a pre-sentence defendant and quoting *United States v. Carr*, 947 F.2d 1239, 1240 (5th Cir.1991)(for the proposition that the language "may be applied by the judicial officer initially ordering such mandatory detention, despite its inclusion in a section generally covering appeals"); *U.S. v. Rentas*, 2009 WL 3444943.

## A. Policy makers recognize the need to reduce jail populations to protect prisoners and the public

In response to the pandemic, there has been a widespread call by community leaders, elected prosecutors, executive officials, and from within the corrections community to reduce jail populations before these institutions are overrun with critically ill inmates. While these calls have been tempered for those charged with offenses like Michael's, the fact of Michael's ASD should alleviate the ordinary concern that sex offenders would pose a risk to the public if released. The fact is, Michael committed these offenses out of ignorance, naivete, and failure to appreciate appropriate boundaries, all stemming from his ASD. By that same token, however, Michael's ASD will ensure that now he does understand the social norms, he will firmly abide by them.

District Attorneys from around the country are moving to seek the release of non-violent offenders who pose the greatest risk of succumbing to the virus, particularly

41

those with misdemeanor offenses.[35] However, even the BOP has begun reviewing the status of every inmate, including those held for felonies, to determine whether release may be appropriate.[36] Such measures are even being taken by the State Attorney's Office in Jacksonville.[37] The danger to prisoners in Florida has become even more acute as the Department of Corrections has ordered that the state prison system stop taking inmates. This means those inmates who are currently in state or county jails must remain in those jails, which will lead to further over-crowding in those facilities.[38]

---

[35]  See Jane Wester, District Attorneys Call for 'Cite and Release' for Offenses That PoseNo 'Physical Threat', New York Law Journal (March 17, 2020) https://www.law.com/newyorklawjournal/2020/03/17/district-attorneys-call-for-cite-and-release-foroffenses-that-pose-no-physical-threat/?slreturn=20200218194209.

> Four New York state district attorneys announced Monday that they support a "cite and release" approach toward offenses posing "no physical threat to the community" and the release of inmates particularly vulnerable to the novel coronavirus. Manhattan District Attorney Cyrus Vance Jr., Brooklyn's Eric Gonzalez, Albany County's David Soares and Ulster County's David Clegg joined a nationwide group including 27 prosecutors from outside New York who say they're open to major changes as the virus continues to spread in the United States.

[36]  *See* discussion, *infra,* p. ?

[37]  See Andrew Pantazi, Coronavirus: Social Distancing is Hard When You're Booked in The Jacksonville Jail, The Florida Times-Union, Jacksonville (March 18, 2020), https://www.jacksonville.com/news/20200318/coronavirus-social-distancing-is-hard-whenyours quore-booked-in-jacksonville-jail

> In Jacksonville, the State Attorney's Office said it would "continue to work with law enforcement, the courts, the Public Defender's Office and the private Bar to identify nonviolent and eligible offenders for expedited release from jail[.]"

[38]  *Id.*

42

## B.   Courts have recognized that local jails may not be able to provide adequate assurance of inmate safety

There is currently a tidal wave of federal and state judicial decisions around the country granting petitions for emergency release in response to the pandemic, citing due process and safety concerns. Steps are being taken in some jurisdictions to facilitate the release of elderly and sick prisoners and to reduce jail populations by discouraging the admission of individuals arrested on non-violent misdemeanor charges.[39] New York City has already begun releasing vulnerable prisoners.[40] Many courts have already recognized the risks posed by Covid-19, and have ordered pretrial release of defendants in custody in varying circumstances.  *See Xochihua-James v. Barr*, No. 18-71460 (9th Cir. Mar. 23, 2020) (unpublished) (*sua sponte* releasing detainee from immigration detention "in light of the rapidly escalating public health crisis").[41]

---

[39]   In New York, Brooklyn District Attorney Eric Gonzalez, joined by public health experts, has asked Governor Cuomo to grant emergency clemencies to elderly and sick prisoners. See Sarah Lustbader, Coronavirus: Sentenced to COVID-19, The Daily Appeal (Mar. 12, 2020),https://theappeal.org/sentenced-to-covid-19/.); see also Cory Shaffer, Cuyahoga County (Ohio) isHolding Mass Pleas and Bail Hearings to Reduce the Current Jail Population, Cleveland.com(March 12, 2020),https://www.cleveland.com/court-justice/2020/03/cuyahoga-county-officialswill-hold-mass-plea-hearings-to-reduce-jail-population-over-coronavirus-concerns.html; see alsoWKBN Staff, Local County Jails Making Changes Due to Coronavirus Outbreak, WKBN FirstNews 27 (March 12, 2020), https://www.wkbn.com/news/coronavirus/mahoning-county-jailrefusing-some-inmates-due-to-coronavirus-outbreak/; see also Charles Scudder, FacingCoronavirus Concerns, Collin County Sheriff Asks Police Not to Bring Petty Criminals to Jail,The Dallas Morning News (March 12, 2020) (https://www.dallasnews.com/news/publichealth/2020/03/12/facing-coronavirus-concerns-collin-county-sheriff-asks-police-not-to-bringpetty-criminals-to-jail/

[40]   See Julia Marsh and Ben Feuerherd, NYC To Begin Releasing Inmates Amid Coronavirus Outbreak, The New York Post (March 18, 2020), https://nypost.com/2020/03/18/nyc-to-begin-releasing-inmates-amid-coronavirus-outbreak/

[41]   Immigration detainees have been released in other circumstances. *See Fraihat v. Wolf*, No. 20-CV-590 (C.D. Cal. Mar. 30, 2020) (noting risk of asymptomatic spread and unsafe conditions in immigration detention mean "[t]he balance of equities tip sharply in [Fraihat's]

(continued...)

43

## 1.    Pretrial release

Pre-trial releases have also been authorized. *See United States v. Powell*, No. 1:94-cr-316-ESH, Dkt. No. 98 (D.D.C. Mar. 28, 2020) (granting unopposed motion for compassionate release in light of COVID-19 and finding it "would be futile" to require defendant to first exhaust in light of open misdemeanor case); *United States v. Mclean*, No. 19-cr-380, Dkt. No. (D.D.C. Mar. 28, 2020) ("As counsel for the Defendant candidly concedes, the facts and evidence that the Court previously weighed in concluding that Defendant posed a danger to the community have not changed - with one exception. That one exception - COVID-19 - however, not only rebuts the statutory presumption of dangerousness, see 18 U.S.C. § 3142(e), but tilts the balance in favor of release."); *United States v.Michaels*, 8:16-cr-76-JVS, Minute Order, dkt. 1061 (C.D. Cal. Mar. 26, 2020) ("Michaels has demonstrated that the Covid-19 virus and its effects in California constitute 'another compelling reason'" justifying temporary release under § 3142(I).); *United States v. Jaffee*, No. 19-cr-88 (D.D.C. Mar. 26, 2020) (releasing defendant with criminal history in gun & drug case, citing "palpable" risk of spread in jail and "real" risk of "overburdening the jail's healthcare resources"; "the Court is . . . convinced that incarcerating the defendant while the current COVID-19 crisis continues to expand poses a greater risk to community safety than posed by Defendant's release to home confinement"); *United States v. Perez*, No. 19 CR. 297 (PAE), 2020 WL 1329225, at *1 (S.D.N.Y. Mar. 19, 2020) (releasing defendant due to the "heightened risk of dangerous complications should he contract COVID-19"); *United States v. Stephens*, 2020 WL 1295155, __F. Supp. 3d__ (S.D.N.Y. Mar. 19, 2020) (releasing defendant in light of "the unprecedented and extraordinarily dangerous nature of the

---

[41] (...continued)

favor" and thus ordering release); *Thakker v. Doll*, No. 1:20-cv-480JEJ (M.D.Pa., Mar. 31, 2020) (granting TRO releasing high-risk immigration detainees from custody due to the dangers of COVID-19); *Basank v. Decker*, No. 20-cv-2518, (S.D.N.Y. Mar. 26, 2020) ("[t]he nature of detention facilities makes exposure and spread of the [coronavirus] particularly harmful" so granting TRO and releasing high-risk plaintiffs); *Coronel v. Decker*, 20-cv-2472-AJN, Dkt. No. 26 (Mar. 27, 2020) (granting TRO and releasing from immigration detention facility in light of COVID-19); *United States v. Bolston*, Case No. 1:18-cr-382-MLB, Dkt. No. 20 (N.D. Ga. Mar. 30, 2020) (releasing defendant in part because "the danger inherent in his continued incarceration at the R.A. Deyton Detention Facility . . . during the COVID-19 outbreak justif[y] his immediate release from custody").

COVID-19 pandemic"); *In re Manrigue*, 2020 WL 1307109 (N.D. Cal. Mar. 19, 2020) ("The risk that this vulnerable person will contract COVID-19 while in jail is a special circumstance that warrants bail."); *United States v. Copeland*, No. 2:05-cr-135-DCN (D.S.C. Mar. 24, 2020) (granting First Step Act relief to defendant in part due to "Congress's desire for courts to release individuals the age defendant is, with the ailments that defendant has during this current pandemic"); *United States v. Davis*, No. 1:20cr-9-ELH, Dkt. No. 21 (D. Md. Mar. 30, 2020) (releasing defendant due to the "urgent priority" of decarcerating, to protect both the defendant and the community, and to preserve Sixth Amendment rights in this perilous time); *United States v. Chavol*, No. 20-50075 (9th Cir. Apr. 2, 2020) (stipulation in a FRAP(9) appeal to release on conditions); *United States v. Tovar*, No. 1:19-cr-341-DCN, Dkt. No. 42 (D. Idaho Apr. 2, 2020) (releasing defendant previously detained in presumption case after finding COVID-19 a compelling basis for release under § 3142(i)); *United States v. Claudio-Montes*, No. 3:10-cr-212-JAG-MDM, Dkt. No. 3374 (D.P.R. Apr. 1, 2020) ("[G]iven the COVID-19 pandemic afflicting the world, rather than issue an arrest warrant at this time, the Court will instead issue a summons[.]"

## 2. *Initial Bail decisions*

In making release decisions at the present, judges are taking into account the added risks of confinement to pretrial detainees. *United States v. Perez*, ECF No. 62, Case No. 1:19-cr-297 (S.D.N.Y. Mar. 19, 2020) (releasing defendant due to the "heightened risk of dangerous complications should he contract COVID-19"); *United States v. Stephens*, 2020 WL 1295155, __F. Supp. 3d__ (S.D.N.Y. Mar. 19, 2020) (releasing defendant in light of "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic"); *In re Manrigue*, 2020 WL 1307109 (N.D. Cal. Mar. 19, 2020) ("The risk that this vulnerable person will contract COVID-19 while in jail is a special circumstance that warrants bail."); *In re Request to Commute or Suspend County Jail Sentences*, Docket No. 084230 (N.J. Mar. 22, 2020) (releasing large class of defendants serving time in county jail "in light of the Public Health Emergency" caused by COVID-19).

### 3. *Presentence release*

Incarcerated defendants who have been convicted, but have yet to be sentenced have been ordered to be released as a result of the coronavirus. *See United States v. Meekins*, Case No. 1:18-cr-222APM, Dkt. No. 75 (D.D.C. Mar. 31, 2020) (post-plea, pre-sentence release order releasing defendant with three pending assault charges due to extraordinary danger COVID-19 poses to folks in detention); *United States v. Hector*, Case No. 2:18-cr-3002, Dkt. No. 748 (W.D. Va. Mar. 27, 2020) (granting release pending sentencing after Fourth Circuit remanded detention decision requiring court to specifically consider extraordinary danger posed by COVID-19 to folks in prison); *United States v. Kennedy*, No. 5:18-cr-20315, Dkt. No. 77 (E.D. Mich. Mar. 27, 2020) (post-plea presentence release of defendant whose pretrial release was revoked because "the COVID-19 pandemic constitutes an independent compelling reason" for temporary release and "is necessary for Defendant to prepare his pre-sentence defense"); *United States v. Harris*, No. 19-cr-356 (D.D.C. Mar. 26, 2020) ("The Court is convinced that incarcerating Defendant while the current COVID-19 crisis continues to expand poses a far greater risk to community safety than the risk posed by Defendant's release to home confinement on . . . strict conditions."); *United States v. Grobman*, No. 18-cr-20989, Dkt. No. 397 (S.D. Fla. Mar. 29, 2020)(releasing defendant convicted after trial of fraud scheme in light of "extraordinary situation of a medically-compromised detainee being housed at a detention center where it is difficult, if not impossible, for [the defendant] and others to practice the social distancing measures which government, public health and medical officials all advocate.").

### 4. *Mid-sentence release, compassionate release*

Prisoners serving their sentences have also been ordered released. *See United States v. Marin*, No. 15-cr-252, Dkt. No. 1326 (E.D.N.Y. Mar. 30, 2020) ("[F]or the reasons stated in his motion, including his advanced age, significantly deteriorating health, elevated risk of dire health consequences due to the current COVID-19 outbreak, status as a non-violent offender, and service of 80% of his original sentence."); *United States v. Muniz*, Case No. 4:09-cr-199, Dkt. No. 578 (S.D. Tex. Mar. 30, 2020) (releasing defendant serving 188-month

sentence for drug conspiracy in light of vulnerability to COVID-19: "[W]hile the Court is aware of the measures taken by the Federal Bureau of Prisons, news reports of the virus's spread in detention centers within the United States and beyond our borders in China and Iran demonstrate that individuals housed within our prison systems nonetheless remain particularly vulnerable to infection."); *In re Request to Commute or Suspend County Jail Sentences*, Docket No. 084230 (N.J. Mar. 22, 2020) (releasing large class of defendants serving time in county jail "in light of the Public Health Emergency" caused by COVID-19); *see also United States v. Avenatti*, No. 8:19-cr-61 (C.D. Cal. Mar. 25, 2020) (*sua sponte* inviting defendant to move for reconsideration of a just-denied motion for release "[i]n light of the evolving nature of the Covid-19 pandemic"); *United States v. Barkman*, 2020 U.S. Dist. LEXIS 45628 (D. Nev. Mar. 17, 2020) (suspending intermittent confinement because "[t]here is a pandemic that poses a direct risk if Mr. Barkman . . . is admitted to the inmate population of the Wahoe County Detention Facility"); *United States v. Underwood*, Case No. 8:18-cr-201-TDC, Dkt. No. 179 (Mar. 31, 2020) (encouraging release to furlough of elderly defendant in BOP custody because, even though no positive of COVID-19 in his facility, "there is significant potential for it to enter the prison in the near future"); *United States v. Edwards*, No. 6:17-cr-3-NKM, Dkt. No. 134 (Apr. 2, 2020) (granting compassionate release; "[h]ad the Court known when it sentenced Defendant in 2018 that the final 18 months of his term in federal prison would expose him to a heightened and substantial risk presented by the COVID-19 pandemic on account of Defendant's compromised immune system, the Court would not have sentenced him to the latter 18 months"); *United States v. Hernandez*, No. 18-cr-20474, Dkt. No. 41 (S.D. Fla. Apr. 2, 2020) (granting unopposed motion for compassionate release for defendant with cancer & immunosuppression and just under 12 months left to serve on 39 month sentence); *United States v. Perez*, No. 1:17-cr-513-AT, Dkt. No. 98 (S.D.N.Y. Apr. 1, 2020) (granting compassionate release where "[t]he benefits of keeping [Perez] in prison for the remainder of his sentence are minimal, and the potential consequences of doing so are extraordinarily grave"); *United States v. Rodriguez*, No. 2:03-cr-271-AB, Dkt. No. 135 (E.D. Pa. Apr. 1, 2020) (granting release after finding risk factors for COVID-19 constitute extraordinary and compelling reason and noting that prisons are "tinderboxes for infectious disease"); *United States v. Williams*, No. 3:04-cr-95-MCR-CJK, Dkt. No. 91 (Apr. 1, 2020) (compassionate release in light of severe

risk posed to defendant by COVID-19); *United States v. Gonzalez*, No. 2:18-cr-232-TOR, Dkt. No. 834 (E.D. Wash. Mar. 31, 2020) (releasing defendant one month into a 10 month sentence in light of medical issues; ordinarily these conditions would be manageable but "these are not ordinary times"); *United States v. Campagna*, 2020 WL 1489829 (S.D.N.Y. Mar. 27, 2020) (compassionate release grant).

### 5.    *Extending time for surrender*

Aware of the impending crisis with the BOP, which has been slow to acknowledge the scope of the crisis,[42] judges have decided to extend voluntary surrender dates given by the BOP. *See United States v. Garlock*, 18-cr-418-VC-1 (N.D. Cal. Mar. 25, 2020) (citing "chaos" inside federal prisons in *sua sponte* extending time to self-surrender: "[b]y now it almost goes without saying that we should not be adding to the prison population during the COVID-19 pandemic if it can be avoided"); *United States v. Matthaei*, ECF No. 30, Case No. 1:19-cr-243-BLW (D. Idaho Mar. 16, 2020) (extending self-surrender date by 90 days in light of COVID-19).

In *In re: Manrique*, No. 19-mj-71055-MAG-1 (TSH), 2020 WL 1307109 (N.D. Cal., Mar. 19, 2020),  Magistrate Judge Thomas Hixon agreed to release a 74-year old man, Alejandro Toledo-Manrique,  awaiting extradition to Peru. Citing concerns with the ability of the county jail in which Mr. Toledo was being housed to combat the coronavirus, the Court found that few if any of the preventative measures taken by the jail would be effective.

> The Court appreciates San Mateo County's management plan for the jail. It looks pretty detailed, although it seems to rely on self-reporting and observation to identify potentially infected people, and it doesn't say anything about testing. At oral argument, counsel for the government was unable to make any representations concerning Maguire [i.e. the jail]'s possession of testing kits. The Court is glad to hear that there are currently no reported cases of COVID-19 at Maguire, but is unsure what that means if people are not being tested. And, as the

---

[42]  Many have responded in shock to the BOP's indication that it will only screen new inmates for active symptoms of the COVID-19 virus.

management plan itself acknowledges, symptoms of COVID-19 can begin to appear 2-14 days after exposure, so screening people based on observable symptoms is just a game of catch up. That's why the Bay Area is on lockdown. We don't know who's infected. Accordingly, the government's suggestion that Toledo should wait until there is a confirmed outbreak of COVID-19 in Maguire before seeking release, see ECF No. 113 at 6 ("If the situation with respect to COVID-19 at Maguire changes, Toledo is free to seek reconsideration of the issue at that point."), is impractical. By then it may be too late.

2020 WL 1307109 at * 1. The Court then acknowledges that there are any number of conditions that could ensure Toledo's return to court, including a sizeable cash bail. "While the risk that Toledo will flee cannot be completely mitigated, certain release conditions will help."

Judges have also recognized that few if any preventative measures will actually have any effect in the confined spaces of jails. In this case, the Delware County Jail has taken some meaningful steps[43] to reduce risk of infection. But even despite reducing the population, the confined and inherently unsanitary conditions of a jail will mean, without a shred of doubt, that if one inmate is infected, others will be too. Also, because of his ASD, disruptions to Michael's routine because of the preventative measures have already been severe, which causes him severe psychological stress.

### 6.    *Suspending confinement*

Judges have adjusted actual confinement terms to avoid putting some convicted defendants into the prison system. *United States v. Barkman*, 2020 U.S. Dist. LEXIS 45628 (D. Nev. Mar. 17, 2020) (suspending intermittent confinement because "[t]here is a pandemic that poses a direct risk if Mr. Barman . . . is admitted to the inmate population of the Wahoe County Detention Facility"); *United States v. Copeland*, No. 2:05-cr-135-DCN (D.S.C. Mar. 24, 2020) (granting compassionate release to defendant in part due to "Congress's desire for courts to release individuals the age defendant is, with the ailments that defendant has during

---

[43]  ABC Channel Six recently did a story on the steps taken at the jail, available online at: https://abc6onyourside.com/news/local/fighting-crime-while-fighting-coronavirus-delaware-jail-tries-to-keep-coronavirus-out

this current pandemic").

In *United States v. Barman*, No. 3:19-cr-0052-RAJ-WGC, 2020 U.S. Dist. LEXIS 45628*, (D.Nev., Mar. 17, 2020), District Court Judge Robert Jones granted the request of the defendant to modify the conditions of his probation so that he did not have to serve intermittent confinement at a local county jail. The Court observed that

> With confirmed cases that indicate community spread, the time is now to take action to protect vulnerable populations and the community at large. [. . .] Conditions of pretrial confinement create the ideal environment for the transmission of contagious disease. Inmates cycle in and out of detention facilities from all over the world and country, and people who work in the facilities including correctional officers, and care and service providers leave and return daily, without screening. Incarcerated people have poorer health than the general population, and even at the best of times, medical care is limited.4 Many people who are incarcerated also have chronic conditions, like diabetes, asthma, high blood pressure, hepatitis, or HIV, which makes them vulnerable to severe forms of COVID-19.

2020 U.S. Dist. LEXIS 45628 at *1 (internal citations omitted).

# Available conditions of release

With the overwhelming evidence that Michael is not a risk of flight, and not a risk of reoffending or violating conditions of release, even if there were no restrictions on him, standard conditions of release will guarantee this to anyone's satisfaction. While his parents are highly motivated to protect Michael from a dreaded infection, they are also highly motivated to ensure that he does not get in any further trouble or leave the home and expose himself to the very infections which frighten them so much now. But in addition, they are certainly willing to make a substantial, and appropriate, pledge of financial security for his release in the form of a reasonable bond.

In addition, GPS monitoring and regular reporting can add ready capability of monitoring his activities.

# Conclusion

Michael Sutherin presents no cognizable risk of flight or violation of conditions of release. The exceptional circumstances created by the coronavirus pandemic, coupled with the likelihood that Michael will suffer heightened threat of infection compared to his cohorts, and heightened and intense psychological torment being detained during the crisis, all on account of his ASD, provide the additional "exceptional reasons" to grant pre-sentence release as soon as possible.

Date:  April 17, 2020

Respectfully submitted,
/s/ Mark J. Mahoney

David H. Thomas
Kathryn S. Wallrabenstein
TAFT STETTINIUS & HOLLISTER, LLP
Ohio Supreme Court No. 0071492
P: (614) 220-0238
F: (614) 221-2007
dthomas@taftlaw.com
kwallrabenstein@taftlaw.com

Mark J. Mahoney, Esq.
HARRINGTON & MAHONEY
70 Niagara Street, 3rd Floor
Buffalo, NY   14202-3407
Ph: 716-853-3700
Facs: 716-853-3710
mjm@harringtonmahoney.com

*(Attorneys for Michael T. Sutherin)*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing was filed with the Clerk of Court for the United States District Court for the Southern District of Ohio using the CM/ECF system, which will send notification of such filing to Assistant U.S. Attorneys Heather Hill and Courter Shimeall, 303 Marconi Boulevard, Suite 200, Columbus, Ohio 43215, on April 17, 2020, by electronic mail.

/s/ Mark J. Mahoney

Mark J. Mahoney