IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| | : | CASE No. 2:19-CR-174 |
| v. | : | |
| | : | |
| MICHAEL T. SUTHERIN | : | CHIEF JUDGE MARBLEY |
| | : | |

**RESPONSE OF THE UNITED STATES IN OPPOSITION TO DEFENDANT'S
MOTION FOR EMERGENCY RELEASE**

Now comes the United States, by and through the undersigned Assistant United States Attorneys, and hereby opposes Defendant Michael T. Sutherin's Emergency Motion for Pre-Sentence Release: 18 U.S.C. 1345(c)[1]. (Doc. #47.) For the reasons that follow, the government submits that neither the defendant's Autism Spectrum Disorder (ASD) nor his speculative claims regarding his potential exposure to COVID-19 at the Delaware County jail permit the Court to order the defendant's release, given the dictates of 18 U.S.C. §§ 3143(a)(1) and (2), nor provide exceptional reasons warranting the defendant's release pursuant to 18 U.S.C. § 3145(c).

**BACKGROUND**

On May 6, 2019, the defendant was charged by criminal complaint with: making a notice or advertisement seeking child pornography (18 U.S.C. §§ 2251(d)(1)(B)); distribution, receipt, and possession of child pornography (18 U.S.C. §§ 2252(a)(2) & (b)(4)(B), 2252A(a)(2) & (a)(5)(B)); and coercion or enticement of a minor to engage in illegal sexual activity (18 U.S.C. § 2422(b)). The charges stemmed from an investigation implicating Sutherin in using online

---

[1] The defendant has cited the provision governing his request for release as 18 U.S.C. § 1345(c). This section of the United States Code is titled Injunctions Against Fraud, and permits, *inter alia*, the Attorney General to commence a civil injunction action against a person who is violating or about to violate various fraud statutes. The government presumes that the defendant intended to reference 18 U.S.C. § 3145(c), which delineates the provisions for appealing an order of detention.

social media accounts to obtain/trade child pornography and to coerce minor females into sending him pictures and images of themselves engaged in sex acts. Near the time of his arrest in May of 2019, Sutherin was interviewed by law enforcement, at which time he admitted to conduct consistent with the above charges. The defendant also admitted that he inappropriately touched a minor to whom he had regular access, hereinafter referred to as Jane Doe. According to Sutherin, the abuse, which had been ongoing for several years, included him touching Jane Doe's breasts, buttocks and vagina both on top of and beneath her clothes, and making Jane Doe touch his penis. Sutherin was indicted on August 8, 2019, with thirteen counts charging him for conduct consistent with that outlined in the criminal complaint. On February 19, 2020, the defendant pled guilty to Counts Three and Nine (coercion and enticement, 18 U.S.C. § 2422(b)), and Counts Six and Eleven (receipt of child pornography, 18 U.S.C. § 2252(a)(2)). He is currently awaiting sentencing.

The parties have already litigated Sutherin's detention once. On May 9, 2020, Magistrate Judge Vascura held a detention hearing on the matter of Sutherin's release pre-trial. The government presented a host of examples of the defendant's prodigious online communications. The Court saw evidence, for example, of just a few of Sutherin's many communications aimed at the solicitation or receipt of any child pornography the defendant could get his hands on. The government also presented the Court with only a handful of examples of Sutherin's many communications with pre-teenage and young teenage girls, in which Sutherin aggressively sought—and often obtained—homemade videos of the young girls engaged in illicit sex acts. Finally, the government also presented evidence of interviews of Sutherin's parents, which suggested that they had been aware of some of the defendant's inappropriate actions. Magistrate Judge Vascura held that Sutherin had failed to rebut the presumption in favor of detention,

therefore concluding that Sutherin was a danger to the community and that no condition or combination of conditions would reasonably assure the safety of the community. (Doc. #16.)

The matter of the defendant's detention is now before the Court again. On April 17, 2020, the defendant filed a motion seeking emergency release, arguing that his ASD makes him a non-threat to the community and that issues surrounding the COVID-19 pandemic constitute "exceptional reasons why he should be released at the present time in anticipation of his sentencing." (Doc. #47, Defendant's Motion at 27.) Because the defendant remains a danger to the community and the existence of COVID-19 does not constitute a sufficient "exceptional reason" justifying his release, the defendant's motion should be denied.

## ANALYSIS AND ARGUMENT

*A. The government concurs that the COVID-19 pandemic is a serious situation*

The government is thoroughly convinced, without resort to all of the defendant's references to the various emergency declarations, orders and new stories that have detailed the growth of the COVID-19 pandemic, that there currently exists in our country, and in Central Ohio, a dire situation regarding the COVID-19 pandemic. But the existence of a national health emergency does not mean that the criminal justice system stops functioning and dangerous criminals are simply released. As much as the public must be protected from COVID-19, it must also continue to be protected from those individuals who have been determined to pose a significant threat. A magistrate judge has already determined that this defendant poses such a threat. Nothing that the defendant has identified regarding the COVID-19 pandemic changes that fact, and his arguments regarding his release, if taken to their logical conclusion, mean that no defendant should ever be detained so long as COVID-19 exists. *See United States v. Kerr*, No 3:19-CR-296 2020 WL 1529180 at *3 (N.D. TX March 31, 2020) ("Any detainee would be

exposed to the same risk that Defendant presents, and, as other courts have also concluded, the court cannot release every detainee who may be at risk of contracting COVID-19, as it would then be required to release *all* detainees.") The defendant has presented no individualized evidence to suggest that he is at any particularly greater risk of contracting or developing complications from COVID-19 than any other dangerous offender, so if the pandemic requires his release, it must also require the release of all defendants. The Court should not accept the defendant's invitation to add further uncertainty to an already difficult situation. The defendant's motion should be denied.

> B. *Regardless of COVID-19, the defendant cannot establish that he is entitled to release under 18 U.S.C. § 3143(a)(2)*

As concerning as the COVID-19 pandemic is to the population generally, and to those who are held in pre-trial detention particularly, "that does not change the applicable legal standards." *United States v. Duncan*, No. 18-40030-01-HLT 2020 WL 1700355 at *1 (Kan. April 8, 2020). The magistrate judge appropriately applied the legal standards under 18 U.S.C. § 3142(g) to the individualized facts of this case, and found that the defendant posed a significant danger to the community if released, and that there were no conditions or combination of conditions that would ensure the safety of the community. None of the defendant's claims in his current motion alter the serious nature of the danger he poses to the community, and he thus cannot establish his entitlement to release.

One thing that has changed since the magistrate judge ordered the defendant detained is that he has now pled guilty to two counts of coercion and enticement of a minor, in violation of 18 U.S.C. § 2422(b), and two counts of receipt of child pornography, in violation of 18 U.S.C. § 2252(a)(2). The violations of § 2422(b) carry a mandatory minimum sentence of ten years and a maximum sentence of life imprisonment. Pursuant to 18 U.S.C. § 3143(a)(2), the court "shall

4

order" that a defendant who has been found guilty of and is awaiting imposition of a sentence for an offense that: 1) is a crime of violence; 2) carries a maximum possible penalty of life imprisonment or death; or 3) is one of certain controlled substances offenses that carry a maximum possible sentence of ten years or more, be detained. 18 U.S.C. §§ 3143(a)(2) & 3142(f)(1)(A) – (C). The defendant is thus subject to the mandatory detention provisions of § 3143(a)(2) as two of his offenses carry a maximum term of incarceration of life and all of his offenses are crimes of violence. *See* 18 U.S.C. § 2422(b) (setting maximum sentence of life imprisonment); 18 U.S.C. § 3156(a)(2)(C) (defining crime of violence to include any felony under Chapter 110 or 117, which includes offenses under 18 U.S.C. §2252(a)(2) and 2422(b)).

Thus, given the procedural posture of this case, the Court must order the defendant detained under § 3143(a)(2) unless: "1) there is a substantial likelihood that a motion for acquittal or new trial will be granted" or "an attorney for the Government has recommended that no sentence of imprisonment be imposed on the person;" *and* 2) there is "clear and convincing evidence that the person is not likely to flee or pose a danger to any other person or the community." 18 U.S.C. § 3143(a)(2)(A) & (B). The defendant cannot meet the first prong of this section for two reasons. First, his guilty plea "mak[es] neither motion [for acquittal or for a new trial] available under § 3143(a)(2)(A)(i). *United States v. Frost*, No. 18-CR-20206, 2020 WL 1899561 at * 5 (E.D. MI April 17, 2020). He also cannot meet the second prong outlined in § 3143(a)(2)(A)(ii), as the offenses to which he has pled guilty carry mandatory incarceration terms, and the government and the defendant have jointly recommended a sentence of 12 years of incarceration pursuant to Rule 11(c)(1)(C). Thus, under § 3143, the defendant must remain detained.

> C. *The COVID-19 pandemic does not constitute the "exceptional reasons" required for release under 18 U.S.C. § 3145(c)*

Because the defendant may not be released under § 3143, the only provision that may permit his release is 18 U.S.C. § 3145(c). This statute requires a defendant to make two showings: first, that he meets the conditions of release set forth in section 3143(a)(1); and secondly, that there are exceptional reasons why his detention would not be appropriate. 18 U.S.C. § 3145(c). *See also Frost*, 2020 WL 1899561 at * 6. "In order to satisfy 18 U.S.C. § 3143(a)(1), the defendant must show by 'clear and convincing evidence' that he or she is 'not likely to flee or pose a danger to the safety of any other person or the community if released' under conditions set forth by the Court." *Id*. In this case, the defendant is able to make neither showing, as his release would pose a significant danger to the community, and the COVID-19 issues, as they relate to this particular defendant, do not constitute exceptional reasons that would justify his release.

> 1. <u>The defendant remains a danger to the community</u>

Sutherin's claim that his offense conduct was caused by his ASD and that he is no longer a threat because he understands the wrongfulness of his actions, does nothing to lessen the danger he poses in light of the evidence in this case. Similarly, his claim that living with his parents will provide sufficient oversight to mitigate any danger does not, as many courts have found, provide the community with appropriate safeguards in light of the nature of the defendant's offense conduct.

The criminal complaint affidavit, the Indictment, and the statement of facts incorporated into the plea agreement in this case all provide the Court with detailed information about the serious and dangerous nature of the defendant's offense conduct. The defendant traded child pornography online with other offenders, including files depicting a child as young as eight to

ten years of age engaged in bestiality and another child of approximately the same age in bondage. (Doc. #1, Complaint Affidavit at 5-6.) He commented on one of the videos he received, indicating that he believed the child depicted in it was 10 or 11 years old. (*Id*. at 6.) His child pornography collection was found to contain files depicting children as young as two-to-three years old being sexually abused or exploited. (*Id.* at 7; Doc. #37, Plea Agreement at 13.) The defendant's actions undoubtedly caused immeasurable harm to the hundreds of children that were abused to create the vile files that he sought out and distributed to others. And those actions are just the tip of the iceberg.

     Not content to just download and distribute files depicting random unknown children being sexually assaulted and exploited, the defendant also reached out directly on various social media platforms to young girls ranging in age from 12 to 16. The statement of facts clearly documents the aggressive manner in which he sought out these young and vulnerable children for his own deviant sexual purposes, often ignoring their references to prior sexual assaults or other traumatic events they had experienced to consistently steer the conversations to sexual topics and requests for depictions of the girls nude and masturbating. And indeed, the defendant's actions were driven by deviant sexual purposes, not a lack of social awareness.

     When initially interviewed by law enforcement, the defendant made comments indicating that knew that law enforcement was at his residence because of his conversations with young children and that he had been trying to find ways to stop himself from engaging in such conduct. He did not just know "'the difference between right and wrong' in the sense that one ought to do one and not the other" (Doc. #47, Defendant's Motion at 12); he knew that what he was doing was wrong. To the extent that he had any doubt, he was informed, on multiple occasions, of as much by others on the social media applications that were his hunting grounds. For example, the

defendant received nude photos from a 14 year-old girl—and one of the girl's online friends told the defendant that the girl was 14 and that he should not be doing what he was doing.  In another example, the parents of one of the underage girls from whom he was receiving nude images found out, and told the defendant—in no uncertain terms—to stop doing what he was doing.  Sutherin carried on regardless, ignoring their unmistakable warnings that his actions were wrong.

This evidence refutes the defendant's claims that his actions were the result of his inability to perceive and understand social cues.  He did not need to understand social cues.  He was told in no uncertain terms that what he was doing was wrong.  And he acknowledged this to law enforcement on their very first encounter.  The defendant engaged in these acts because he was—as he expressed to several of his online cohorts—sexually interested in pre-teen and young teenage girls.  There is no reason to believe that such actions would not continue if the defendant were released.

The defendant's contention that his parents will "supervise him closely and capably" (Doc. #47, Defendant's Motion at 25), is also refuted by the facts and record in this case. Sutherin seeks to return to the same home where he was given the latitude to engage in countless online communications with underage girls seeking images of illicit sexual conduct, and countless online communications where he sought child pornography from other online users. This is also the same home where the defendant lived when he sexually abused Jane Doe, a minor child to whom he would likely continue to have regular access.

Making matters worse, interviews of the defendant and his parents suggest that at least his father, if not both of his parents, were aware of some of Sutherin's illicit activity. The defendant himself informed law enforcement that his parents were aware that he had previously sexually abused Jane Doe.  His father, on the first date that law enforcement arrived at the

8

defendant's residence, informed the agents that Sutherin looked at pornography online and said that he assumed that might be why agents wanted to talk to the defendant. (Doc. #1, Complaint Affidavit at 3.) While his father did not state that Sutherin was looking at child pornography, it is rather incredible that he would believe that federal law enforcement agents arrived at his home to talk to his son about legal pornography. Sutherin's father also made statements to law enforcement, as presented to the magistrate, indicating that he was aware that the defendant had done things to Jane Doe in the past, although he did not know that it was ongoing. While the government does not provide this information to suggest that the defendant's parents were actively enabling the defendant's offense conduct, the evidence that his parents ignored clear signs that their son was engaging in inappropriate actions must factor into the Court's decision. While it is completely understandable that parents would want to close their eyes to such actions by their children, the defendant's parents' willingness to do so makes them inappropriate substitute supervisors in light of the serious nature of the defendant's offenses. Their willingness to monitor Sutherin now is particularly unavailing in light of the difficulties in monitoring or enforcing restrictions on internet access that have been recognized by numerous courts. *See e.g. United States v. Brown*, No. CR2-08-106, 2008 WL 2098070, at *5 (S.D. Ohio May 16, 2008) ("[E]ven electronic monitoring and home detention do not adequately address Brown's ability to access phones or computers in his mother's home even if steps were taken to try to prevent those items from being present or available in the house. In this day and age, with devices such as cellular phones, Blackberries, and laptops, there are no conditions that can reasonably assure the safety of the community under the particular circumstances of this case if Brown is released on bail."); *United States v. Sammons*, No. 2:19-CR-107, 2020 WL 613930 at * 6 (S.D. Ohio February 10, 2020) ("While Mr. Sammons insists that he would be without any internet access if

released, there would be no real mechanism to enforce or police this, and the Court would need to rely on Mr. Sammons's promises to abstain. The Court is not willing to depend on Mr. Sammons's good faith, particularly given the concerning allegations present here.").

Neither the defendant's ASD nor his proposal that his activities could be effectively monitored and controlled by his elderly parents constitute clear and convincing evidence that he is not a danger to the community. As such, he cannot meet the first prong required to entitle him to release under 18 U.S.C. § 3145(c) and his motion should be denied on this basis alone. *See Frost*, 2020 WL 1899561 at * 6 ("The Court need not discuss whether COVID-19 constitutes an "exceptional reason" in this case since Defendant cannot demonstrate that he would not pose a danger to the public if released."); *United States v. Hsieh*, No. 18-20754 2020 WL 1873594 at *3 (E.D. MI April 15, 2020) (declining to address whether COVID-19 constitutes an "exceptional reason" why detention is not appropriate for defendant with high blood pressure and heart problems, because defendant "fail[ed] to show by clear and convincing evidence that he is not likely to flee or pose a danger to the safety of any other person or the community if released.").

    2.   <u>COVID-19 is not an "exceptional reason" as it relates to this defendant</u>

Even if the Court were to find that the defendant's proposal that he live with his parents sufficiently addresses the danger he poses to the community, he has failed to establish that there are exceptional circumstances that warrant abrogating the mandatory detention provisions of § 3143. The defendant's "exceptional reasons" claim rests entirely on the existence of the COVID-19 pandemic and the possibility of an outbreak at his current detention facility. The defendant has made no particularized showing that he is at any greater danger of contracting the virus than any other detainee, stating only that being young does not prevent him from getting the virus. While his arguments regarding the psychological strain that an outbreak may cause

him due to his ASD might seem to differentiate him from other detainees, that argument is premised on either the possibility of something that could potentially occur in the future or on alleged potential harms that are completely unrelated to the COVID-19 pandemic. Particularly in light of the steps being taken by the Delaware County jail, as thoroughly detailed below, such speculative claims do not rise to the level of "exceptional reasons" justifying his release.

Ignoring the fact that the defendant could contract COVID-19 while in the community (or expose his parents, who are in their 70's, to the disease), the government disputes the defendant's description of the threat he faces within the jail. Communications with Jessie Jackson, the Assistant Director of the Delaware County Jail, as recently as April 21, 2020, have revealed that the staff at the facility are taking substantial precautions to protect all inmates and staff. For example, according to Ms. Jackson, the Jail has adhered to the following for more than a month.[2]

*Visitation/flow of people into the Jail.* The Jail has ceased on-site programming for inmates. Every person who enters the Jail—officers, staff, county employees, medical staff, kitchen staff, even the county sheriff himself—has his/her temperature taken before entering the building. As with inmates, any person whose measured temperature meets or exceeds 100.4° F cannot come in. Any staff member with a temperature of at least 100.4° F is quarantined from the Jail for 14 days. Any inmate exhibiting symptoms is designated to a quarantine pod for 14 days, during which the inmate is closely monitored by medical staff and tested for COVID-19.

*Cleaning and hygiene.* The entire Jail is cleaned three times a day. Officers have received specific instructions about how and where to clean, beyond the normal cleaning regimen. The result: jail staff members clean *every* touchable surface in *every* inmate's living

---

[2] The government has filed similar briefings in other cases, some of which have laid out in more detail the steps the Delaware County Jail has taken to address COVID-19 concerns. Should the Court find information of assistance in its effort to resolve this motion and others like it, the government directs the Court to see, for example, S.D. Ohio Case No. 2:19-cr-163, Doc. #87, at 9–13 (United States' memo. in opp., filed March 24, 2020).

space with a disinfectant solution *every* hour.  Restrooms are supplied with soap, and the Jail provides additional hygiene items to indigent inmates.  Inmates may shower as often as they like, except during periods of lockdown and during overnight sleeping hours.  Additionally, inmates have access to disinfectant solution if they choose to conduct cleaning above and beyond the scheduled cleanings.  To ensure that inmates are cleaning properly and maintaining proper hygiene, the Jail has mandated all inmates avail themselves of required COVID-19 education, including regarding healthy habits, sanitation, and hygiene.

*Reduction in population*.  Finally, the Jail has undertaken a dramatic effort to minimize the number inmates and detainees present in the facility, in an effort to reduce the chance of infection.  On approximately March 12, 2020, the Jail totaled roughly 220 inmates and detainees.  On March 19, 2020, the population was approximately 150.  As of April 21, the total population is down to 89.

In addition to following those procedures for the past month, the Jail has continued to update its approach to COVID-19 mitigation.  As of no less than two weeks ago, the Jail also now quarantines all new inmate arrivals for 14 days before introducing those incoming inmates into the general population.  New arrivals are also screened upon entrance and then screened again before being medically released from these 14-day quarantine areas.  In addition, the Jail has increased its approach to staff monitoring, now screening—including temperature testing—any Jail staff each day before they are permitted to come onto the premises for work.  Finally, the Jail is requiring anyone present inside its walls to wear a mask to minimize the risk of one inmate, detainee, or staff member unknowingly spreading any infection.

In the face of these remarkable steps being taken by the Jail to address any potential COVID-related concern or threat, the defendant fails to offer any particularized reason for his

concern about the virus. A close look at the defendant's confinement indicates that it would be hard at this time for him to do so. As of April 21, the Delaware County Jail still has no confirmed COVID cases among its staff, detainees, or inmates.[3] This would explain why, also as of April 21, the defendant has manifested no symptoms of the virus and has not sought medical attention for any virus-like symptoms during his time at the Jail. As another example of the Jail taking this issue seriously, the defendant has his own cell, and has access—along with two other inmates—to a common area and an individual shower. The defendant has been joined in this triple with the same two inmates since April 2, 2020.

These circumstances make it far from "inevitable" that the defendant's "fellow inmates will make Michael suffer," or that they "will see to it that he is among the infected." (Doc. #47, Defendant's Motion at 37.) The details regarding the significant efforts being made by staff and officials at the Jail described above also contradict his claims about horrific conditions at the Jail. In short, nothing about the existence of COVID-19 has created any particularized danger to Sutherin that is not faced by any other detainee or, frankly, any other member of the community. As numerous courts have found, such generalized concerns do not constitute "exceptional reasons" justifying the release of a dangerous defendant. *See United States v. Barnes*, No. 5:19CR451, 2020 WL 1887586 at *2 (N.D. Ohio April 16, 2020) (finding that the "exceptional reasons" required for release under § 3145(c) "cannot be based on probability, conjecture, intuition or speculation. Rather, the exceptional reasons must be 'clearly shown' to render detention inappropriate.") (internal citations omitted); *Kerr* 2020 WL 1529180 at *3 ("[W]hile

---

[3] The defendant summarized the number of COVID-19 cases at other local jails, and then states that "Delaware County, where Michael is detained, has 96 confirmed cases as of April 13, 2020." (Doc. #47, Defendant's Motion at 28.) While the defendant has not provided any source for this information, the government presumes that those 96 cases he references are the number of cases reported for *Delaware County as a whole,* not the number reported within the Delaware County Jail.

13

the COVID-19 health crisis has certainly created an unprecedented and extraordinary situation, Defendant has not demonstrated why his speculative concern about an outbreak arises to an exceptional circumstance as contemplated under Section 3145(c)."); *United States v. Ortiz*, No. 1:18-CR-00134, 2020 WL 1904478, at *7 (M.D. Pa. Apr. 17, 2020) ("Defendant is asserting that he is entitled to release because he is detained and subjected to a generalized risk of contracting COVID-19. Such a claim, however, is insufficient to establish an "exceptional reason" warranting presentence release.") *See also Duncan*, 2020 WL 1700355 at *7 ("A growing number of courts have rejected these types of generalized and speculative arguments on motions seeking release based on COVID-19 because they apply 'equally to anyone in custody or, for that matter, at the halfway house or anywhere else in this community or any other,' and because 'the Court cannot release every detainee at risk of contracting COVID-19 because the Court would then be obligated to release every detainee.'") (citing cases denying similar arguments as speculative).

The Court should not be persuaded that the defendant's concerns about potential psychological harm caused by a theoretical COVID-19 outbreak at the Jail changes the foregoing analysis. His claims in this regard are again premised on what *could* happen *if* there is an outbreak at the Jail. Given all of measures being taken by the Jail, those claims are entirely speculative. While the defendant makes numerous other claims regarding abuse that he is suffering at the jail, the government is dubious that such extreme abuses as he describes are being ignored or going unaddressed by staff at the Jail who are working so hard to ensure the safety of the inmates and detainees. In any event, it is unclear how these allegations relate to or support his claim that COVID-19 issues warrant his release, as the issues he describes appear to be related to the nature of his charges, not COVID-19 or his ASD. (Doc. #47, Defendant's

Motion at 40-41.) While he claims that the issues he faces as a result of his ASD "will become more serious if he is held during an acute crisis inside an unforgiving and insensitive prison setting" (*id.* at 40), that claim again is dependent on the occurrence of an outbreak at the Jail, an occurrence that is far from certain. This issue does nothing to make the COVID-19 pandemic any more of an exceptional reason for Sutherin's release than it is for any other detainee.

A final issue for the Court to consider is the potential COVID-19-related ramifications of the defendant's proposed release plan. *See United States v. Williams*, No. 2:18-CR-20641-TGB, 2020 WL 1930065 at * 2 (E.D. MI April 21, 2020) (finding factors, including "the likelihood that the defendant's proposed release would increase COVID-19 risks to others," that were outlined in *United States v. Smoot*, No. 2:19-CR-20, 2020 WL 1501810 at *2 (S.D. Ohio March 30, 2020) and *United States v. Clark*, No 19-40068-01, 2020 WL 1446895 at *9 (Kan. March 25, 2020), to address what constitutes a compelling reason for release under 18 U.S.C. §3142(i) is also useful in determining whether there are "exceptional reasons" for release under § 3145(c)). Here, the defendant's plan gives no assurance that his exposure to COVID-19 will be significantly reduced by his release from the Jail, where there are no identified cases of COVID-19 at the Jail, and there are stringent cleaning procedures at the Jail. His plan similarly provides no reason to believe that his release will provide any measure of protection to the community. His release would require that he have continuous and daily contact with his elderly parents, after they would, presumably, be in close confines in a vehicle with him to transport him to their residence. To the extent that Sutherin may have been exposed to the virus, he could be one of the many carriers who never exhibit any significant symptoms, and he could therefore easily contaminate one of his parents, both of whom are in their 70's.

The defendant's parents are only one concern. There is also the concern regarding the additional family members of the defendant that may visit his parents, or want to visit but refrain from doing so because of the defendant's presence. Additionally, the pre-trial services officers that will be required to interact with the defendant and install monitoring equipment at his parents' residence are a concern. And, as discussed above, monitoring of the defendant in a manner that would sufficiently ensure that he did not gain access to the internet would be essentially impossible under normal circumstances. Asking pre-trial services officers to engage in the sort of monitoring of the defendant that would be required to ensure that access is prevented under the current circumstances is simply too great a burden when the defendant has given no particularized reason that he is more susceptible to COVID-19 than any other detainee.

## **CONCLUSION**

At a time when society is facing an historic and frightening pandemic, adding greater uncertainty about the functioning of the criminal justice system will do nothing to assure the safety of the community. Nothing has changed in regards to the magistrate judge's finding that the defendant presents a significant danger to the community if released and his generalized claims regarding the COVID-19 pandemic do not constitute exceptional reasons justifying his release. Upending the rules that clearly call for the defendant's detention fails to provide the safety the community needs more than ever at this difficult time, and does nothing to even assure the defendant's safety and good health. His detention was called for prior to the COVID-19 outbreak and it continues to be called for now. His motion should be denied.

Respectfully submitted,

DAVID M. DEVILLERS
United States Attorney


s/*Heather A. Hill*
HEATHER A. HILL (IL 6291633)
S. COURTER SHIMEALL (0090514)
Assistant United States Attorneys
303 Marconi Boulevard, Suite 200
Columbus, Ohio 43215
Office: (614) 469-5715
Fax: (614) 469-5653
E-mail: Heather.Hill@usdoj.gov
          Courter.Shimeall@usdoj.gov

**CERTIFICATE OF SERVICE**

      I hereby certify that a copy of the foregoing Motion in Opposition was served this 22nd day of April, 2020, electronically upon all counsel of record for the defendant.

                                                s/*Heather A. Hill*
                                               HEATHER A. HILL (IL 6291633)
                                               Assistant United States Attorney