The Honorable Chief Judge Algenon Marbley

U.S. District Court for the Southern District of Ohio

Dear Judge Marbley:

I am Michel's mother. I want to first thank you for the opportunity you gave us to talk to our son in person the day of his plea agreement. Since May 2019, we have been unable to touch him or speak to him in person. I long for the time when I can hug him again.

As you know, my son suffers from life-long Autism Spectrum Disorder (ASD). Michael is a very loving person that needs his family around him. Michael has a strong connection with his parents and his sister Brittney. Jail is the first time Michael has been away from home without a family member with him.

We have had two medical doctors test Michael. They agree he is autistic, he has no interest in prepubescent children, and he is not a pedophile. The Autism community is starting to be more powerful and trying to educate the public about the problems these people face. I am sorry the doctor reports took so long. We had trouble getting them into the jail. Please listen to the medical community. Michael is not a danger. Research shows that these people do not reoffend. This is Michael's first offence. Michael has told me that he will not do anything that would chance him getting incarcerated again.

This has been very hard on me and my family. I cannot wait till I can touch my son again.   Michael has been beaten in jail, spent two months in solitary confinement for his safety, spent a night in solitary after being beaten just shaking and crying. A full water bottle thrown to his crotch, a dirty mop used to hit him and his butt, toilet paper swung in something to hit him, threatened, told what to say on the phone, told he would not survive prison, hit from behind even during our video visits.  This is very hard to know what is happening to our son that has a developmental disability. The sounds, lights, and odors in the jail are magnified for an Asperger person. Michael is in a living Hell and has been very depressed. We worry when he has not call – is he ok, has he been beaten again- it is hard. Michael wants no pictures of his sisters or for them to visit him again because the inmates said they are going to "f***" them. Michael feels his life is in danger in jail. All the tools Michael has been taught to use to calm down and help with depression are not available in Jail. Music, a quiet room, no lights, someone that cares for him, a hug are things that have helped him cope with life. Ivy is his support cat. He is afraid he will never see Ivy again. We send Michael pictures of the cat and try to make the cat meow for him during phone calls. We have dogs that Michael likes. Michael is very kind to the animals.

Tom and I live alone now. Michael was the first in a group of triplets. His sister Brittney will graduate in the spring. His other sister Barbara will graduate in December. Barbara has been selected to the National Society of Leadership and Success. This has been very hard on the triplets because they have been there and help each other all their lives. Our emotions have been all over the place. Tom and I are older parents. We hope our health remains good. Michael is afraid that we will die before he gets out of jail. Tom had a triple bypass 15 years ago. We have used our retirement money to help Michael, who feels lost. Michael is not a normal person having been born with a developmental disability. None of us wanted him to be autistic but he is. Michael needs us more than ever.

Michael is a very nice person that will give you the shirt off his back to help anyone. Michael does not drink, smoke, or do drugs. It is the first time he has been in trouble with the law. Please help Michael. Everything that Michael has done is because he is autistic and very depressed. Michael will have a harder life than most people due to his autism. With prison and sexual predator on his history, his chance for getting a job are slim. We have Michael's support team already set up.

Michael is worried about how he will look for you in court. He is concerned about the striped jail outfit he has to wear, his hair and clean shaven. Michael get very nervous and upset in strange situations. As he did at the presentencing hearing. He was embarrassed at how nervous and that he gave the wrong answers to the judge's questions. His attorney told him what to say and he still had trouble. He did not understand everything he agreed to but did so on attorney's advice.

Please listen to the medical community. Michael is not a pedophile or sexual predator and has the social maturity of a 15 year-old. Michael is Autistic! Michael depends on Tom and myself. I love my son! I need a hug from him.

Respectfully,

Ann Sutherin

April 20, 2020


The Honorable Chief Judge Algenon L. Marbley
United States District Court for the Southern District of Ohio
Joseph P. Kinneary U.S. Courthouse
85 Marconi Boulevard
Columbus, Ohio 43215


Honorable Judge Marbley,

My name is Thomas W. Sutherin. I am writing to you on behalf of my son, Michael T. Sutherin. I have obviously known Michael his whole life. He is one of a set of triplets, our only son, and the last male to carry on the Sutherin name.  Raising triplets requires hard work and sacrifice but it is not without many enjoyable times and experiences.  As our triplets got older, our parental duties did not get easier they merely changed.  As problems or issues were resolved, new ones arose to take their place.

Although we didn't know that Michael had a developmental disability called Asperger's Syndrome until he was fourteen, we have struggled to help and understand him since he was about 8 or 9 years old. We are still learning new things about Michael's autism and how he must deal with it every day.  Because Michael is a "high-functioning" autistic person, his Asperger's is easily overlooked or hidden, but it still seriously affects him.  Like many young people who strive to fit in with their peers, Michael too wanted to make friends and be socially accepted. However, Michael's autism prevented him from recognizing and accurately interpreting normal social cues. Simple conversation and common idioms are very difficult for Michael to handle and understand.  He has trouble making friends who don't bully him or take advantage of his naivety.  He often says he understands something even if he doesn't because he has learned it is an acceptable response.

In spite of, or perhaps because of, Michael's development disability, he has always had a strong sense of family.  He has always been friendly, helpful, and very thoughtful.  He started working in the election polls when he was in high school. He has donated blood. He always looks for ways to help the neighbors such as shoveling their snow or carry groceries for them. He seems to have an innate need to connect to his mother, to call often, and to know how everyone is doing.  Growing up with two same-age sisters was not always easy for Michael. They had their squabbles and disagreements but his sisters also provided a sense of normal for him. They provided incentive for him to master simple developmental milestones, such as walking, speaking, writing, bike riding, and getting his driver's license.

I am providing this background information so that you might see that Michael is not a bad person.  He made some bad choices that have gotten him where he is today but I am sure that he is remorseful and he will never do anything illegal again. The internet, with all its wonderful

advantages, makes it way too easy for someone to fall into the pit trap that has engulfed Michael.  Michael's disability makes it difficult for him to recognize potentially dangerous situations.  In his efforts to show his maturity and independence, Michael tries to fit in, to be "neuronormal," but he doesn't always see the warning signs and  red flags that we as parents constantly try to teach. This autistic lack of awareness doesn't make Michael a threat to society but it certainly makes him easily misled.

Incarceration, as tough as it is for anybody, is particularly harsh and severe for people with autism.  They are usually easy targets for beating, harassment, and general bullying. Bright lights, loud noises, constant noise, and being abruptly moved around all provide amplified stress. Michael's normal coping mechanisms are not available to him in jail. He relies on music, video games, driving by himself, and sometimes just a quiet, dark room to decompress and self-regulate. Michael never harmed or molested or maliciously touched anyone. The treatment he is receiving in jail seems far worse than anything he did on the internet. With Michael's current and constant state of depression, I am truly afraid that he won't survive any prison sentence. It is well documented that autistic people rarely, if ever, re-offend.

It is also well known that autistic people in prison have a high rate of suicide.  I would urge you to read the reports filed by Dr. A.J. McConnell and Dr. Fredrick Peterson, particularly Dr. McConnell's section regarding treatment recommendations. Michael is not a pedophile, a child molester, or a sexual deviant.  He is not a threat to society. When all is said and done, what progress have we made in eliminating child pornography by sending an autistic person to prison?

As Michael's father, I struggle to deal with my son's current situation. What could I have done better to help my son avoid his problems?  I cannot make his autism go away. There is no 'cure' for his developmental disability.  As parents, we can only try to help him learn to live with his autism because it is as much a part of him as any other part of his physical and mental makeup. He truly wants to be a hard-working, productive member of society and we have to help him attain these goals. He needs compassion, guidance, therapy, and love. It is my hope that you can see the good, decent person who is my son.

Thank you for your time and consideration,


Thomas W. Sutherin

The Honorable Chief Judge Algenon Marbley
U.S. District Court for the Southern District of Ohio
Joseph P. Kinneary U.S. Courthouse
85 Marconi Blvd
Columbus, OH 43215

Dear Judge Marbley,

My name is Brittney Sutherin. I am one of Michaels' sisters. Together with Michael and my sister Barbara, I am one of a set of triplets. I have literally known Michael since conception. I am a senior in college at Seton Hill University and majoring in International Business with a Spanish minor.

Michael is different. I never really noticed it growing up because it did not occur to me that he was different, he was just Michael. I started to notice he was different when other kids started to point it out to me. When we made the switch from catholic school to public school in the 4th grade is when he really started to get bullied and I tried to help him. I would tell the teachers about the harassment he was receiving from other students, on occasion telling the students to stop myself. I was very shy growing up and got bullied myself so it was a very rare occasion that I would directly stand up for myself, but I did my best for my brother because he struggled.

Ultimately, I noticed Michael's differences in middle school. At that point, he had been severely bullied but always behind the closed doors of boy scouts or at school when neither his other sister, Barbara, nor I were around.

In middle school, peers would come up to Barbara or me and tell us all the weird or odd things Michael had been doing that day. For example, Michael frequently left class for extended periods of time; he would forget things in other classrooms; would talk about things that other kids weren't interested in, etc. Michael would come home and would act out due to being bullied he was depressed, anxious, and lonely. He would argue with our parents about doing homework or chores. The arguments would eventually end. He would sit down to do his homework and find out he had forgotten or lost his paper or book. I would sit and watch Mom and Dad try their best to help him with his homework.  He would go to school the next day and not turn in his assignments.

The Michael whom our peers saw in school was very different from the Michael most adults would see. Oddly, the same quirks that made Michael the target of bullying—his open, trusting nature, his frank way of speaking—made him more popular with older people than his peers. My family and I can recall countless times where adults have been more receptive to Michael's differences. Michael is never afraid of talking to strangers in any capacity. He would ask for directions or just chat with people all the time.  Once, my family and I had gone to see a movie about a ghost writer at the Drexel Theater. This was a movie that had little to interest Michael. He got up after the first quarter of the movie and left the theater. After about 20 minutes, he came back into the theater to say that he was fine but had met the guy who owns the theater and was chatting with him. He asked permission from Mom and Dad for an exclusive backstage tour of the Drexel. When we left the movie, Michael came down from the film room with his arms fully loaded with free merchandise, snippets of film, and posters that the employees and owner had given him to take home. Walking out of the theater, every single employee said bye to Michael. Something similar happened during one of our trips to Disney World. His autism meant that he was easily overwhelmed by long days, or crowds. He would frequently go back to the hotel in the middle of the afternoon for a swim or a nap or just some down time from the chaos. He loved going to Disney though. There was one time we were waiting in line and there was a family in front of us. This wait had been taking awhile and Michael asked the dad in front of a question. Barbara and I were embarrassed, the usual reaction from us when Michael would talk to strangers, and told him to stop. He did not listen and proceeded to learn about the entire family in front of us. That is Michael's open, trusting, and curious nature.

Many of the things that kids growing up would do like getting a license, going to school, playing sports, etc, Michael did, or at least tried to do. He got his license around the age of 18 or 19, but could barely drive and rarely did. He would go to school and participate in class. He joined the bowling team which he liked doing but it took a while for him to get used to the sounds and atmosphere in a bowling alley. Those are normal things for a kid growing up to do, but he did none of it "normally." His participation in school would be to what he enjoyed, his few friends enjoyed and which teachers he could befriend to make getting through the day a little easier. While other athletes were participating in lacrosse, soccer and basketball, Michael - who was not very athletic at all - joined the bowling team. While kids were talking about getting their

licenses, he would talk about getting the newest video gaming system or game and was perfectly satisfied with Mom and Dad being there to drive him around. Then while there were kids being able to purchase their first car, Michael was just then getting his license.

The point of this letter is to help you be aware of how Michael's autism has affected him. But the thing is, it didn't merely "affect" him. It **IS** him in everything he does. In every one of those examples I provided above, Michael was autistic and displaying those qualities, but unless you know autism, you'd just think that's Michael. Because of having a brother with autism, I am able to distinguish other people on the spectrum and begin to understand them. This is just one of the ways having Michael as a brother has influenced other aspects of my life.

I understand this case is a particularly hard one for anyone, believe me. I hope these letters from my family help to shed some light on how Michael truly is. His intent was never to be predatorial as he is socially so immature. He sees himself as still in high school. Michael is someone who needs help, who needs counseling to help him with his disabilities. He will never reoffend. He simply wants to come home, go to school, go to work and sit with his cat. He wants to better himself and turn his life around.

Thank you for your time,


Brittney Sutherin

3389 Cardington Road
Marion, Ohio 43302
740/360-2632

April 3, 2020

The Honorable Chief Judge Algenon L. Marbley
United States District Court of the Southern District of Ohio
Joesph P. Kinneary U.S. Courthouse
85 Marconi Boulevard
Columbus, Ohio 43215

Dear Chief Judge Marbley:

RE: Michael Sutherin

We are Michael's Uncle and Aunt, Jim and Gayle Sutherin. Jim is Michael's Dad's brother. We are both retired. Jim was an Electrical Engineer and Gayle, a church secretary.

We know Michael as a beloved member of our family. He came into this world as the male part of triplets, so he has always been thought of as part of a three-some. As a youngster, he was always a caring and loving guy. We could always count on being greeted by a hug and lots of questions. He was particularly proud when he became taller than the rest of us.

As Michael matured, it became noticeable that he had autistic traits. Jim took him on a fishing trip in Canada a number of years ago along with our grandson. Even though everyone had a good time, it was obvious that Michael's tendencies were different than our grandson's. He was harder to keep on task and often forgot things (bait, etc.) when going out in the boat. We also went on a cruise two years ago with Michael and his family. He could hardly wait to -ask questions of our guides and was always first in line his trips. He seemed to enjoy learning about where we were and was always courteous to other travelers.

That being said, we have never observed any tendencies that would ever have made us think he was going down the path he has allegedly taken. Phone conversations have occurred between Michael and us since he has been incarcerated. It is obvious he regrets the situation he has gotten himself into and is deeply sorry for the hardships he has caused his parents. We believe he understands the behavior that caused his situation and would never engage in those acts again. Michael would never cause harm to anyone intentionally.

Sincerely,

*[signature]*
*[signature]*

James A. Sutherin
Gayle Sutherin

Madeline Shaw
1213 Leicester Pl
Columbus, OH 43235
March 16, 2020

The Honorable Chief Judge Algenon Marbley
U.S. District Court for the Southern District of Ohio
Joseph P. Kinneary U.S. Courthouse
85 Marconi Blvd
Columbus, OH 43215

Dear Judge Marbley,

Ann and Tom Sutherin have lived in the house almost directly behind ours for more than 30 years. I consider them and their family to be very good neighbors and despite the fact that they have a 6ft fence encircling their property, I have dropped by to say hello more often than I do with most of the neighbors on my block.

I remember Michael Sutherin when he was a little boy, when he and his two sisters used to ring our doorbell to ask if I would participate in whatever school fundraiser they were tasked to do by buying something. They were triplets and very cute. I had heard from his mother Ann that Michael had learning disabilities related to autism and required a lot of special help, unlike his sisters. Because I knew about his situation, I tried to be as kind and patient as possible when we talked. As the triplets grew older, it became more obvious that the girls were developing at a more advanced pace than Michael was. Brittney and Barbara would go on to activities that didn't involve their brother and I would see them individually when they stopped by with fundraisers for their co-curricular activities. By then they were far more mature than Michael, pretty aware, and more self-sufficient. I could talk to either of the girls like young adults to gauge what they were thinking and planning for college. Michael, on the other hand, was more of the moment like a younger child and not able to convey that he could think ahead and focus on long term goals. I accepted that about him because I knew he had learning disabilities.

I was impressed one day when Michael told me he had been volunteering to be a poll worker at our neighborhood polling station, which was conveniently located across the street. In fact he had already volunteered for more than one election as a high school student and seemed quite proud to be helping at our polling location. I viewed this as a really positive sign of progress for him.

Because of Michael's ADHD, I assumed he'd not be as fortunate about getting high school summer jobs as his sisters. So, I would occasionally contact Ann to find out if I

**EXHIBIT A**          **Page 9 of 10**

could get Michael to water our veggie garden and flowers for a small amount of money when we would go on vacation. Once high school was over, I assumed Michael would continue to make progress toward independence and I didn't seek him out for any future odd jobs that one would ask a neighborhood kid to do because I took it for granted that he would be moving forward to more important phase in his life.

I will end by stating that I have never heard Michael Sutherin use bad or inappropriate language, exhibit rudeness, or act in any threatening way. On the contrary, he always seemed to want to please in a very earnest way, expressing a million thoughts popping out of his head that he wanted to share.

Respectfully,

Madeline Shaw

**EXHIBIT A**                    **Page 10 of 10**

Outcomes in Cases Involving Defendants with Autism (all)

| | A | B | C | D | E | F | G | H | I | J | K | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | State/Fed | State/District | Judge | Case | Charges | Plain language | Plea | Mandatory Minimum | SORA | GL Range | Departure | Sentence | % reduction | Recidivism |
| 2 | F | NYWD | Hon. Charles J. Siragusa | **United States v. Andolino, 12-CR-6141-S (W.D.N.Y. 2013).** | 18 USC 2252A(a)(5)(B) | Possession | 18 USC 1462 | No | No | 27-33 | -27 | 5 years probation | 100% | No |
| 3 | F | SDNY | Hon. Sidney H. Stein | **United States v. Argyris, 18-cr-00547-SHS-1 (S.D.N.Y.)** | 18 U.S.C. § 2422(b), 18 U.S.C. § 1591(a)(1) | Attempted Inducement of a Minor to engage in sexual activity; Sex trafficking of children or by force, fraud, or coercion | 18 USC 1470 | No | No | 15-21 | -15 | Time Served; 3 years Supervised Release | 100% | No |
| 4 | F | PAED | Hon. Jan E. DuBois | **United States v. Bayoumy, DPAE 2:17CR000184-001 (E.D.Pa.)** | 18 USC 2422(b), 18 USC 2423(b), 18 USC 2252A(a)(4)(B), 18 USC 2251(a) and 2251(e), 18 USC 2252(a)(2) | Sexual abuse; sexual abuse of a ward; possession; production; receipt or distribution | 18 USC 1462(a) | No | No | 006-12 | -6 | Time served, no supervised release | 100% | No |
| 5 | F | FLMD | Hon. Charlene E. Honeywell | **United States v. Beasely, 6:12-cr-00234-CDH-TBS-1 (M.D. Fla. 2012)** | 18 USC 2252A(a)(2)(B), 18 USC 2252A(a)(5)(B) | Receipt | Receipt | Yes | Yes | 151-188 | -36 | 115 months; 10 years Supervised Release | 38% | No |
| 6 | F | VAED | Hon. Gerald Bruce Lee | **United States v. Boccardo, 17-CR-121, (EDVa. 2017)** | 18 USC 2252A(a)(4)(B), (b)(2) | Possession | Possession | No | Yes | 78-97 | -78 | 2 years Probation | 100% | No |
| 7 | F | MOED | Hon. Henry E. Autrey | **United States v. Candelario, 15-cr-00417-HEA (E.D. Mo. 2017)** | 18 USC 2252A(a)(2) | Receipt | 18 USC 1462 | No | No | 151-188 | -115 | 36 Months | 76% | No |
| 8 | F | FLMD | Hon. Paul G. Byron | **United States v. Carlsson, 15-CR_200-B (M.D.Fla. 2016)** | 18 USC 2252A(a)(5)(B) | Possession | Possession | No | Yes | 78-97 | -78 | Time served, supervised release 10 years | 100% | No |
| 9 | F | NYWD | Hon. David G. Larimer | **United States v. Carpenter, 6:08-CR-06256-001 (WDNY 2009)** | 18 USC 2252A(a)(5)(B) | Possession | Possession | No | Yes | 51-63 | -51 | Probation | 100% | No |
| 10 | F | OHND | Hon. James. S. Gwin | **United States v. Collins, 5:14-cr-00279-JG (N.D. Ohio)** | 18 USC 2252(a)(2); 18 USC 2252A(a)(5)(B) | Distribution; Possession | Jury verdict | Yes | Yes | 240 | -180 | 60 months; | 75% | No |
| 11 | F | CACD | Hon. Christina A. Snyder | **United States v. Danaher, CR10-150-CAS (C.D.Ca.)** | 18 USC 2252A(a)(5)(B) | Possession | Dismissed | No | Yes | 97-121 | -97 | 1 day (Time served); 10 years supervised release | 100% | No |

Outcomes in Cases Involving Defendants with Autism (all)

| | State/District | Judge | Case | Charges | Plain language | Plea | Mandatory Minimum | SORA | GL Range | Departure | Sentence | % reduction | Recidivism |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | A | B | C | D | E | F | G | H | I | J | K | L | M | N |
| | State/Fed | | | | | | | | | | | | |
| F | IAND | Hon. Linda R. Reade | **United States v. DeHaven, 08-CR-0031-LRR (N.D.Iowa 2009)** | 18 USC 2252(a)(5)(B), (b)(2) | Possession | Possession | Yes | Yes | 78-97 | -78 | 1 day (Time served) | 100% | No |
| F | MIED | Hon. David R. Grand | **United States v. Dubin, 2:12-cr-20828-AJT-DRG (E.D. Mich.)** | 18 USC 2252A(a)(5)(B) | Possession | Possession | No | yes | N/A | N/A | 1 day (Time Served); 5 years Supervised Release | 100% | No |
| F | VAED | Hon. James C. Cacheris | **United States v. Fenn, 1:12-CR-00510-JCC-1 (E.D. Va. 2012)** | 18 USC §§ 2252(a)(2); 18 USC 2252A(a)(4)(B) | Receipt | Receipt | Yes | Yes | 108-135 | -34 | 74 Months; 240 Months Supervised Release | 31% | No |
| F | MD | Hon. Pul W. Grimm | **United States v. Fils-Aime, 8:17-cr-00137-PWG (D. Md. 2019)** | 18 USC § 2252(a)(2); 18 USC § 2252(a)(5)(B) | Distribution; Possession | N/A | Yes | No | 41-51 | -41 | Non-prosecution | 100% | No |
| F | PAED | Hon. Jeffrey L. Schmehl | **United States v. Flynn, 5:17-cr-00423-JLS (E.D. Pa. 2017).** | 18 USC 2252(a)(4)(B); 18 USC 1466A(b)(1)(A) | Possession | 18 USC 1466 | No | No | 006-12 | | **SCHEDULED** | | |
| F | IASD | Hon. John A. Jarvey | **United States v. Gatton, 3:08-cr-00055 (S.D. Iowa 2009).** | 18 USC 2252A(a)(2); 18 USC 2252(a)(4)(B) | Distribution | Distribution | Yes | Yes | 210-240 | -120 | 90 months; 10 years Supervised Release | 57% | No |
| F | ALMD | Hon. W. Keith Watkins | **United States v. George, 15-cr-344 (M.D. Al. 2015)** | 18 USC 2252(a)(2) | Receipt | Receipt | Yes | Yes | 151-184 | -67 | 85 Months; Supervised Release for Life | 44% | No |
| F | MOWD | Hon. Fernando J. Gaitan, Jr | **United States v. Gilges, 4:10-cr-00028-FJG-1 (W.D. Mo. 2010)** | 18 USC 2252(a)(4)(B) | Possession | Possession | No | Yes | 135-168 | -57 | 78 Months; 10 years Supervised Release | 42% | No |
| F | WAWD | Hon. James L. Robart | **United States v. Gran, 13-cr-00207-JLR (W.D. WA. 2014).** | 18 USC 2252(a)(2); 18 USC 2252(a)(4)(B) | Receipt; Possession | Possession | No | Yes | 70-87 | -46 | 24 Months; Supervised Release for Life | 66% | No |
| F | FLSD | Hon. Beth Bloom | **United States v. Huffman, 18-CR-60053, (S.D.Fla. 2019)** | 18 USC 2252(a)(4)(B), (b)(2) | Possession | Possession | No | No | N/A | N/A | Pretrial Diversion | 100% | No |
| F | NYND | Hon. Gary L. Sharpe | **United States v. Joy, 1:07-CR-0187-001 (NDNY 2008)** | 18 USC 2252A(a)(5)(B) | Possession | Possession | No | Yes | 57-71 | -57 | Time served | 100% | No |
| F | FLMD | Hon. Daniel C. Irick | **United States v. Keskin, 6:17-CR-077 (M.D.Fla. 2017)** | 18 USC 2252(a)(4)(B) | Possession | Possession | No | Yes | 97-121 | -97 | Time served | 100% | No |

**EXHIBIT B**

Outcomes in Cases Involving Defendants with Autism (all)

| | A | B | C | D | E | F | G | H | I | J | K | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | State/Fed | State/District | Judge | Case | Charges | Plain language | Plea | Mandatory Minimum | SORA | GL Range | Departure | Sentence | % reduction | Recidivism |
| 24 | F | MSND | Hon. Michael P. Mills | **United States v. Kirkley, 09 CR 54 (N.D. Miss. 2010).** | 18 USC 2252A(a)(5)(B) | Possession | Possession | No | Yes | 120 | -96 | 24 Months | 80% | No |
| 25 | F | NED | Hon. Joseph F. Bastaillon | **United States v. Mallat, 4:13-CR-3005 (D. Neb. 2013)** | 18 USC 2252A(a)(2); 18 USC 2252(a)(4)(B) | Distribution | Possession | No | Yes | 120 | -120 | Time Served; 6 years Supervised Release | 100% | No |
| 26 | F | OKND | Hon. Claire V. Eagan | **United States v. Manzo, 12CR180CVE (N.D.Ok 2014)** | 18 USC §§ 2252(a)(2); 18 USC §§ 2252(a)(4)(B), | Distribution; Possession | Possession | No | Yes | 120 | -90 | 30 Months; 84 months Supervised Release | 75% | No |
| 27 | F | MND | Hon. Patrick J. Schiltz | **United States v. Meiller, 650 F.Supp.2d 887, 07–CR–0158 (D. Minn. 2009).** | 18 USC 2252A(a)(5)(B) | Possession | Possession | No | Yes | 57-71 | -57 | 1 day, 30 years supervised release | 100% | No |
| 28 | F | MDD | Hon. Richard D. Bennett | **United States v. Munson, 07-CR-443 (D. Md. 2009).** | 18 USC 2252A(a)(5)(B) | Possession | Possession | No | Yes | 51-63 | -48 | 3 Months | 94% | No |
| 29 | F | TXWD | Hon. David A. Ezra | **United States v. Pelaez-Gomez, 5:17-cr-00468-DAE (W.D. Tx. 2019)** | 18 USC 2252A(a)(2); 18 USC 2252A(a)(5) | Receipt and Distribution; Possession | Pled to Receipt and Dsitribution | Yes | Yes | 151-188 | -91 | 60 months; | 40% | No |
| 30 | F | GAND | Hon. Mark H. Cohen | **United States v. Perry, 16-CR-334 (N.D.Ga. 2019)** | 18 USC 2252A(a)(2), 18 USC 2252(a)(4)(b) | Receipt or distribution; possession | 18 USC 2252(a)(4)(B) | No | Yes | 135-168 | -135 | 5 years Probation | 100% | No |
| 31 | F | UTD | Hon. Robert J. Shelby | **United States v. Peterson, 2:14-CR-0505 (D. Utah 2016)** | 18 USC 1462, 2422(b) | sexual solicitation of a minor | 18 USC 1462 | No | No | 15-21 | -15 | 4 years probation | 100% | No |
| 32 | F | FLSD | Hon. Ursula Ungargo | **United States v. Rodriguez, 14-CR-20877 (S.D.Fla. 2014)** | 18 USC 2252A(a)(5)(B), (a)(2) | Possession | Dismissed | N/A | No | 240 | -240 | Non-prosecution | 100% | No |
| 33 | F | NYWD | Hon. Charles J. Siragusa | **United States v. Rubino, 09-Cr-06054 (WDNY 2009)** | 18 USC 2252A(a)(5)(B) | Possession | 18 USC 1462 | No | No | 60 | -60 | 5 years Probation | 100% | No |
| 34 | F | FLSD | Hon. Daniel T.K. Hurley | **United States v. Saidman, 0:05-CR-60296-001 (S.D. Fla. 2006).** | 18 USC § 2252A(a)(5)(A) | Possession | Possession | No | Yes | 108-135 | -78 | 30 Months | 72% | No |
| 35 | F | CASD | Hon. Marilyn L. Huff | **United States v. Wilson, 12-CR-5220-H (S.D. Ca. 2015)** | 18 USC 2252(a)(4)(A) | Possession | 18 USC 1462 | No | No | 78-97 | -78 | Time served, 1 year supervised release | 100% | No |

**EXHIBIT B**

Page 3 of 5

Outcomes in Cases Involving Defendants with Autism (all)

| | A | B | C | D | E | F | G | H | I | J | K | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | State/Fed | State/District | Judge | Case | Charges | Plain language | Plea | Mandatory Minimum | SORA | GL Range | Departure | Sentence | % reduction | Recidivism |
| 36 | S | Niagara County, New York | Hon. Matthew J. Murphy | **People v. Agugliaro, 2014-092** | NYPL 263.15 and 130.91 D Felony - mandatory minimum 2 years | | Attempt PL 110; 263.15 (A misdemeanor) | No | No | N/A | N/A | 1 year Probation | N/A | No |
| 37 | S | Columbus, Ohio | N/A | **B., J. Columbus, Ohio, February 2013** | N/A | | N/A | No | N/A | N/A | N/A | Non-prosecution | N/A | No |
| 38 | S | Connecticut | Hon. George N. Thim | **State of Connecticut v. Casciato, FBT-CR-08-230568 (superios Ct. 2008)** | 53a-196e | Possession | Possession | No | Yes | N/A | N/A | 8 year suspended sentence; 10 years Probation | N/A | No |
| 39 | S | Massachusetts | N/A | **A.C., Dedham, MA; 2019 (PENDING)** | N/A | N/A | N/A | N/A | N/A | N/A | N/A | Pre-Trial Diversion | N/A | N/A |
| 40 | S | Virginia | Hon. Charles S. Sharp | **Commonwealth of Virginia v. DeJerolme, CR16-381 (Stafford Co. 2016)** | 18.2-374.1:1, 18.2-374 | Reproduction of CP | Obscenity | No | No | N/A | N/A | Probation | N/A | no |
| 41 | S | Nebraska | Hon. Robert Steinke | **State of Nebraska v. Getzfred, (Platte Co. Neb. 2010)** | | Possession; delivery | 3 counts of possession | No | Yes | 12-240 | -12 | 8 years Probation | 100% | no |
| 42 | S | Virginia | N/A | **T.G., Loudoun Co. VA., June 2015** | | Alleged sex offenses against children | | No | No | N/A | N/A | Dismissal (incompetent) | N/A | No |
| 43 | S | North Carolina | N/A | **Attorney Jim Gronquist, Charlotte North Carolina** | No charges filed. (inappropriate sexual activity with younger sister) | N/A | N/A | No | N/A | N/A | N/A | Non-prosecution | N/A | No |
| 44 | S | Oregon | Hon. Katherine Weber | **State v. Hilderbrand, No. CR1302078** | 1st, ORS 163.684, B Felony; 2nd, ORS 163.686, C felony | Encouraging child sexual abuse; Encouragin Child Sexual Abuse; Child Abuse | jury verdict | No | Yes | N/A | N/A | 1 Day | N/A | No |
| 45 | S | Ohio | Hon. Chris Brown | **State v. Hofmann, 15-cr-003066 (Ohio 2015)** | R.C. 2907.322 | Pandering CP | Pandering CP | No | Yes | N/A | N/A | 3 years of community control | N/A | No |
| 46 | S | Oklahoma | Hon. Sharon Holmes | **State v. Husted, CF-2017-3000 (Tulsa County, 2020)** | Possession | Possession | | no | yes | | | 10 years suspended sentence | | |
| 47 | S | Virginia | N/A | **J.K., Alexandria, Virginia; 2015** | N/A | N/A | N/A | N/A | N/A | N/A | N/a | Non-prosecution | N/A | No |

Outcomes in Cases Involving Defendants with Autism (all)

|   | A | B | C | D | E | F | G | H | I | J | K | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | State/Filed | State/District | Judge | Case | Charges | Plain language | Plea | Mandatory Minimum | SORA | GL Range | Departure | Sentence | % reduction | Recidivism |
| 48 | S | Lake County, Florida | Hon. Lawrence Semento | **State v. Matthew Kinney, 35-2017-CF-002037 (Lake Co., Fla. 2017** | 847.0135(4); 847.01480 | Solicitation | Solicitation | No | No | N/A | N/A | 5 years Probation | N/A | No |
| 49 | S | Texas | Hon. Jack Robison | **State of Texas v. Lock, CR 17-0038 (Hayes Co. 2017)** | Possession | 10 counts of Possession of CP | Not Competent | N/A | N/A | N/A | N/A | Dismissal (incompetent) | N/A | No |
| 50 | S | Louisiana | N/A | **C.M., Baton Rouge, LA 2020** | Possession | No Charges Filed | N/A | N/A | N/A | N/A | N/A | Pre-Trial Diversion | N/A | No |
| 51 | S | Massachusetts | N/A | **N.S., Plymouth, MA; 2019 (PENDING)** | N/A | N/A | N/A | N/A | N/A | N/A | N/A | Pre-Trial Diversion | N/A | N/A |
| 52 | S | Texas | Hon. Patty Maginnis | **State of Texas v. Tyer, (Montgomery Co. 2020)** | Tex. Penal Code Ann. § 43.26(a) | Possession | N/A | N/A | N/A | N/A | N/A | Dismissal (not competent) | N/A | N/A |
| 53 | S | Texas | N/A | **State of Texas v. Venus (Harris Cty. 2016)** | Possession | Possession | N/A | N/A | N/A | N/A | N/A | Dismissal (via No Bill) | N/A | No |
| 54 | S | Lousiana | N/A | **J.W., Baton Rouge, LA 2013** | | N/A | N/A | N/A | N/A | N/A | N/A | Non-prosecution | N/A | no |



---

| | |
|---|---|
| **Name:** | Michael Sutherin |
| **Date of Birth:** | ******* |
| **Referring Agency:** | Taft Law Firm |
| **Case Number:** | 2:19-CR-00174 |
| **Psychologist:** | A.J. McConnell, Psy.D. |
| **Report Date:** | 02/10/2020 |

---

## INTRODUCTION

### Referral Information

Mr. Michael Sutherin was referred for a psychological evaluation regarding the role of his Autism Spectrum Disorder and other neurodevelopmental disabilities in the conduct which prompted his arrest on charges of:

- Three counts of Sexual Exploitation of a Minor, in violation of 18 U.S.C. §§ 2251(a) and (e).
- Four counts of Making a Notice for Child Pornography in violation of 18 U.S.C. §§ 2251 (d)(1)(B) and (e).
- Two counts of Coercion or Enticement of a Minor in violation of 18 U.S.C. §§ 2422(b).
- Two counts of Receipt of Child Pornography in violation of 18 U.S.C. §§ 2252(a)(2) and (b)(1).
- One count of Distribution of Child Pornography in violation of 18 U.S.C. §§ 2252(a)(2) and (b)(1).

- One count of Possession of Child Pornography in violation of 18 U.S.C. §§ 2252(a)(4)(B) and (b)(2).

In this report, I find evidence that Michael meets DSM-5[1] diagnostic criteria for an Autism Spectrum Disorder. This report will focus on the effects of this diagnosis, in addition to his other diagnoses, on the behavior which led to his arrest.

**Sources of Information and Methods of Evaluation**

Collateral Records

(1)   Our Lady of Bethlehem Schools, Inc. records, including the following:

   a. 2001-2002 Preschool Progress Report

   b. Report of Student Progress / Performance Standards for second grade, 06/02/2006.

   c. Report of Student Progress / Performance Standards for third grade, 06/04/2007.

(2)   Haugland Learning Center, Proposed Individualized Education Program (IEP), not dated.

(3)   Nationwide Children's Hospital records, including the following:

   a. Speech/Language Evaluation, 02/10/2000.

   b. Diagnostic Intake and Treatment Plan Summary, 03/08/2010.

   c. Diagnostic Evaluation Report, 05/07/2010.

   d. Psychological Evaluation completed by Janet Souder, Psy.D., 07/28/2010.

   e. Auditory Processing Evaluation Summary, 07/08/2011.

   f. Audiological Evaluation Summary, 07/08/2011.

   g. Speech and Language Evaluation, 09/27/2011.

(4)   Steven Guy, Ph.D., Neuropsychological Evaluation, 08/15/2012.

---

[1] American Psychiatric Association (2013). *Diagnostic and statistical manual of mental disorders - fifth edition* (DSM-5). American Psychiatric Publishing: Washington, D.C.

**EXHIBIT C**          **Page 2 of 61**

(5)    Worthington City Schools, special education records, including the following:

      a.  Evaluation Team Report, 05/21/2013.

      b.  Individualized Education Program, 05/06/2015.

      c.  Evaluation Team Report, 04/27/2016.

      d.  Individualized Education Program, 05/17/2016.

(6)    ESC of Central Ohio, Summary of Performance, 04/18/2017.

(7)    The Ohio State University, Wexner Medical Center, medical records from 12/09/1997 to 06/07/2019.

(8)    River's Edge Pediatrics, letter written by John Sotos, M.D., 05/08/2019.

(9)    Discovery records provided by Michael's defense counsel, which included the following:

      a.  Consent to Search Computer(s), 04/26/2019.

      b.  Receipt for Property Received/Returned/Released/Seized, 04/26/2019.

      c.  Search and Seizure Warrant, 04/29/19.

      d.  Interview Transcript between Michael Sutherin and Special Agent David Knight and Special Agent Mike Kerry, 05/02/2019.

      e.  Criminal Complaint, 05/06/2019.

      f.  Federal Bureau of Investigation, Government Exhibit #6, 05/08/2019.

      g.  Federal Bureau of Investigation, Government Exhibit #4, not dated.

      h.  Federal Bureau of Investigation, Government Exhibit #7, 05/08/2019.

      i.  Federal Bureau of Investigation, Government Exhibi #8, 05/08/2019.

      j.  Burke, Meis, & Associates, LLC, cover letter, 05/22/2019.

      k.  Indictment, 08/08/2019.

(10)  The Center for Cognitive and Behavioral Therapy, letter written by Jeanie Zsambok, Ph.D., 07/22/2019.

(11)  United States District Court, Ex parte Order, 09/05/2019.

(12)  DeLong, Peterson, & Associates, Psychological Evaluation Report, 08/30/2019.

**EXHIBIT C**          **Page 3 of 61**

Clinical Interview and Mental Status Examination

(1)  I completed a clinical interview, mental status examination, and psychological testing with Michael for 3 hours at the Delaware County Jail in Delaware, Ohio on 09/30/2019.

(2)  I met with Michael for 5 hours, 5 minutes  to complete additional psychological testing at the Delaware County Jail in Delaware, Ohio on 10/18/2019.

(3)  I met with Michael for 55 minutes at the Delaware County Jail in Delaware, Ohio on 02/10/2020.


Testing

The following testing and/or instruments were used in the current assessment:

(1)  Wechsler Adult Intelligence Scale - Fourth Edition (WAIS-IV), 10/18/2019.

(2)  Vineland Adaptive Behavior Scales - Third Edition (Vineland-3), completed by Mr. Thomas Sutherin and Ms. Ann Sutherin, Michael's parents, on 11/01/2019.

(3)  Autism Diagnostic Observation Schedule - Second Edition (ADOS-2), 10/18/2019.

(4)  Gilliam Autism Rating Scale - Third Edition (GARS-3), completed by Mr. Thomas Sutherin and Ms. Ann Sutherin, Michael's parents, on 10/28/2019.

(5)  Autism Spectrum Quotient (AQ), completed by Michael Sutherin on 09/30/2019.

(6)  The Reading the Mind in the Eyes Test - Revised, completed by Michael Sutherin on 09/30/2019.

(7)  Beck Depression Inventory - Second Edition (BDI-II), completed by Michael on 09/30/2019.

(8)  Beck Anxiety Inventory (BAI), completed by Michael on 09/30/2019.

(9)  Conner's Adult ADHD Rating Scale - Observer: Long Version (CAARS-O:L), completed by Mr. Thomas Sutherin and Ms. Ann Sutherin, Michael's parents, on 10/29/2019.

(10)  Conner's Adult ADHD Rating Scale - Self-Report: Short Form (CAARS-S:S), completed by Michael Sutherin on 10/18/2019.

**EXHIBIT C**          **Page 4 of 61**

(11) Socio-Sexual Knowledge and Attitudes Assessment Tool - Revised (SSKAAT-R), 09/30/2019.

(12) Multiphasic Sex Inventory - Second Edition (MSI-II), completed by Michael Sutherin on 10/18/2019.

<u>Collateral Interviews</u>

(1) I interviewed Mr. Thomas Sutherin and Ms. Ann Sutherin, Michael's biological parents, for 2 hours, 12 minutes at their private residence in Columbus, Ohio on 10/29/2019.

**Disclosure of Purpose and Limits of Confidentiality**

At the onset of each interaction with Michael, the purpose of the evaluation was explained to him in simple terms. It was also explained that the evaluation was not confidential, in that it was being completed at the request of his attorney for a court related matter. Michael was told that if I was asked to submit a written report or if I was asked to testify in his case or if I was asked to submit a written report and testify in his case, that I would do so. He was also informed that there was no guarantee that my evaluation would be favorable to him or his case. To my satisfaction, he understood these explanations before voluntarily agreeing to proceed.

## AN OVERVIEW OF AUTISM SPECTRUM DISORDER

Autism has been a diagnosis recognized by mental health professionals for several decades. During its early years, Autism often referred to children with very severe symptoms and extensive intellectual deficits. Over the past 40 years, the diagnostic criteria for Autism has become more specified. Beginning with the DSM-III in 1980, a new category was introduced known as Pervasive Developmental Disorders. This included diagnoses such as Autism, Asperger Disorder, and Pervasive Developmental Disorder - Not Otherwise Specified. A diagnosis of Autism between 1980 to 2012

**EXHIBIT C**          **Page 5 of 61**

indicated that an individual had persistent deficits in socialization, communication, and restricted interests and repetitive / stereotyped behaviors. A diagnosis of Asperger's Disorder was similar except that deficits in communication were not part of the diagnostic criteria. Lastly, an individual may have received a diagnosis of PDD-NOS if they exhibited some symptoms associated with Autism, Asperger's, or another type of PDD; however, the individual did not meet full diagnostic criteria for any specific disorder in the PDD category.

In 2013, the DSM-5 diagnostic criteria for autism changed significantly. As scientific research has evolved, it was determined that communication deficits alone did not indicate a person met diagnostic criteria for an Autism Spectrum Disorder. Instead, it was the social aspects of communication that were relevant. Furthermore, autism was viewed as a spectrum with some individuals exhibiting substantial deficits in social communication and behavior, whereas, other individuals varied on the severity of their deficits. Therefore, the terminology for the diagnoses of Autism, Asperger's Disorder, and PDD-NOS changed. A diagnosis of Autism Spectrum Disorder is now the appropriate clinical term. Individuals previously diagnosed with Autism, Asperger's Disorder, or PDD-NOS are considered to still meet DSM-5 diagnostic criteria for an Autism Spectrum Disorder

There are now two main symptom categories associated with a diagnosis of an Autism Spectrum Disorder: (A) Persistent deficits in social communication and social interaction across multiple contexts, and (B) restricted, repetitive patterns of behavior interests, or activities.

Criterion A focuses on social communication deficits in an individual. In social communication, an individual with an Autism Spectrum Disorder needs to have all of the three symptoms in this category. Individuals need to have deficits in social emotional

EXHIBIT C          Page 6 of 61

reciprocity, deficits in nonverbal communication behaviors used for social interactions, and deficits in developing maintaining and understanding relationships. Deficits in social emotional reciprocity may include an abnormal social approach and failure of normal back-and-forth conversation; reduced sharing of interests, emotions, or affect; or failure to initiate or respond to social interactions. Deficits in nonverbal communicative behaviors used for social interaction mya include poorly integrated verbal and nonverbal communication; abnormalities in eye contact and body language; deficits in understanding and use of gestures; or lack of facial expressions and nonverbal communication. Deficits in developing maintaining and understanding relationships may include difficulties adjusting behavior to suit various social contexts, difficulties in sharing imaginative play or in making friends; or absence of interest in peers.

Criterion B emphasizes the presence of restricted, repetitive patterns of behavior, interests, or activities. Individuals with an Autism Spectrum Disorder need to demonstrate deficits in two of the four categories of symptoms. They may display difficulties in stereotyped repetitive motor mannerism and movements, insistence on sameness or being inflexible with routines, may have highly-restricted, fixated interests that are abnormal in intensity, or may have a hyper- or hyporeactivity to sensory input or unusual interest in sensory aspects of the environment.

The totality of the available evidence, as described throughout this report, indicates that Michael meets DSM-5 diagnostic criteria for an Autism Spectrum Disorder. The following table provides a visual representation of the criteria associated with an Autism Spectrum Disorder that is present in Michael's case.

**EXHIBIT C**          **Page 7 of 61**

| DSM-5 Criteria for an Autism Spectrum Disorder | | |
|---|---|---|
| **Criterion A:** **Persistent Deficits in Social Communication and Social Interaction Across Multiple Contexts** | **Is the Diagnostic Criteria Present in Michael Sutherin?** | |
| **Criteria** | **Yes** | **No** |
| Deficits in social-emotional reciprocity | ✓ | |
| Deficits in Nonverbal communicative behaviors used for social interaction | ✓ | |
| Deficits in developing, maintaining and understanding relationships | ✓ | |
| **Criterion B:** **Restricted, Repetitive Patterns of Behavior, Interests, or Activities** | **Is the Diagnostic Criteria Present in Michael Sutherin?** | |
| **Criteria** | **Yes** | **No** |
| Stereotyped or repetitive motor movements, use of objects, or speech. | ✓ | |
| Insistence on sameness, inflexible adherence to routines, or ritualized patterns of verbal or nonverbal behavior. | ✓ | |
| Highly restricted, fixated interests that are abnormal in intensity or focus. | ✓ | |
| Hyper- or hypo-reactivity to sensory input or unusual interest in sensory aspects of the environment | ✓ | |

Again, Michael continues to meet DSM-5 diagnostic criteria for an Autism Spectrum Disorder. This report will focus on how this diagnosis impacts Michael's current legal situation as well as provide recommendations on how to best serve Michael's needs while simultaneously protecting the public.

**EXHIBIT C**          **Page 8 of 61**

## RELEVANT HISTORY / BACKGROUND INFORMATION

The background information that follows was collected through the aforementioned sources.  What follows in this section are some of the more salient aspects of Michael's history that are determined to be particularly germane to the purpose of this evaluation and associated opinions and recommendations, consistent with the guidelines pertaining to the practice of forensic psychology (see, for instance, Section 11.04 of the *Specialty Guidelines for Forensic Psychologists*). Thus, the background information presented here should not necessarily be construed as a reflection of the total amount of background information collected in this case.

### Birth History

Mr. Michael Sutherin was born on December 9th, 1997 at The Ohio State University's Wexner Medical Center in Columbus, Ohio. Michael was the first born in a set of triplets. He was prematurely born via cesarean section at 22 weeks gestation. Michael weighed 3 pounds, 12.5 ounces at birth. Jaundice was a concern after birth and his parents reported that he was "placed under a blue light." Michael was admitted to the Neonatal Intensive Care Unit (NICU) following his birth and was discharged when he was 10 days old. No other prenatal and postnatal complications were endorsed by Michael or his parents.

### Childhood Developmental Milestones

Michael has a history of developmental delays. His parents noted that he was monitored by the Neonatal Clinic at Nationwide Children's Hospital (NCH) from the ages of 5 months until he was 2 years old.  At this time, Michael reportedly had delays in his speech-language and gross motor skills (e.g., difficulty walking down stairs). His parents also reported that Michael was often overly sensitive to certain foods and loud noises.

**EXHIBIT C**          **Page 9 of 61**

He also struggled with establishing and maintaining eye contact with his parents and others.

Michael has a history of developmental delays and began receiving special education services, as well as specialized therapies, when he was in preschool. He continued to have delays in his speech-language and motor skills. He received speech-language therapy both privately and through his school. He also received private occupational therapy through Columbus Speech and Hearing. Occupational therapy focused on him holding a pencil, using scissors, and developing other fine motor skills. Michael reportedly did not learn to tie his shoes until he was 15 years old.

Michael was diagnosed with an Autism Spectrum Disorder in August 2012  when he was 15 years old. The following developmental deficits are associated with his diagnosis of an Autism Spectrum Disorder:

Communication

Michael began receiving speech-language therapy when he was 2 years old. It was reported that he had a limited vocabulary, only spoke in single words, and was not able to speak in phrases or sentences. He also struggled with pronouncing various sounds and he was difficult to understand. He received speech-language therapy both privately and at his school throughout his childhood. His parents as well as collateral records also noted that Michael engaged in echolalia (i.e., repeating words or phrases that were stated by others) and scripting (e.g., reciting lines from movies, books, or other sources that are out of context). For example, his parents reported that he watched television shows and movies with closed captioning on. He watched scenes from these shows/movies repeatedly and often knew most of the lines, word for word. Concerns associated with echolalia, scripting, awkward phrasing, and social pragmatic

EXHIBIT C                    Page 10 of 61

communication were present as an adolescent and adult based on information provided by Michael, his parents, and collateral records.

Socialization

Michael's deficits in social skills are well documented in the collateral records (see "Collateral Records" section." In preschool, he struggled with participating in groups and circle time activities. As he grew older, he continued to have difficulty with structured and unstructured social activities at school. He struggled with understanding and using nonverbal language (e.g., eye contact). He did not always follow social scripts and norms at school. His social deficits often resulted in him being bullied by his peers throughout his schooling. Michael did not always recognize when others were bullying him or making fun of him. His rigid expectations often resulted in him having conflict with his peers and teachers at school.  His parents reported that Michael struggled to develop, maintain, and understand social relationships. He occasionally went out with others as an adult but was often talked into engaging in activities, such as going to a bar or an OSU football game, that he did not want to go to. During these social outings, Michael's peers often ignored him or left him and he typically  called his parents to request that they pick him up.

Restricted Interests and Repetitive Patterns of Behaviors

Michael exhibited restricted and repetitive behaviors as a young child. He was fixated on turning lights on and off and also repetitively opened and closed doors because he "loved the motion of the door." As he grew older, he continued to suck his thumb and did so until he was 16 years old. He also had a chewing fixation and chewed his clothing and bedding until they were unusable. These behaviors still occur per his parents.

**EXHIBIT C**　　　　　　**Page 11 of 61**

Michael has the ability to memorize and recall specific details. His parents reported that he is able to memorize directions, recalls spelling lists from elementary school, recalls phone numbers, memorizes music from piano lessons. and is able to script lines from a movie or television show.

Michael also exhibits rigidity in his routine. His parents reported that he engages in a rigid routine prior to bedtime that involves him closing his blinds and turning on his ceiling fan. He is not able to fall asleep unless this routine is followed. He also follows a rigid routine in mowing the grass in which he will mow a section of the yard, turn the mower off, restart the mower, and resume mowing the grass. He engages in this routine several times prior to completing the task of mowing the yard.

Sensory Concerns

Michael is sensitive to certain noises. His parents reported that he could not handle parties or large groups at school because of the loud noise. They first became aware of this during parties at preschool. As an adult, he will avoid public places where loud noise is prevalent.

Michael is also sensitive to clothing. He prefers to wear short sleeved shirts and shorts. He does not wear clothing that has tags or any clothes that he believes are "scratchy." His parents reported that they needed to hide off-season clothing in order for Michael to wear weather appropriate clothes. He dislikes walking in his bare feet, especially walking on grass in his bare feet.

Michael has a restricted diet and is a picky eater. As a young child, he preferred soft foods and chocolate milk. He was particular in only consuming certain brands, such as his preference to only drink Kroger's chocolate milk. Michael was willing to try new foods that his mother presented to him. He agreed to place a new type of food into his

**EXHIBIT C**                     **Page 12 of 61**

mouth and taste it but often spit it out rather than swallow it. He continues to have a restricted diet as an adult. In fact, he complained and talked excessively about the taste and texture of the  food provided to him at jail during both of my meetings with Michael.

**Family Background**

Michael was raised by his biological parents, Mr. Thomas Sutherin and Ms. Ann Sutherin. Both of his parents are still living and reside in Columbus, Ohio. In describing his relationship with his parents, Michael said, "It's a fairly good relationship. No parent has a perfect relationship with their child. They are always going to argue but at least it's strong." He further said, "I get along with both of my parents. There were times when we argued and fought as a teenager but we got past that. They are good parents."

Michael reported that his parents were married in 1994. He described his parents as having a "good" relationship. He said, "They are still married after 25 years so it has to be going fine."

Michael reported that he has four sisters. As mentioned previously, Michael was the first born in a set of triplets. His triplet sisters are Brittney and Barbara. Michael reported that his triplet sisters are attending Seton Hill University in Pennsylvania. He reported having a good relationship with both Brittney and Barbara but also stated, "I get along with Brittney better than Barbara." Michael's two older sisters are Elizabeth Buck and Christine Buck. He could not recall their ages. He reported that his sister, Elizabeth, resides in Columbus. In describing his relationship with Elizabeth, Michael said, "It is fairly good. Sometimes we bug each other." Michael's sister, Christine, resides in Indianapolis, Indiana. In terms of his relationship with Christine, Michael said, "Not really talked (to her)."

**EXHIBIT C**                    **Page 13 of 61**

I asked Michael about certain family problems. He reported that his sister, Brittney, struggles with anxiety and depression. Michael denied any family history of substance abuse problems or legal problems.

**Childhood Conduct**

Michael denied engaging in any behaviors associated with a Conduct Disorder during his childhood. His parents also reported that Michael did not engage in any significant maladaptive behaviors during his childhood. The totality of the available evidence indicates that Michael did not meet criteria for a Conduct Disorder or other type of Disruptive, Impulse-Control, or Conduct Disorder.

**Education History**

Michael attended preschool at Our Lady of Bethlehem in Columbus, Ohio from preschool to third grade. Michael began receiving special education services in preschool and had an Individualized Education Program (IEP). Collateral records, as further discussed below, indicated that he had social-emotional difficulties in preschool and struggled to stay on task once he entered elementary school. His parents reported that Michael's pre-kindergarten teacher stated that Michael needed medicine "to help him calm down and concentrate more." He met academic standards while he attended school at Our Lady of Bethlehem.

Next, Michael attended Worthington Bluffsview Elementary School in Worthington, Ohio. He attended this school from fourth to sixth grade. His parents reported that beginning in fourth grade, Michael was no longer on an IEP but that the IEP was resumed prior to Michael going to middle school. During his time at Worthington Bluffsview Elementary, Michael was the target of excessive bullying from his peers as well as conflict with his teachers.

**EXHIBIT C**          **Page 14 of 61**

Michael attended Phoenix Middle School in Worthington, Ohio. His parents reported that Michael was placed on an IEP. His parents also stated that Michael often completed his homework but usually failed to turn it in to his teacher. It was also reported that his teachers had trouble keeping track of him because he would leave the classroom for a bathroom break, become distracted in the halls, and roam the halls. He also struggled with staying in his seat and staying focused in class.

Michael attended two different high schools. He attended Haugland Learning Center for ninth and tenth grade. He completed his final two years of high school at Worthington Kilbourne High School. In high school, collateral records indicated that Michael had conflict with his peers, struggled with organizational skills, had pragmatic communication delays, struggled with comprehension and following directions, had difficulty staying focused, and experienced other social difficulties (e.g., being rejected and bullied by his peers). Michael reported that he graduated high school in 2016.

After high school, Michael reported completing nine semesters at Columbus State Community College. He reported that his major was Interactive Media.

In summary, Michael received special education services for the majority of his schooling. He had an IEP from preschool to third grade, and seventh grade until graduation. Michael said he was not held back and never failed a grade. He reported that he obtained a cumulative grade point average of 2.0 upon his high school graduation.

**Employment History**

While attending Columbus State Community College, Michael participated in a joint transition program for students with an Autism Spectrum Disorder. He was encouraged to work and he obtained a job at Meijers. Michael reported that he started working at

**EXHIBIT C**          **Page 15 of 61**

Meijers in October 2016 and that his primary responsibility was "cart collecting." He resigned from Meijers on 12/01/2016. His parents reported that Michael resigned from Meijers because he primarily worked outside and was sensitive to cold weather; therefore, he was not willing to work outside during the winter. In contract, Michael reported that he quit working at Meijers because "I had trouble keeping up with my classes. My boss was a pain in the neck. (My boss) wouldn't help me out."

Next, Michael started working at Sam's Club in October 2017. Functional Training Services, Inc., a group that assists individuals with disabilities with employment, helped Michael obtain this job and provided him with a job coach. Michael reported that he was terminated from Sam's Club in January 2018 because "I was doing my job recklessly. I don't remember all the details." His parents reported that Michael was terminated after 90 days because they were concerns about his safety. Safety concerns include: Michael walking in front of a moving car in the parking lot, lowering a pallet on his foot, and operating a floor cleaner without receiving proper training. Michael's parents reported that he was invited to reapply again after three months.

Michael's most recent job was working at Giant Eagle in the hot food bar. He obtained this job on his own and began working in January 2019. Michael reported that his primary responsibility was "mostly washing dishes." He worked at Giant Eagle until his date of arrest for his current legal case.

**Substance Use**

Michael reported past consumption of alcohol. He stated that he first consumed alcohol when he was "19 or 20 years old." He reported that he had one alcoholic beverage, a Red's Apple Ale, each month starting when he turned 21 years old. He reported that he stopped drinking alcohol in March 2019 because "I didn't want to spend a lot of money."

**EXHIBIT C**          **Page 16 of 61**

Michael denied using any illicit substances. Michael denied experiencing any symptoms or engaging in any behaviors associated with a substance use disorder. His parents also reported that they have not observed any behaviors from Michael that are indicative that he might have a substance use disorder.

**Legal History**

Michael's current legal situation is his first involvement with the legal system. He does not have a juvenile legal history.

**Medical History**

Michael reported that he has been previously diagnosed with "pre-diabetes." No other chronic medical conditions were endorsed at the time of this evaluation.

Michael's parents reported that Michael had double hernia surgery when he was 2 months old and laser corrective eye surgery in March 2019. They also noted that Michael had a high pain tolerance as a child and rarely complained of being sick or injured. He reportedly broke his arm when he was 4 years old and did not cry.

Michael reported that he has been previously prescribed Adderall (a stimulant medication used to treat ADHD), Seroquel (an antipsychotic medication used to treat psychotic disorders, bipolar, and/or depression), and Zoloft (an antidepressant medication). Collateral records also indicated that he was previously prescribed Daytrana (a stimulant medication used to treat ADHD).

**Mental Health History**

Michael was previously diagnosed with ADHD, Autism Spectrum Disorder, Dysthymic Disorder, and Anxiety Disorder - Not Otherwise Specified during his childhood. Michael

**EXHIBIT C**                    **Page 17 of 61**

also was diagnosed with Generalized Anxiety Disorder and Major Depressive Disorder as an adult.

Michael said he has previously received outpatient mental health services. He reported that he participated in counseling through NCH Behavioral Health from the ages of 12 to 14 years old. More recently, Michael participated in therapy with Dr. Jeanie Zsambok from August 2018 to January 2019.

Michael said he has never been hospitalized for psychiatric purposes.

## COLLATERAL RECORDS

**Our Lady of Bethlehem Schools, Inc.**

According to the *2001-2002 Preschool Progress Report,* Michael exhibited social-emotional difficulties in a preschool setting. It was noted that he needed to work on the following skills: participating in groups, participating during circle time activities, listening quietly, raise his hand before talking, and following two step directions. There were also recommendations for him to work on further developing his fine motor skills.

According to the *Our Lady of Bethlehem Report of Student Progress / Performance Standards for second grade,* dated 06/02/2006, it was noted that Michael met the standards of performance in most academic areas. However, his teachers commented that "distractions continue to be a problem."

According to the *Our Lady of Bethlehem Report of Student Progress / Performance Standards for third grade*, dated 06/04/2007, Michael continued to meet the standards of performance in most academic areas. During the fourth quarter of the 2006-2007 academic year, it was written, "Michael has been progressing well this year, but has had a difficult quarter. Michael has not been making good choices in the classroom this

**EXHIBIT C**          **Page 18 of 61**

quarter. He is not staying on task and is choosing to make decisions which make it difficult for him to learn. He has been easily distracted this quarter as well."

**Nationwide Children's Hospital**

A *Speech/Language Evaluation* was completed by Gina Vasilay, SLP, at Nationwide Children's Hospital on 02/10/2000. Michael was 26 months old at the time of this evaluation. It was reported that he had a "mild delay in the acquisition of most milestones" and that he "could not comply consistently with direct commands." His receptive and expressive language skills were delayed and speech-language therapy was recommended.

A *Diagnostic Intake and Treatment Plan Summary* was completed by Caroline Murphy, Ph.D. at the NCH Child Development Center on 03/08/2010. Michael was referred for an assessment to determine if he met criteria for an Autism Spectrum Disorder. Dr. Murphy wrote the following behavioral observations regarding Michael: "Yawning, inconsistent eye contact, initially stuttering / awkward phrasing, articulation difficulties; talkative, offered stories with good eye contact, asked about me; embarrassed / covered head with coat when being talked about." Dr. Murphy ruled out the presence of an Autism Spectrum Disorder but recommended further assessment to rule out learning difficulties, anxiety, depression, and significant social difficulties (i.e., it was noted that he was rejected by his peers and a target of bullying). She also noted that his social skills were delayed. It should be mentioned that only an interview with Michael and his parents was completed and no formal testing was administered as part of this diagnostic intake.

A *Diagnostic Evaluation Report* was completed by Gina Handrum, SLP, on 05/07/2010. It was reported that Michael's classroom teachers were concerned that Michael was not processing language and that he frequently did not follow through with directions that he

EXHIBIT C                    Page 19 of 61

was given. His receptive and expressive language abilities were noted to be within the average range based on testing completed as part of this evaluation. Furthermore, his listening/auditory comprehension skills and oral expression abilities were also within the average range. He was noted to have weaknesses with observing turn taking rules during social interactions, participating and interacting in structured and unstructured group activities, understanding appropriate use of nonverbal messages (e.g., interpreting and using appropriate nonverbal language, reading social scripts correctly and behaving/responding appropriately). Michael reported participated in a social skills group on a weekly basis but he required frequent reminders to stay on task. He was described as being impulsive and being easily distracted in group settings.

A *Psychological Evaluation* was completed by Janet Souder, Psy.D. on 07/28/2010. It was reported that Michael was referred by his counselor for assistance with diagnostic clarification. It was reported that Michael had trouble focusing and completing school work, peer difficulties, and experienced negative mood symptoms. Information provided by his teachers indicated that Michael exhibited atypical behaviors at school, including "Constantly moving, fidgety, and is often impulsive. He seems to struggle to fit in, does not demonstrate appropriate ways of interacting and tends to bother or irritate other students." It was also noted that he had difficulty attending to or understanding social cues. The Kaufman Brief Intelligence Test - Second Edition (KBIT-2) was administered and it was determined that his cognitive abilities were within the average range (Verbal IQ = 94, Nonverbal IQ = 111, and IQ Composite = 103). Behavioral measures indicated elevated or very elevated concerns associated with somatic complaints, social problems, thought problems, attention problems, rule-breaking behavior, aggressive behavior, hyperactivity/impulsivity, learning problems/executive functioning problems, and peer relations. It was concluded that Michael met diagnostic criteria for ADHD - Combined Type, Dysthymic Disorder, and Anxiety Disorder - Not Otherwise Specified.

**EXHIBIT C** **Page 20 of 61**

A *Speech and Language Evaluation* was completed by Jennifer Haney, SLP, on 09/27/2011.  Michael was 13 years old at the time of the evaluation and the reported concerns included auditory processing delay and "repeating words when talking at a rapid rate of speech." He was diagnosed with Mixed Receptive-Expressive Language Disorder and Other Developmental Speech or Language Disorder. It was reported that his receptive and expressive language abilities were age appropriate but that he continue speech-language therapy at school to assist with social pragmatic language.

**Steven Guy, Ph.D.**

A *Neuropsychological Evaluation* was completed by Steven Guy, Ph.D., on 08/15/2012. The Wechsler Intelligence Scale for Children - Fourth Edition (WISC-IV) was administered. Michael obtained a Full Scale IQ of 99, which was within the average range. The Wechsler Individual Achievement Test - Third Edition (WIAT-III) was also administered. Michael performed within the average range in mathematics, written language, and reading. Testing assessing Michael's social-emotional abilities indicated concerns with social withdrawal, atypical behaviors, sustained attention, cognitive flexibility, organization and planning, repetitive/compulsive behaviors, sleep disturbance, sensory defensiveness, and social difficulties. The Gilliam Asperger's Rating Scale was administered and Michael was rated to be within the high/probable range. Diagnostically, Dr. Guy reported that Michael met diagnostic criteria for ADHD - Combined Type and Asperger's Disorder (now known as Autism Spectrum Disorder).

**Haugland Learning Center**

A *Proposed IEP (*Individualized Education Program) was completed by Haugland Learning Center. It was noted that Michael had difficulties with pragmatic language and that this was most evident when there was friction between Michael and other students. It was reported that Michael had been involved in 4-6 physical altercations with other students as well as numerous verbal arguments. Details about these altercations and

**EXHIBIT C**          **Page 21 of 61**

arguments were not provided; however, it was reported that Michael needed to work on self-monitoring his choice of language and avoid using negative descriptions of himself, his teachers, and peers. His organizational skills were noted as being significantly improved in the classroom setting.

**Worthington City Schools**

An *Evaluation Team Report* (ETR) was completed by Worthington City Schools on 05/21/2013. It was reported that Michael had a history of deficits in his receptive and expressive communication, fine motor skills, gross motor skills, attention, impulsivity, and social/pragmatic communication skills. It was reported that Micahel has "difficulty staying on task for more than a couple of minutes" and that he "often distracts himself sometimes by standing up and moving to another part of the class without purpose." In regards to his communication abilities, Michael at the time had difficulty comprehending and following directions, conversations, and material presented to him in class most of the time. It was also indicated that mIchael had difficulty explaining new concepts, making socially inappropriate responses, and was unable to verbally sequence ideas and organize information both verbally and written. The Behavior Assessment System for Children - Second Edition (BASC-2) was completed by Michael's teacher. BASC-2 results indicated that there were clinically significant concerns associated with hyperactivity and attention problems and at-risk concerns associated with aggression, conduct problems, school problems, and atypical behaviors. Michael was determined to remain eligible for special education services under the category of Autism.

An *Individualized Education Program* (IEP) was completed by Worthington City Schools on 05/06/2015. Michael attended Worthington Kilbourne High School and was in the 11th grade at the time of this IEP. Regarding Michael's social/behavioral abilities, it was documented that Michael "is able to get along with a majority of his peers, but he becomes easily irritated by people he has had conflicts with in the past. He struggles to

**EXHIBIT C**                    **Page 22 of 61**

talk with his peers about relevant topics unless prompted to as part of a group or partner assignment. He is able to ask for help, but this only happens after he has reached his frustration level with a task. When he becomes frustrated or upset or sees a peer acting in a way that he does not agree with, Michael's volume, tone of voice, and derogatory language towards peers often result in peer conflicts." His IEP contained goals focusing on employability,  work completion,  attention, and social pragmatic communication,

An *ETR* was completed by Worthington City Schools on 04/27/2016. At the time, it was reported that Michael was enrolled in Worthington Kilbourne High School as a 12th grade student. The Wechsler Adult Intelligence Scale - Fourth Edition (WAIS-IV) was administered. Michael obtained a Full Scale IQ of 91, which was within the average range. His performance on the factor indices of the WAIS-IV were within the very low to average range (Verbal Comprehension = 91, Perceptual Reasoning = 98, Working Memory = 102, and Processing Speed = 79). The Kaufman Test of Educational Achievement - Third Edition (KTEA-3) was also administered. Michael's achievement abilities in the areas of reading, math, and written language were within the average range; however, it should be noted that his reading comprehension was below average. In terms of his communication abilities, it was reported that Michael "displayed below average pragmatic skills within a classroom setting, often displaying difficulty with conversations, turn-taking, strategies for gaining attention, and interactions with others." It was also reported that Michael struggled to work independently and often became dependent on his teachers for support in completing assigned tasks. It was determined that Michael remained eligible for special education services under the category of Autism.

**ESC of Central Ohio**

A *Summary of Performance* was completed by the ESC of Central Ohio on 04/18/2017. It was reported that Michael had successfully completed his high school graduation

**EXHIBIT C**                    **Page 23 of 61**

requirements and that he had also finished one semester at Columbus State Community College. He was working towards an associates degree in Interactive Media. It was noted that Michael does very well with self-advocating, learning, and navigating new surroundings. He independently rode the COTA bus to and from campus. However, it was reported that Michael required support in the areas of speech and language and executive functioning. Michael reportedly had difficulty with taking turns, having conversations, and gaining the attention of other people. He often made off-topic comments and needed redirection to stay on task when working. Problems with attention, organization, initiation, and planning were also noted.

**The Ohio State University Wexner Medical Center**

Medical records from The Ohio State University, Wexner Medical Center were reviewed from 12/09/1997 to 06/07/2009. It was reported that Michael was diagnosed with ADHD, Generalized Anxiety Disorder, Mild Episode of Recurrent Major Depressive Disorder, and Asperger's Disorder (now known as Autism Spectrum Disorder). Presenting concerns noted during this time frame included impulsivity, agitation, difficulty concentrating, hypersensitivity to the way things felt on his skin (e.g., he didn't like the itching caused by the Daytrana patch), suicidal thoughts, depression,

He was previously prescribed Intuniv (an antihypertensive medication used to treat hypertension and/or ADHD), Adderall (a stimulant medication used to treat ADHD), Daytrana (a stimulant medication used to treat ADHD), Zoloft (an antidepressant medication), Wellbutrin (an antidepressant medication), and CBD oil. Medical records also indicated that Michael had hernia repair surgery in 1998, wisdom tooth extraction in 2016, and lasik eye surgery on 04/24/2019.

**EXHIBIT C**          **Page 24 of 61**

A letter written by Christopher Hanks, M.D., from 05/06/2019 was reviewed. Dr. Hanks reported that Michael was diagnosed with an Autism Spectrum DIsorder, ADHD, Generalized Anxiety Disorder, and Major Depressive Disorder.

### River's Edge Pediatrics

A letter written by John Sotos, M.D., from 05/08/2019 was reviewed. Dr. Sotos reported that Michael was under his medical care and that Michael had a long-standing diagnosis of an Autism Spectrum Disorder, ADHD - Combined Presentation, and an Anxiety Disorder. Furthermore, Dr. Sotos noted that Michael has also exhibited cognitive rigidity and repetitive/compulsive behaviors from a young age. Dr. Sotos wrote, "He has exhibited these behaviors from a young age… picking at his skin repetitively, low frustration tolerance for change in 'the routine' of the day or if he has perceived he was 'wronged' in any way."

### The Center for Cognitive and Behavioral Therapy

A letter written by Jeanie Zsambok, Ph.D., from 07/22/2019, was reviewed. It was reported that Dr. Zsambok met with Michael six times for therapy between 08/31/2018 to 01/16/2018. The focus of treatment sessions was transition to adulthood. Michael was diagnosed with an Autism Spectrum Disorder. Dr. Zsambok wrote, "Mr. Sutherin presented as a fairly typical young man with a diagnosis of an Autism Spectrum Disorder who was having difficulty navigating the real world on his own, and a reluctance to seek or accept advice from others on how to do so."

### DeLong, Peterson, & Associates

A *Psychological Evaluation* was completed by Dr. Frederick Peterson on 08/30/2019. The focus of the evaluation was to assess whether Michael demonstrated sexual interest in children based upon his current legal charges. The Abel Assessment for Sexual Interest - Second Edition (AASI-2) was administered and it was concluded that

EXHIBIT C                    Page 25 of 61

Michael's sexual interests are primarily toward adult and adolescent females and not young, prepubescent children. His sexual interests were within the normal range for adult males. It was concluded that Michael did not meet diagnostic criteria for a pedophilic disorder.

## MENTAL STATUS EXAMINATION AT THE TIME OF EVALUATION

### Appearance and Behavioral Observations

Michael was a 21-year-old Caucasian male at the time of this evaluation who looked about his stated age. Michael reported that he was 5 feet, 8 inches tall and weighed 170 pounds. This seemed accurate. Michael had hazel eyes and brown hair, with no facial hair. He was dressed in jail attire. Overall, I would describe Michael's grooming as fair. His clothing appeared clean. His hair was greasy and unkept during my first visit with Michael but was adequately attended to during our second meeting. I would describe his hygiene as fair. No foul odors were detected. There were no obvious body markings, including scars, tattoos, or birthmarks.

Michael ambulated independently. His gait was normal and steady. There was nothing unusual about his posture. At times, he exhibited psychomotor agitation. He was able to remain seated over the course of this evaluation; however, he was restless and fidgety. He engaged in behaviors that are common in individuals with an Autism Spectrum Disorder. His eye contact was inconsistent. During my first meeting with Michael, he took off the top shirt of his jail attire. He was wearing a white t-shirt underneath. He commented that the jail attire was bothering him. This is an example of a hyper-sensory response to clothing that is common in individuals diagnosed with an Autism Spectrum Disorder. Michael was reprimanded by one of the guards for taking off the top layer of his jail attire. There were a total of seven random instances were Michael began randomly snapping his fingers in a rigid manner during our first meeting.

EXHIBIT C                    Page 26 of 61

Michael's general approach toward the evaluation seemed cooperative. He was pleasant but was, at times, guarded in disclosing details, particularly when I asked him about his current legal charges or his sexual history. Rapport was quickly established and easily maintained.

**Speech and Language**

Problems were noted in Michael's expressive and receptive speech and language abilities. He was able to follow single step verbal commands as well as a conditional verbal command. He struggled with following multi-step verbal commands and would often stop and ask clarifying questions. He seemed to understand me. I had no difficulty in making sense of what he was expressing. There were not any problems observed in word finding and the expressing of ideas. His articulations were clear. The quality of his speech was normal. The flow, rate, and rhythm of his speech were disturbed, as evidenced by the presence of vocal tics (only during my first meeting with Michael) and a lack of elaboration at times. His phraseology was unremarkable.

**Orientation**

Michael was alert and fully oriented to person, place, time, and situation. He was able to state his name, his attorney's name, and the names of his family members. He was able to state the name of the facility, the city, and the state where we met at. He was able to provide me with the day of the week, date, month, and year. He understood the purpose of this evaluation even before I explained it to him. Of note, Michael was very time oriented and noted that I was a few minutes late to our original meeting. He also was fixated on the time throughout both of my meetings with him, as he commented about the time frequently and asked questions about how long each task would take. This is a common interest and behavior associated with individuals with an Autism Spectrum Disorder.

**EXHIBIT C**          **Page 27 of 61**

**Attention and Concentration**

Michael's attention and concentration were fair. He was fairly motivated. He attempted every task asked of him. He struck me as being variably attentive. He put forth fair effort, but his effort was not sustained over the course of this evaluation. Specifically, he became fatigued as testing progressed during our second meeting. Michael was  overly distracted, at times, becoming fixated on his legal situation and asking repetitive questions about his attorney. There were normal latencies between questions and answers.

**Memory**

There were no obvious problems with Michael's short term retention, recent past memory, or remote memory.

**Mood and Affect**

At the time of this evaluation, Michael impressed me as being depressed and anxious. His affect was restricted.

Michael admitted to a history of thinking about suicide, but he denied a history of attempting suicide. He said, "I thought of it but never attempted it. There are moments of my life where depression acted up momentarily when I might want to end it all but then I think about who will miss me and I stop." Michael said he was not considering suicide at the time of this evaluation, and he denied that he had developed a plan, acquired the means, or had the intention of following through on any thoughts of suicide.

**EXHIBIT C**                    **Page 28 of 61**

Michael said he has never thought about killing another person. He said he did not have any intentions of hurting another person following this evaluation or at any time in his future.

### Perceptual Functioning / Hallucinations

Michael denied experiencing hallucinations or perceptual abnormalities in the past or at the time of this evaluation. Michael did not impress me as presently experiencing perceptual disturbances.

### Thought Content / Delusions

Michael did not express any delusional beliefs, including ideas of thought broadcasting, mind control, grandeur, persecution, or reference.

### Thought Processing

Michael's thought processing was tangential (i.e., ideas shifted from one idea to another that was completely unrelated). His thought processing was also marked by a preoccupation with somatic complaints, food, and his current legal situation. Overall, this pattern of thought processing is common in individuals diagnosed with an Autism Spectrum Disorder.

### Reasoning, Insight, and Judgment

Based on his fund of information, his vocabulary, his use of the English language, and previous and current psychological testing, I would estimate that Michael's intellectual abilities are in the average range. His abilities to reason and exercise good social judgement are worse than his overall intellectual abilities. His insight and judgement are limited. It should be noted that Michael's delays in reasoning, insight, and judgement are primarily associated with his diagnosis of an Autism Spectrum Disorder and are not indicative of an intellectual disability, personality disorder, or other deviant behavior.

**EXHIBIT C**          **Page 29 of 61**

## PSYCHOLOGICAL TESTING SUMMARY

**Wechsler Adult Intelligence Scale - Fourth Edition (WAIS-IV)**

The Wechsler Adult Intelligence Scale - Fourth Edition (WAIS-IV) was administered by A.J. McConnell, Psy.D., Psychologist, and Collin Weekes, M.A., Psychology Trainee, to assess Michael's cognitive abilities. The WAIS-IV is an individually administered measure of intellectual functioning normed on individuals aged 16 and above. The WAIS-IV yields an overall intelligence quotient (FSIQ), as well as several index scores in the areas of verbal comprehension index (VCI), perceptual reasoning index (PRI), working memory index (WMI), and processing speed index (PSI).

The following results were obtained (note that scaled scores have an average of 10 and a standard deviation of 3; standard scores have an average of 100 and a standard deviation of 15):

| Index / Subtest | Scaled Score | Composite Score & 95% Confidence Interval | Percentile Rank | Description |
|---|---|---|---|---|
| Similarities | 10 | N/A | 50th | The examinee is presented with two words that represent common objects or concepts and describes how they are similar. |
| Vocabulary | 9 | N/A | 37th | The examinee defines words that are presented visually and orally. Vocabulary is designed to measure an examinee's English word knowledge and verbal concept formation |

**EXHIBIT C**          **Page 30 of 61**

| | | | | |
|---|---|---|---|---|
| Information | 12 | N/A | 75th | The examinee is asked to answer questions on a range of topics, including culture, history, reading, interests, and occupational history. |
| **Verbal Comprehension Index (VCI)** | 31 | 102 (96-108) Average | 55th | The VCI is composed of subtests measuring verbal concept formation, verbal reasoning, and knowledge acquired from one's environment. |
| Block Design | 8 | N/A | 25th | Working within a specified time limit, the examinee views a model and a picture, or a picture only, and uses red- and -white blocks to recreate the design. |
| Matrix Reasoning | 11 | N/A | 63rd | In this subtest, the examinee looks at an incomplete matrix and selects the response option that completes the matrix series. |
| Visual Puzzles | 8 | N/A | 25th | Working within a specified time limit, the examinee views a completed puzzle and selects three response options that, when combined, reconstruct the puzzle. |

**EXHIBIT C**          **Page 31 of 61**

| | | | | |
|---|---|---|---|---|
| **Perceptual Reasoning Index (PRI)** | 27 | 94 (88-101) Average | 34th | The PRI is a measure nonverbal reasoning, spatial processing, and perceptual organization. |
| Digit Span | 11 | N/A | 63rd | For Digit Span Forward, the examinee is read a sequence of numbers and recalls the numbers in the same order. For Digit Span Backward, the examinee is read a sequence of numbers and recalls the numbers in reverse order. For Digit Span Sequencing, the examinee is read a sequence of numbers and recalls the numbers in ascending order. |
| Arithmetic | 13 | N/A | 84th | Working within a specified time limit, the examinee mentally solves a series of arithmetic problems. |
| **Working Memory Index (WMI)** | 24 | 111 (104-117) High Average | 77th | The WMI is composed of subtests measuring working memory (specifically, simultaneous and sequential processing), attention, and concentration. |

**EXHIBIT C**            **Page 32 of 61**

| | | | | |
|---|---|---|---|---|
| Symbol Search | 9 | N/A | 37th | Working within a specified time limit, the examine scans a search group and indicates whether one of the symbols in the target group matches. |
| Coding | 7 | N/A | 16th | Using a key, the examinee copies symbols that are paired with numbers within a specified time limit. |
| **Processing Speed Index (PSI)** | 16 | 89 (82-98) Low Average | 23rd | The PSI is composed of subtests measuring speed of mental and graphomotor processing. |
| **Full Scale (FSIQ)** | 98 | 98 (94-102) Average | 45th | The FSIQ is a composite score based on the examinee's performance on all core subtests. |

*Subtest and index descriptions taken from Wechsler, D (2008). Wechsler adult intelligence scale [Manual]. Bloomington, MN: Pearson.

On the WAIS-IV, Michael obtained a *Full Scale IQ* (FSIQ) of 98, which is within the average range. Michael's cognitive strengths and weaknesses will be further described below.

Michael performed within the average range on the *Verbal Comprehension Index* (VCI). Specifically, he obtained a Verbal Comprehension Index score of 102, which is the

**EXHIBIT C**       **Page 33 of 61**

same or greater than 55% of his same-aged peers. Verbal Comprehension measures verbal concept formation and verbal reasoning. Michael performed within the average range in defining general vocabulary terms (Vocabulary subtest), answering questions that assess general knowledge (Information subtest), and answering questions about how two items were similar to each other (Similarities subtest).

Michael scored in the average range on the Perceptual Reasoning Index. Perceptual Reasoning tasks measure nonverbal reasoning (problem-solving) skills, spatial processing, and visual-motor integration. Michael obtained a Perceptual Reasoning Index score of 94, which is the same or greater than 34% of his same-aged peers. Michael performed within the average range on tasks requiring him to complete various designs using blocks (Block Design subtest) and on tasks requiring him to solve puzzles that were presented visually (Visual Puzzles subtest). He also performed within the average range on tasks requiring him to solve sequential patterns that were present visually (Matrix Reasoning subtest).

The Working Memory Index measures an individual's ability to temporarily retain information, perform and operation or manipulation of that information, and produce a result. It also measures attention, concentration, and mental control. Michael performed within the high average range on the Working Memory Index. He obtained a Working Memory Index score of 111, which is the same or greater than 77% of his same-aged peers. He performed within the average range on tasks that required him to recall numbers both forward and backwards or organize letters and numbers in a particular order (Digit Span subtest). In contrast, he performed in the high average range on solving arithmetic problems without the use of paper or pencil (Arithmetic subtest).

Michael performed within the low average range on the Processing Speed Index. The Processing Speed Index measures an individual's ability to quickly and correctly scan,

**EXHIBIT C**　　　　　　　**Page 34 of 61**

sequence, or discriminate simple visual information. He obtained a Processing Speed Index score of 89, which is the same or greater than 23% of his same-aged peers. Michael performed within the average range on the Symbol Search subtest  but within the borderline range on the Coding subtest.


**VINELAND-3**

Michael was evaluated using the Vineland Adaptive Behavior Scales - 3rd Edition Domain Parent/Caregiver form, which was completed by his parents Thomas and Ann Sutherin, on 11/01/2019.  The Vineland-3 measures adaptive behaviors, which are then compared to those of a norm sample, which is a representative group of individuals of the same age. Rather than assessing what an examinee can do in a testing situation, the Vineland-3 focuses on what an individual actually does in daily life, according to a trusted third party informant. The Vineland-3 has an average of 100 and a standard deviation of 15.

| Vineland Adaptive Behavior Scales - Third Edition (Vineland-3) Completed by Mr. Thomas Sutherin and Ms. Ann Sutherin | | | |
|---|---|---|---|
| **Domain** | **Standard Score** | **Age Equivalent** | **Adaptive Level** |
| **Communication** | **56** | **N/A** | **Low** |
| Receptive | 1 | 2:7 | Low |
| Expressive | 16 | 16:0+ | Adequate |
| Written | 12 | 13:0 | Moderately Low |
| **Daily Living Skills** | **61** | **N/A** | **Low** |
| Personal | 8 | 9:4 | Low |
| Domestic | 11 | 15:0 | Moderately Low |

**EXHIBIT C**          **Page 35 of 61**

| Community | 11 | 16:9 | Moderately Low |
| **Socialization** | **24** | **N/A** | **Low** |
| Interpersonal Relationships | 7 | 3:2 | Low |
| Play and Leisure | 8 | 6:7 | Low |
| Coping Skills | 4 | 2:10 | Low |
| **Adaptive Behavior Composite** | **48** | **N/A** | **Low** |

Based on the responses provided by Michael's parents, Michael's overall level of adaptive functioning is within the low range and is the same or greater than <1% of his same-aged peers.

The Communication domain measures how well Michael exchanges information with his others. His overall communication abilities are within the low range and are the same or greater than <1% of his same-aged peers. Michael's ability to attend to, understand, and respond appropriately to information from others is low (Receptive Communication subdomain). His ability to use words and sentences to express himself verbally is adequate (Expressive Communication subdomain). Last, his reading and writing skills are moderately low (Written Communication subdomain).

The Daily Living Skills domain assessed Michael's performance on practical, everyday tasks of living that are appropriate for his age. His overall daily living skills are within the low range and are the same or greater than <1% of his same-aged peers. Michael's level of self-sufficiency in such areas as eating, dressing, washing, hygiene, and health care is low (Personal subdomain). His ability to perform household tasks such as cleaning up after himself, chores, and food preparation is low (Domestic subdomain). Last, his functioning in the world outside his home, including safety, using money, travel, and rights and responsibilities are low (Community subdomain).

**EXHIBIT C**            **Page 36 of 61**

The Socialization domain reflects Michael's functioning in social situations. His socialization abilities are low and are the same or greater than <1% of his same-aged peers.  Michael's ability to respond and relate to others, including friendships, caring, social appropriateness, and conversation are low (Interpersonal Relationships subdomain). His ability to engage in play and fun activities with others is also low (Play and Leisure Skills subdomain). Last, his ability to control his behavior and emotions in different situations involving others is low (Coping Skills subdomain).

**Beck Depression Inventory-II**

On 09/30/2019, Michael completed the Beck Depression Inventory - Second Edition (BDI-II), which is a 21-item questionnaire that asks individuals to rate how they felt within the preceding two weeks, including the day of testing. The results produce a score which indicates the level of depression as experienced by the individual completing the questionnaire. Michael obtained a total score of 46, which was within the severe range of depression. He endorsed experiencing the following symptoms of depression within the two weeks preceding the date he completed the BDI-II: sadness, pessimism, feeling like a failure, loss of pleasure, guilty feelings, punishment feelings, self-dislike, self-criticalness, suicidal thoughts, crying spells, agitation, loss of interest, indecisiveness, worthlessness, loss of energy, decreased sleep, irritability, inconsistent appetite, concentration difficulty, tiredness or fatigue, and decreased sex drive.

**Beck Anxiety Inventory**

On 09/30/2019, Michael completed the Beck Anxiety Inventory (BAI), which is a 21-item questionnaire which asks individuals to rate how often they experienced certain symptoms of anxiety over the preceding week, including the day of testing. Michael obtained a total score of 37, which was within the severe range. He rated the following symptoms of anxiety as severe: unable to relax, fear of the worst happening, heart

EXHIBIT C               Page 37 of 61

pounding or racing, feeling terrified, feeling nervous, fear of losing control, and fear of dying. He rated the following symptoms of anxiety as moderate: feeling hot, wobbliness in legs, feeling dizzy or lightheaded, feeling unsteady, indigestion or discomfort in the abdomen, and feeling faint. Last, Michael reported the following symptoms of anxiety as being mild: numbness or tingling, hands trembling, feeling shaky, and difficulty breathing.

**Autism Diagnostic Observation Schedule - Second Edition (ADOS-2)**

The ADOS-2 is a standardized assessment of communication, reciprocal social interaction, and imaginative use of materials.  The assessment allows for the observation of behaviors relevant to autistic spectrum disorders.  A Social Affect + Restricted and Repetitive Behavior score of 10 and above is classified as autism and a score ranging between 7 to 9 indicates a possible autism spectrum disorder.

| Domain | Score |
|---|---|
| **Communication** | |
| Stereotyped / Idiosyncratic Use of Words or Phrases | 0 |
| Conversation | 2 |
| Descriptive, Conventional, Instrumental, or Informational Gestures | 0 |
| Emphatic or Emotional Gestures | 3 → 2 |
| **Communication Total** | 4 |
| **Reciprocal Social Interaction** | |
| Unusual Eye Contact | 2 |
| Facial Expression Directed to Examiner | 1 |
| Comments on Others' Emotions/Empathy | 1 |
| Responsibility | 0 |
| Quality of Social Overtures | 1 |
| Quality of Social Response | 1 |
| Amount of Reciprocal Social Communication | 2 |
| **Social Interaction Total** | 8 |
| **Communication & Social Interaction Total** | 12 |

**EXHIBIT C**            **Page 38 of 61**

| | |
|---|---|
| Imagination / Creativity | 1 |
| **Stereotyped Behaviors and Restricted Interests**<br>    Unusual Sensory Interest in Play Material / Person<br>    Hand and Finger and Other Complex Mannerisms<br>    Excessive Interest in Unusual or Highly Specific Topics / Objects or<br>        Repetitive Behaviors<br>    Compulsions or Rituals | <br>1<br>2<br>0<br><br>1 |
| **Stereotyped Behaviors and Restricted Interests Total** | 4 |

The ADOS-2, Module 4 was administered. Michael's communication was age-appropriate as he used complex sentences in a largely correct fashion. His speech appropriately varied in intonation, volume, rhythm, and rate. Immediate echolalia or stereotyped/idiosyncratic use of words or phrases were not observed during the administration of the ADOS-2. Overall, Michael's conversational abilities were limited. There was little reciprocal conversation. Questions that Michael asked often followed his own train of thought rather than being appropriate to the conversational topic. He used several descriptive gestures but did not use any emphatic or emotional gestures.

Regarding reciprocal social interaction, Michael's eye contact was poor. He did not always direct his facial expressions towards me. His verbal and nonverbal communication was not always linked. For example, Michael would ask a question but would look elsewhere in the room rather than establishing eye contact. He did not express any enjoyment or pleasure when interacting with the ADOS-2 materials. Instead, he complained often. Michael was able to effectively communicate some of his emotions but struggled when asked to comment on the emotions of others. Michael showed some insight into having a relationship with another person but this was delayed. Furthermore, he had little insight into his role in forming friendships with others. Michael's social overtures were limited to his restricted interests. The quality of his social response was limited and socially awkward.

**EXHIBIT C**                    **Page 39 of 61**

Several stereotyped behaviors and restricted interests were observed. Michael complained about the loud noises in jail as well as the texture of the food. He exhibited repetitive hand and finger mannerisms. For example, there were seven instances in which he stopped what he was doing and randomly snapped his fingers in an odd, repetitive pattern. Michael also refused to use any ink pens and requested to have access to pencils. He was distracted by some of the papers and pictures associated with my testing materials not being flat or that they were bent in certain places. No other excessive interest or references to unusual topics, objects, or repetitive behaviors were observed during the administration of the ADOS-2.

Based upon the current administration, the ADOS-2 Communication and Social Interaction Total Score of 12 is above the Autism Spectrum Cutoff (Cutoff Score = 10). This suggests that Michael still exhibits behaviors that are associated with an Autism Spectrum Disorder.

**Gilliam Autism Rating Scale - Third Edition (GARS-3)**

Mr. and Ms. Sutherin completed the Gilliam Autism Rating Scale - Third Edition (GARS-3) based on the interactions with their son, Michael. This questionnaire asks for individuals to rate the behaviors, speech, and interactions of individuals well known to them, who may be suspected of behaving similarly to those with Autism Spectrum Disorder. Their scores are as follows:

| Scale | Scaled Score | Percentile |
|---|---|---|
| Restricted / Repetitive Behaviors | 8 | 25th |
| Social Interactions | 5 | 3rd |
| Social Communication | 9 | 37th |
| Emotional Responses | 11 | 63rd |

**EXHIBIT C**                    **Page 40 of 61**

| Cognitive Style | 13 | 84th |
| Maladaptive Speech | 10 | 50th |
| **Autism Index** | **94** | **35th** |
| **Probability of ASD** | **Very Likely** | |

Based on the results of the GARS-3, Michael falls within the very likely range of meeting diagnostic criteria for an Autism Spectrum Disorder. The severity of his symptoms are within the level two range, which suggests that he requires substantial support with social communication and managing his repetitive and stereotypical behaviors/interests.

**Autism Spectrum Quotient (AQ)**

The Autism Spectrum Quotient (AQ)[2] is a self-report measure designed for individuals, ages 16 and older, suspected of having an Autism Spectrum Disorder. It consists of 50 questions assessing various symptoms associated with a diagnosis of Autism Spectrum Disorder, such as social skills, communication, imagination, attention switching, and attention to detail. Michael completed the AQ and obtained a total score of 33. A score of 32 or higher is indicative of an individual meeting diagnostic criteria for an Autism Spectrum Disorder.

**Reading the Mind in the Eyes Test - Revised**

The Reading the Mind in the Eyes Test - Revised[3] was developed to assess social cognition dysfunction for individuals with normal intelligence but social deficits. The test consists of pairs of eyes, without the rest of the face, expressing various emotions. The

---

[2] Baron-Cohen, S., Wheelwright, S., Skinner, R., Martin, J., & Clubley, E. (2001). The Autism Spectrum Quotient (AQ): Evidence from asperger syndrome/high functioning autism, males and females, scientists and mathematicians. *Journal of Autism and Developmental Disorders, 31,* 5-17.

[3] Baron-Cohen, S., Wheelwright, S., Hill, J., Raste, Y., & Plumb, I. (2001). The "Reading the Mind in the Eyes" Test revised edition: A study with normal adults and adults with Asperger syndrome or high-functioning autism. *Journal of Child Psychology and Psychiatry, 42*(2), 241-251.

**EXHIBIT C**               **Page 41 of 61**

task is to choose one of four possible descriptors that best describes the expression being modeled. It is believed that those diagnosed with an Autism Spectrum Disorder lack the ability in discerning emotions in others and that the eyes best represent those underlying emotions.

On the Reading the Mind in the Eyes Test - Revised, Michael obtained a total score of 24 out of 36. For reference, individuals with an Autism Spectrum Disorder obtained an average total score of 21.9 (Standard Deviation = 6.6), whereas typically developing adults obtained an average score of 26.2 (Standard Deviation = 3.6).

**Conner's Adult ADHD Rating Scales (CAARS)**

The Conner's Adult ADHD Rating Scale - Observer: Long Version (CAARS-O:L) was completed by Mr. Thomas Sutherin and Ms. Ann Sutherin, Michael's parents. Similarly, Michael completed the Conner's ADult ADHD Rating Scale - Self Report: Short Form (CAARS-S:S). Four abbreviated, factor-derived scales assess a cross section of ADHD-related symptoms and behaviors in adults. Scores on the CAARS-O:L have a mean of 50 and a standard deviation of 10. Michael's scores are provided below.

| Conner's Adult ADHD Rating Scales - Observer: Long Version(CAARS-O:L) - completed by Mr. Thomas Sutherin & Ms. Ann Sutherin | | | |
|---|---|---|---|
| **Scale** | **Raw Score** | **Guideline** | **Tendency of high scorers** |
| Inconsistency Index | 8 | Abnormal | 0 to 7 = Normal<br>8 or more = Indicates inconsistent response style |
| **Scale** | **T-Score** | **Guideline** | **Tendency of high scorers** |
| Inattentive/ Memory Problems | 73* | Very Elevated | Learn more slowly, have problems organizing and completing tasks, and have trouble concentrating |

| Hyperactivity/ Restlessness | 58 | Average | Have difficulty working at the same task for very long, and feel more restless and "on the go" than others |
|---|---|---|---|
| Impulsivity/ Emotional Lability | 64^ | High Average | Engage in more impulsive acts than others, moods change quickly and often, and are more easily angered and irritated by people |
| Problems with Self-Concept | 60^ | High Average | Have poor social relationships, low self-esteem, and low self-confidence |
| DSM Inattentive Symptoms | 76* | Very Elevated | Have tendencies associated with the inattentive subtype of ADHD, described in the DSM-IV. |
| DSM Hyperactive / Impulsive | 67* | Elevated | Have tendencies associated with the hyperactive subtype of ADHD, as described in the DSM. |
| DSM Total ADHD Symptoms | 74* | Very Elevated | Meet the criteria for ADHD, as described in the DSM. |
| ADHD Index | 65* | Elevated | Have clinically significant levels of ADHD symptoms compared to adults with a low score. High scores are useful for differentiating clinical ADHD individuals from non-clinical individuals. |

On the CAARS-O:L, Michael's parents reported very elevated concerns associated with inattention and elevated concerns associated with hyperactivity and impulsivity. The ADHD Index was within the elevated range.

EXHIBIT C          Page 43 of 61

| Conners Adult ADHD Rating Scale- Self-Report: Short Form (CAARS S:S) - completed by Michael Sutherin | | | |
|---|---|---|---|
| **Scale** | **Raw Score** | **Guideline** | **Tendency of High Scorers** |
| Inconsistency Index | 7 | Normal | 0 to 7 = Normal 8 or more = Inconsistent response style |
| **Scale** | **T-Score** | **Guideline** | **Tendency of High Scorers** |
| Inattentive/ Memory Problems | 75* | Very Elevated | Learn more slowly, have problems organizing  and completing tasks, and have trouble concentrating |
| Hyperactivity/ Restlessness | 63^ | High Average | Have difficulty working at the same task for very long, and feel more restless and "on the go" than others |
| Impulsivity/ Emotional Lability | 64^ | High Average | Engage in more impulsive acts than others, moods change quickly and often, and are more easily angered and irritated by people |
| Problems with Self-Concept | 68* | Elevated | Have poor social relationships, low self-esteem, and low self-confidence |
| ADHD Index | 73* | Very Elevated | Have clinically significant levels of ADHD symptoms |

**EXHIBIT C**          **Page 44 of 61**

| | | | |
|---|---|---|---|
| | | | compared to adults with a low score. High scores are useful for differentiating clinical ADHD individuals from non-clinical individuals. |

On the CAARS-S:S, Michael reported very elevated concerns associated with inattention and memory problems. He also reported elevated concerns associated with his self-concept and high average concerns associated with hyperactivity/restlessness and impulsivity/emotional lability. The ADHD Index was very elevated and indicates that Michael perceives himself as exhibiting several symptoms associated with a diagnosis of ADHD.

## PSYCHOSEXUAL HISTORY

### Interview with Michael

Michael reported that he learned about sex from his parents, sex education at school, and media. he reported that sex was never discussed openly and comfortably in his home. Michael reported that he was never sexually abused and was not aware of anyone in his household being sexually abused or assaulted by others.

Michael has never been married. He reported that he has never had a formal romantic relationship. He does not have any children.

Michael reported that he had a cordial relationship with a girl when he was in high school. He reported that they did not formally date and typically did not have any interaction with her outside of school. Regarding this relationship, Michael said, "My parents didn't like her mostly because of age differences. We went to the same school. I was 14. She was 12."

**EXHIBIT C**          **Page 45 of 61**

Michael reported having his first non-intercourse sexual experience (e.g., making out, heaving petting, fondling) when he was 17 years old. He reported that he rarely engaged in kissing. Michael said he never engaged in the following activities with another person: partner manipulating his genitals, performing oral sex on a partner, partner performing oral sex on him, perfoming anal sex on his partner, partner performing anal sex on him, or vaginal intercourse.

Michael reported that he is sexually interested in adult females, adult males, and adolescent females. These sexual interests are normal for adult males. It should be noted that sexual interest towards an adolescent female is a part of normal sexual development for adult males[4] but sexual activity between an adult male and an adolescent female is not legal.

As an adult, Michael reported that he masterbated at least once a day and thought about sex "more than once a day." He stated that he used stories and internet videos to help arouse him when masterbating. He reported that he fantasized "mostly about people my age or around my age" while masterbating. He stated that he was physically attracted to "Just about anything really, but mostly Blondes and Redheads." Regarding his pornography use, Michael reported that he watched pornography more than once or twice a week, but not daily. He stated that he mostly accessed pornography via the internet. When searching for porn, he said that he primarily searched the following keywords, "names, Teenagers."

Michael denied engaging in any sexual paraphilias or other associated behaviors. Specifically he denied engaging in the following behaviors: fetish burglary, voyeurism, brushing against or bumping into people sexually, exhibitionism, transvestism,

---

[4] Bancroft, J. (2006). Normal sexual development. In Juvenile Sex Offender (2nd ed., pp. 19-57).

**EXHIBIT C**                    **Page 46 of 61**

beastiality, necrophilia, autoerotic behavior, group sex, sadism/masochism, use of human waste, or prostitution.

Regarding his current legal situation, Michael reported that alcohol or substances were not part of his current offenses. He reported that he has never been charged or convicted of a sexual offense prior to his current legal charges. Michael reported that his behavior associated with his current offenses were impulsive. He said, "I didn't plan on this. I was just looking for something more exciting than what I was looking at." Michael reported feeling anxious, depressed, and hopeless at the time of the alleged offenses. He also reported that he began talking to an adolescent female and agreed to trade images online but did not specifically understand that it was child pornography. He said, "The first time they sent it to me, I had no idea what it was."

**Interview with Parents**

Mr. and Ms. Sutherin reported that Michael was first introduced to pornography the summer after fourth grade, when he was 9 or 10 years old, but two peers from school. They reported that the students told Michael about how to find pornography on the computer. His parents changed the password and took the powercords in order to prevent Michael from looking at pornography.

As he grew older, Mr. and Ms. Sutherin reported that Michael looked at pornography on his computer in his room. They were also aware that he was masterbating. They reported that he engaged in these behaviors in the privacy of his room.

Mr. and Ms. Sutherin reported that a girl named Lizzie, liked Michael in the tenth grade. They were not formally dating but they would spend time together at school and with each other's family. His parents also reported that a girl named Kyrie, who was 2-3 years younger than Michael, was interested in him. They attended the same school.

**EXHIBIT C**          **Page 47 of 61**

Kyrie reportedly sent Michael sexualized messages on social media and would threaten to kill herself if Michael broke up with her. They talked off and on throughout high school but this relationship was never serious.

**Psychosexual Testing Results**

Socio-Sexual Knowledge and Attitudes Assessment Tool - Revised (SSKAAT-R)

The Socio-Sexual Knowledge and Attitudes Assessment Tool - Revised (SSKAAT-R) was administered to Michael in order to assess his knowledge and attitudes towards socio-sexual topics. The SSKAAT-R was developed for adolescents and adults with developmental disabilities and sexual issues (Ages 15-80). It consists of drawings and photographs of social and sexual activities. It does not require advanced verbal ability to complete and was considered appropriate for Michael because of his history of neurodevelopmental difficulties.

Michael received a T-Score of 63 on the Anatomy subscale. This is similar to the performance of individuals that function within the borderline range of intellectual functioning (T-scores range from 54 to 66). Michael demonstrated a good understanding of male and female anatomy,; however, he struggled to describe in detail how men and women differed from one another. He was able to describe some reasons how boys differ from men, but was only able to provide a limited description on how girls differ from women. He was able to identify and appropriately label both sexual and nonsexual body parts for males and females. Overall, his knowledge of anatomy concepts is consistent with individuals with a borderline range of intellectual functioning.

Michael obtained a T-Score of 67 on the Men's Body (and what men need to know about women) subscale. This is similar to the performance of individuals with  borderline intellectual functioning (T-scores range from 56 to 67). Michael demonstrated a basic understanding of public and private behaviors. He knew he should get undressed in his

**EXHIBIT C**          **Page 48 of 61**

bedroom and that viewing erotic materials and masterbation should occur only in a private setting. He was able to describe illustrations of an erection and ejaculation. Regarding his understanding of women, Michael was able to describe the terms "menstruation" or "having periods." His greatest difficulty was understanding prostate cancer and preventive measures he could take to prevent cancer.

Michael received a T-Score of 63 on the Intimacy subscale. This is similar to the performance of individuals without a developmental disability (T-scores of 60 and higher). Michael was able to describe pictures of a couple going on a date and a couple getting married. He was also able to describe drawings of a couple holding hands, kissing, engaging in vaginal sexual intercourse, engaging in oral sex, and a couple engaging in anal sexual intercourse. He was not able to describe a drawing of a couple engaging in heavy petting. Michael was able to describe places where these behaviors are considered appropriate. Michael was able to describe the concept of an orgasm. He was also able to provide information on how someone could ask a person on a date. He struggled with describing what needs to happen for a couple to get married as well as explaining why people get married.

On the Pregnancy subscale of the SSKAAT-R, Michael obtained a T-score of 60. This is similar to the performance of individuals with borderline intellectual functioning (T-scores range from 54 to 60). Michael was able to demonstrate understanding on topics such as prenatal care, childbirth, abortion, and miscarriage. He struggled in describing appropriate care for an infant and the adoption process.

Part of the Birth Control subscale of the SSKAAT-R was administered. Not all the items were administered on this subscale due to some of the materials not being available in the jail (i.e., this subscale requires an individual to place a condom on a model of male genitalia, which was not available at the time of administration).  Thus, Michael obtained

EXHIBIT C                    Page 49 of 61

a minimum T-score of 69 and could have obtained a T-score as high as 84 if all items would have been administered. Of note, individuals without a developmental disability obtain a T-score of 60 or higher on this subtest; therefore, Michael's performance on this subtest was comparable to an individual without a developmental disability. Michael was able to identify various forms of birth control, including birth control pills, condoms, and abstinence. He struggled with the topic of sterilization in men and women. He exhibited an appropriate understanding of sexually transmitted diseases. He was not able to answer some questions regarding the proper use of condoms, such as whether it is ok to use an old condom and what you should do after using a condom.

The Healthy Socio-Sexual Boundaries subscale of the SSKAAT-R was relevant to Michael because of his current legal situation. Michael received a T-Score of 64 on the Healthy Socio-Sexual Boundaries subscale. This is similar to the performance of individuals without a developmental disability (a T-score of 64 or higher). Michael was able to identify illustrations that portrayed boundary violations, such as inappropriate touching or scenarios where an individual would bribe or force someone into sexual activity. Although Michael was able to identify that these situations were not appropriate, he struggled in providing rationales for his responses and, thus, was not always able to describe why the situation was inappropriate or how the victim should respond afterwards.

<u>Multiphasic Sex Inventory - Second Edition (MSI-II)</u>

Michael completed the Multiphasic Sex Inventory - Second Edition (MSI-II) on 10/18/2019. The *MSI II* is designed to measure the sexual characteristics of an adult male alleged to have committed a sex offense or sexual misconduct and can be used as part of an evaluation or as a means to measure treatment progress. Michael's responses were complared to a nationally standardized sample of mixed sex offenders drawn from a population sample of 30,000 obtained from state prisons, hospitals,

**EXHIBIT C**          **Page 50 of 61**

mental health centers, probation services, and private clinicians throughout the United States and Canada. Please note, the MSI-II has not been validated on individuals diagnosed with an Autism Spectrum Disorder. Therefore, I will explain the context of Michael's responses on the MSI-II as it relates to his current diagnoses.

### Test Taking Attitudes and Behaviors

This scale is designed to identify an individual's attempt to exaggerate or to deny psychopathology. Generally, most persons alleged to have committed a sex offense show some measure of defensiveness, which could influence the reliability and/or validity of clinical, behavior, or sexual scales. Therefore, this scale incorporates multiple measures that can test for an individual's carelessness, malingering, inconsistency, evasiveness, defensiveness, and deception.

Michael produced a valid MSI-II profile. There were no indications that he was defensive, attempted to deceive, or feigned deficits

### General Sexuality

A general sexual (non-criminal) assessment was undertaken and the findings show Michael has below average knowledge of sexual anatomy and physiology. His results indicated that he is sexually attracted to women. He is open and non-defensive about his sexual interests and desires. He appears to have sadism fantasies which sexually arouse him. Please note, the presence of sadism fantasies alone are not a deviant behavior and are not indicative of a mental illness. With regard to any sexual obsessions or addictions it was found that he reported having had an addiction to pornography and is currently concerned about having a preoccupation with sex.

**EXHIBIT C**                    **Page 51 of 61**

<u>Summary of MSI II Findings</u>

Michael's test results suggest he has negative emotion disorder problems which underlie the condition of sex deviance. In other words, his diagnoses of an Autism Spectrum Disorder, ADHD, Major Depressive Disorder, and ADHD, underlie his sexualized behaviors. His results indicated he is very emotionally immature and has poor judgment overall which may affect his interests and choices of sex partners. He has a history of being victimized, misunderstood, and mistreated. This is likely a result of him not being able to fully assess the intent of social interactions, which allows others to take advantage of him. He appears to be easily hurt and angered. He may vacillate between argumentative defiance and passive, smiling acceptance. Michael's results also find that he is very emotionally needy and suffers from deep-seated emotions of feeling lonely, affection starved and abandoned. Feelings of emptiness and affective instability are suggested leading him to continually search for love and affection and when that does not occur, it contributes to his feelings of being victimized. His results indicate he is currently concerned about his preoccupation and obsession with sex which suggests he may have concern regarding his ability to control his sexual impulses. The results suggest he has a negative body image and low self-esteem. While his results indicate he is sexually attracted to women, his responses indicate he feels inadequate and lacks confidence in interacting socially with adult females which likely adversely affects his behaviors around them and his relationships with them. Test indicators suggest he may not have adequate coping strategies and skills which contributes to sexual problems. All together, these characteristics can be typical of an individual with an Autism Spectrum Disorder.

Michael did not report engaging in molest behaviors[5]. He reported having traded deviant pornography. He disclosed having had problems involving on-line solicitation of a minor. He does not recognize or is unable to acknowledge all of the behaviors which precede

---

[5] I reviewed some of the questions on the MSI-II with Michael on 02/10/2010. He did not understand several sexual terms that are commonly used in the MSI-II, such as molestation and sex play.

**EXHIBIT C**        **Page 52 of 61**

sexual behaviors, i.e., scheming/planning and excitement of the behavior. This supports information provided by Michael and collateral sources that indicate that he did not purposefully plan to engage in deviant behavior and that there was a combination of social niavety and lack of sexual knowledge that was associated with his behavior. Michael reported that he did not know he could possibly get in trouble if two underage individuals engage in sexual behavior. Michael's rigid and concrete thinking style, which is common in individuals with an Autism Spectrum Disorder, indicates that he will need explicit instruction on sexual boundaries and appropriate sexual behavior. Based on this profile, the MSI-II would suggest the presence of cognitive distortions underlying this behavior, at least in a typically developing male. This is not likely in the case of Michael, for the reasons just stated, but the possibility of this should be investigated in therapy.

Michael presented as depressed in mood. He says life is not worth living and that he has been having thoughts of how he might kill himself. Suicide ideation was endorsed by Michael on the MSI-II; however, he did not report suicidal ideation or having a plan, intent, or means to harm himself during my interactions with Michael.

_Treatment Candidacy_

If treatment is a consideration, then Michael's test taking behavior and responses can be helpful. For example, treatment amenability is evaluated by the degree of openness and disclosure shown on testing, evidence of sustained effort in taking the test, some estimate of contrition offered and the level of motivation to want to make the necessary changes.

Using the results from Michael's testing it was learned that he is capable of showing effort in treatment. He was generally found to be disclosing on testing which should carry over into treatment. He says he has committed a sex offense and now acknowledges engaging in inappropriate behavior. He reported he feels guilty about his

**EXHIBIT C**                    **Page 53 of 61**

behavior. He says he needs help because he is not able to control his sexual behaviors. His history of interpersonal difficulties, rigid thinking, and being bullied and victimized by others should also receive special attention throughout treatment.

### CURRENT DSM-5 DIAGNOSES

- Autism Spectrum Disorder, without Intellectual Impairment, with Language Impairment; Level 1, requiring support
- Attention-Deficit/Hyperactivity Disorder (ADHD) - Combined Presentation
- Major Depressive Disorder, Recurrent, Severe without Psychotic Features
- Generalized Anxiety Disorder

Diagnostically, Michael meets DSM-5 diagnostic criteria for an Autism Spectrum Disorder, ADHD, Major Depressive Disorder, and Generalized Anxiety Disorder. He does not meet DSM-5 diagnostic criteria for a Paraphilic Disorder.

Michael was first diagnosed with an Autism Spectrum Disorder when he was 15 years old; however, symptoms associated with this diagnosis were evident by his parents and professionals at a very young age. Autism Spectrum Disorder is a neurodevelopmental disorder characterized by (a) persistent deficits in social communication and social interaction across multiple contexts, and (b) restricted, repetitive patterns of behavior, interests, or activities. The totality of the available evidence indicates that Michael continues to exhibit social communicative deficits. Furthermore, restricted, repetitive patterns of behavior, interests, hypersensory responses, or activities are present. Current testing indicated that Michael's cognitive/intellectual abilities are within the average range; however, his processing speed is delayed. Furthermore, adaptive behavior test results noted significant deficits in his communication, daily living skills, and socialization. In particular, his receptive communication and interpersonal

**EXHIBIT C**                    **Page 54 of 61**

relationships are substantially delayed, with age equivalents of 2 years, 7 months and 3 years, 2 months, respectively.

Michael was also previously diagnosed with ADHD as a child and currently meets DSM-5 criteria for a Combined Presentation of this diagnosis. ADHD is a neurodevelopmental disorder that is characterized by a persistent pattern of inattention and/or hyperactivity that interferes with functioning or development. Results of the CAARS suggest that Michael still exhibits symptoms associated with inattentiveness, hyperactivity/impulsivity, and executive functioning problems. Deficits in working memory and processing speed are also common in individuals diagnosed with ADHD. In Michael's case, he has deficits in processing speed but not working memory (see WAIS-IV results); however, deficits in working memory were identified in previous psychological testing. Michael has been previously prescribed medications to assist him in managing his symptoms of ADHD; however, he was not prescribed medications for this condition while being incarcerated at the Delaware County Jail. He is receptive to medications to help manage his ADHD symptoms if permitted.

Major Depressive Disorder is a psychiatric disorder characterized by symptoms of depression that have been present for at least a two week period, represent a change from previous functioning, and cause clinically significant distress and/or impairment in functioning. Michael was diagnosed with a Major Depressive Disorder as an adolescent and has continued to experience symptoms of depression on and off throughout his adolescence and adulthood. Michael endorsed several symptoms associated with depression at the time of this evaluation, including the following symptoms; depressed mood / sadness, pessimism, feeling like a failure, loss of pleasure, guilty feelings, punishment feelings, self-dislike, self-criticalness, suicidal thoughts, crying spells, agitation, loss of interest, indecisiveness, worthlessness, loss of energy, decreased sleep, irritability, inconsistent appetite, concentration difficulty, tiredness or fatigue, and

**EXHIBIT C**                         **Page 55 of 61**

decreased sex drive. He also endorsed experiencing suicidal ideation on self-report measures but denied suicidal ideation as well as having a plan, intent, or means to harm himself during my interviews with Michael. He has previously been prescribed antidepressant medication to manage his symptoms of depression; however, he has not been given medication since being incarcerated at the Delaware County Jail.

Generalized Anxiety Disorder is a psychiatric disorder characterized by excessive anxiety and worry, occurring more days than not, for at least a six month period. Michael was diagnosed with this condition as an adolescent and continues to exhibit symptoms at this time. On the BAI, Michael endorsed several symptoms associated with Generalized Anxiety Disorder, such as restlessness or feeling keyed up or on edge, being easily fatigued, difficulty concentrating or mind going blank, irritability, muscle tension, and sleep disturbance.

## SEXUAL OFFENSES AND AUTISM SPECTRUM DISORDERS

Psychosexual test results indicated that Michael lacked knowledge in several areas associated with sexuality, including anatomy and understanding some of the differences between genders. It was also concluded that Michael does not exhibit behaviors associated with a Paraphilic disorder. This aligns with the results of the AASI-2 administered by Dr. Peterson on 08/30/2019.

Michael has substantial deficits in his social communication. He has struggled with communication and understanding the social nuances of everyday life, ranging from his interactions with others at school, work, and in the community. Simultaneously, he has struggled in developing, maintaining, and understanding interpersonal relationships, both in person and online. This is evidenced by his lack of friendships, being a target of bullying, and difficulty responding to sexualized comments made by a female peer that desired a relationship with Michael. It is likely that Michael continued to have difficulty

**EXHIBIT C**　　　　　**Page 56 of 61**

understanding the context and consequences of engaging in highly sexualized online communication that is associated with his current legal charges.

Similar to other individuals with and without an Autism Spectrum Disorder, Michael is interested in computers and video games. However, unlike those without a neurodevelopmental disability, individuals with an Autism Spectrum Disorder are still vulnerable when using technology, including social media, as they still lack social understanding. Given his lack of social- and sexual knowledge in some critical areas, Michael was vulnerable to engaging in illegal activity by accessing child pornography without fully understanding how this was wrong or appreciating the abuse and harm to the children depicted or with whom he communicated. Unfortunately, this is becoming a severe problem for this population due to their lack of social understanding, the ease of access to material on the intent, and an internet environment in which others are seeking sexual experiences but in which many young men with ASD try to participate but they simply lack the social judgment to understand the bounds of appropriateness as they become chronologically older than persons they feel are their peers. Michael now understands that his actions are wrong. Appropriate treatment can assist him in obtaining further education on appropriate sexual behavior and boundaries.

### TREATMENT RECOMMENDATIONS

1. Given the findings of my evaluation, a diversion program should strongly be considered as an appropriate outcome for this case. Around the country, such consideration of individuals on the Autism Spectrum is occuring owing to their lack of criminal intent, poor social understanding of laws regarding age of consent, no previous offenses, no sociopathic tendencies and the true danger incarceration represents for them. Diversion would provide ample time for the prosecutor and the court to be convinced that a criminal conviction is not warranted or necessary.

**EXHIBIT C**       **Page 57 of 61**

2. For individuals diagnosed with an Autism Spectrum Disorder, incarceration represents a true threat to life and well-being. Individuals with an Autism Spectrum Disorder are often targets of bullying and violence by inmates and staff [6789]. They often spend excessive time in solitary confinement in order to keep them safe or as punishment because they struggle to adapt to the social behavioral expectations imposed on them by the jail. This has already occurred to some degree in Michael's case as both Michael and his parents reported that he has been bullied by other inmates and previously placed into solitary confinement. I also observed Michael have difficulty controlling his hypersensitivity to jail attire such that he removed part of his jail clothing and was verbally reprimanded by a guard.

3. Inclusion on the registry of sexual offenders would serve to make a compromised life an impossible one where employers and neighbors reject one's very being. Michael has demonstrated some prosocial interests despite having difficulty doing so. He has attempted to seek employment and has completed courses in college. Furthermore, he has supportive parents that have advocated for him throughout his schooling.

4. Although research is limited on sex offender treatment options for individuals with ASD, available research and resources on this topic,[10,11] indicate that traditional

---

[6] Lewis, A., Ptrichett, R. Hughes, C., et al. (2015). Development and implementation of autism standards for prisons. *Journal of Intellectual Disabilities and Offending Behaviour, 6*(2), 68-80.
[7] Hare, D.J., Gould, J., Mills, R. & Wing, L. (1999). A preliminary study of individuals with autism spectrum disorders in three special hospitals in England.
[8] Robertson, C.E., & McGillivray, J.A. (2015). Autism behind bars: A review of the research literature and discussion of key issues. *The Journal of Forensic Psychology, 26*(6), 719-736.
[9] The ARC of New Jersey, Criminal Justice Advocacy Program. (2014). Individuals with intellectual and developmental disabilities who become involved in the criminal justice system: A guide for attorneys.
[10] Sutton, L.R., et al. (2013). Identifying individuals with autism in a state facility for adolescents adjudicated as sexual offenders: A Pilot Study. *Focus on Autism and Other Developmental Disabilities, 28*(3), 175-183.

**EXHIBIT C**          **Page 58 of 61**

sexual offending programs for sex offenders are ineffective with this population. Specifically, traditional sexual offending programs place a strong emphasis on learning to empathize with the victim's point of view, as well as participating in group therapy, both of which are difficult for individuals with ASD due to their deficits in social-communication. An alternative treatment model may involve a combination of psychotherapy and social skills training[12]. For reference, Yale University has provided the following guidelines for treating "Child Pornography Offenders" with an Autism Spectrum Disorder[13]:

    a. They need to be instructed very concretely, literally, and firmly that this behavior is unacceptable.

    b. They need instruction on the concept of underage males and females.

    c. They need instruction on how to distinguish between pornography that is everywhere and child pornography.

    d. They need instruction on explicit sanctions for viewing child pornography.

    e. They need instruction on how not to violate the rule that has been taught.

5. I also recommend that any treatment program that Michael is enrolled in should be one in which his psychiatric/pharmacological needs may also be addressed. He has been previously prescribed medications to manage his symptoms of depression and ADHD. It is recommended that he continue to be monitored by a psychiatrist while in treatment due to the severity of his depressive and anxiety symptoms at this time.

6. Given Michael's diagnosis of Autism Spectrum Disorder and his adaptive behavior deficits (see Vineland-3 results), he could benefit from services through

---

[11] DeAngelis, T. (2011). A tailored approach for autistic youth? *APA Monitor on Psychology, 42*(11), 71.
[12] Names of providers in Columbus, Ohio that specialize in working with adult offenders diagnosed with neurodevelopmental disabilities can be provided upon request.
[13] See Dubin, L.A., & Horowitz, E. (2017). *Caught in the web of the criminal justice system: Autism, developmental disabilities, and sex offenses*. Philadelphia, PA: Jessica Kingsley Publishers.

the Franklin County Board of Developmental Disabilities (FCBDD). He would specifically benefit from having a Service Coordinator, adult employment services, and/or consideration for a medicaid waiver. FCBDD has staff that are specialized in working with adult offenders with neurodevelopmental disabilities and can potentially provide additional support for Michael and his family. Michael and/or his parents are encouraged to contact the Intake Department at (614) 342-5490 to inquire about services. Additional information can also be obtained on the FCBDD website at https://fcbdd.org/enrollment/applying-for-services/.

7. Michael has substantial deficits in his social skills. Results of the Vineland-3 and other tests assessing symptoms of autism (i.e., ADOS-2, Reading the Mind in the Eyes Test - Revised) indicate that he has interpersonal difficulties, a lack of social competence, and cannot accurately or consistently interpet social norms. As an adjunct to the other treatment recommendations cited above, Michael could benefit from a structured social skills curriculum, such as the UCLA Program for the Education and Enrichment of Relational Skills (PEERS) program, that will teach him important life skills.  The PEERS program is an evidence-based curriculum that focuses on teaching young adults with Autism Spectrum Disorder basic social skills. Please note, the PEERS program is not currently available in Central Ohio. However, their website provides information and resources that Michael, his parents, and mental health treatment team can access in order to incorporate the curriculum into his treatment. Information on the PEERS program can be found at https://www.semel.ucla.edu/peers/young-adults.

**EXHIBIT C**                              **Page 60 of 61**

**Respectfully submitted,**

**Allen (A.J.) McConnell, Psy.D.**

**Psychologist**

**EXHIBIT C**　　　　　　**Page 61 of 61**

# DeLong, Peterson & Associates
## Clinical Consulting Specialists
Dayton & Greenville, Ohio


## CONFIDENTIAL


### Psychological Evaluation Report
**To be read only by those legal, medical or psychological professionals
on a need-to-know basis or those with permission of the client.**


**Identifying Information:**

| | |
|---|---|
| Name: | **Mr. Michael Sutherin** |
| Age: | 21 |
| Date of Evaluation: | August 30, 2019 |
| Location of Evaluation | Delaware County Jail, Delaware, Ohio |
| Evaluator: | Dr. Frederick L. Peterson |
| | Clinical Psychologist & Sexual Health Specialist |
| Evaluation Procedures: | Abel Assessment for Sexual Interest (AASI-2) |
| | Minnesota Multiphasic Personality Test (MMP2) |

**Introduction and Reason for Referral:**

Mr. Sutherin was referred to this evaluator from his attorney Mr. Mark Mahoney secondary to charges of possession of child pornography. The referral was to complete a clinical assessment of Mr. Sutherin's sexual interest pattern, utilizing the Able Assessment of Sexual Interests (AASI), the most sophisticated evaluation procedure available for investigating any sexual interests an individual may have in children.

**Psychological Testing Results for Mr. Sutherin:**

The specific focus of this assessment was using the AASI to evaluate whether Mr. Sutherin demonstrated objective evidence of sexual interest in children. A person who is clinically considered a pedophile is defined as a person having a mental illness characterized by enduring and intense sexual interest in young children. The question of whether Mr. Sutherin demonstrates evidence of pedophilia is important regarding the evaluation as it relates to any risk that Mr. Sutherin may present to children. This is a key question as research strongly suggests pedophiles are responsible for the vast majority of sexual acts perpetrated against children (Abel, Wiegel & Osborn; 2007; found in *Innovations in Clinical Practice: Focus on Sexual Health*, by VandeCreek, Peterson & Bley).

**EXHIBIT D**                                            **Page 1 of 9**

**Page 2/9: Sutherin**
**Psychological Testing Results (continued):**

Subjective and objective measures of Mr. Sutherin's sexual interest pattern were evaluated by the Abel Assessment for Sexual Interest (AASI-2), which is the most advanced psychological assessment for evaluating pedophiles currently available. The AASI-2 shows the client hundreds of slide viewings of clothed people representing different ages (including four prepubescent age categories), different genders, and different races. All together, the ASSI-2 evaluates the client's sexual interest across 22 different sexual interest categories.

Mr. Sutherin was asked to rate his sexual attraction to each person in the slides, which produced his self-reported subjective ratings of his sexual interests. Outside of his awareness, objective measures were concurrently being taken regarding all slide categories which produced more empirical measures of Mr. Sutherin's sexual interest patterns. These measures have seventy years of research documenting the direct relationship between sexual interest and the objective patterns demonstrated on the AASI-2. Basically, this relationship demonstrates that the higher the sexual interest an examinee has toward the person in the slide, the more significant the objective measure the examinee demonstrates toward the person in the slide.

The results of the AASI-2 confirm that Mr. Sutherin's self-reported sexual interests are primarily toward adult and adolescent females. He also demonstrated some interest towards adult men. Objective measures of Mr. Sutherin's sexual interest pattern demonstrate an absence of sexual interest in any prepubescent females. This sexual interest pattern reflects a pattern of sexual interest typical for adult males. There are no indications or evidence that Mr. Sutherin has sexual interests in prepubescent children.

Statistically, sociologically and biologically; it is normal for adult men to have sexual interest in teenagers, but it is illegal for men to pursue their interest to the point of attempting to have physical contact. Because of both the age of this young man and his history of autism spectrum disorder, it is especially within normal limits (if not expected), that Mr. Sutherin would demonstrate sexual interests in adolescent females.

Mr. Sutherin's self-report was consistent with his objective measures, meaning he was not attempting to hide or conceal his true sexual interests. The combination of his objective and self-reported measures are valid and reliable evidence that, beyond a reasonable level of psychological certainty, Mr. Sutherin is not a pedophile. He is sexually attracted to adults, women and adolescent females as well as adult men. Again, these results are within the normal range for adult males.

**Page 3/9: Sutherin**
**Psychological Testing Results (continued):**

Mr. Sutherin completed the Minnesota Multiphasic Personality Inventory II (MMPI-2), a widely used and respected objective personality test. Results were reviewed and considered valid. It is typical for individuals to want to present themselves in a favorable light in these types of evaluations, as did Mr. Sutherin. His responses were a bit guarded but the clinical profile he produced is valid.

Patients with Mr. Sutherin's clinical profile on the MMPI-2 are typical for people who have concerns regarding the functioning of their body but also are introverted, having poor social skills, and feeling insecure and anxious in interpersonal relations. They often have high energy and considerable drive, as well as wanting to avoid situations with interpersonal conflict. There were no signs of psychosis or personality disorder. Overall, Mr. Sutherin's clinical profile demonstrates an overall healthy adjustment (with the symptoms noted above).

The mental status examination, psychiatric interviews and results from psychological testing rule out psychopathology such as brain abnormality (such as traumatic brain injury), substance abuse problems, or personality disorder (such as psychopathic personality disorder) for Mr. Sutherin. He does not match any specific diagnostic criteria for such a personality disorder or sexual disorder.

Mr. Sutherin was referred for assessment of his mental health and sexual health, with a specific concern about his history of committing a sex offense. He participated on a voluntary basis. An important aspect of this evaluation is the assessment whether Mr. Sutherin demonstrates evidence of having pedophilia (Pedophilic Disorder in the Diagnostic Statistical Manual; DSM-5). Regarding Mr. Sutherin, there are several important questions.

**Key Questions Regarding Mr. Sutherin:**

1.    Does Mr. Sutherin have pedophilic disorder?

Answer:   No.  Based on objective measures taken outside Mr. Sutherin's awareness as well as other contra-indications in this assessment, the answer is that he is not a pedophile.  Pedophiles will continue to think and respond sexually toward children all their lives because of their enduring and intense sexual interest in children. Pedophilia is a classified mental illness and pedophiles are responsible for the overwhelming majority of sex offenses against children.  As noted earlier, the vast majority of sex offenses against children (90-95%) are perpetrated by adult pedophiles (Abel, et. al. 2007, found in *Innovations in Clinical Practice: Focus on Sexual Health*, edited by VandeCreek, Peterson & Bley).  Objective measures taken during this evaluation serve as evidence indicating that Mr. Sutherin does not have sexual interest in preadolescent children.

**EXHIBIT D**                    **Page 3 of 9**

**Page 4/9: Sutherin**
**Key Questions (continued):**

2.  <u>Upon which sources of information is this conclusion based?</u>

    a.  Objective measures of Mr. Sutherin's sexual interest pattern take
        outside his awareness, via the Able Sexual Interest Inventory-2 (AASI-2),
        which has 70 years of research support and is the most sophisticated
        technology available for investigating evidence of pedophilic interests.

    b.  Self-reported sexual interest patterns which were consistent with
        AASI-2 objective measures, indicating Mr. Sutherin made no
        attempt to misrepresent his sexual interest patterns.

    c.  Personality evaluation ruling out serious mood or thought
        disorders, brain injury, or substance abuse disorders that could account
        for problematic sexual behavior (see below).

    d.  Clinical judgment based upon thirty years of evaluating sex offenders and
        work in the fields of clinical psychology and sexual health.

**Special Note Regarding Autism Spectrum Condition:**

It is important to note that Mr. Suthrin has been previously diagnosed with
Autistic Spectrum Disorder (ASD) and there is significant scientific literature to be
considered relative to interpreting any test results from evaluation of this
individual. The term Autistic Spectrum Condition (ASC) will be used in this report
as it is the direct synonym of ASD as defined by the (fifth edition of) the
Diagnostic and Statistical Manual of Mental Disorders (American Psychiatric
Association, 2013) yet is more respectful of individuals with neurodiversity by
acknowledging their strengths as well as challenges (Mandy, Clarke, McKenner,
Strydom, Crabtree, Lai, Allison, Baron-Cohen & Skuse; 2018).

People with ASC frequently have behaviors associated with inappropriate sexual
behavior which are related to reduced social and coping skills, learning problems,
obsessive thinking, following others, and more limited impulse control (Stokes,
Newton & Kaur, 2007; Attwood 2013; O'Sullivan and Thompson, 2014). All these
behaviors listed are very common among people with ASC and, therefore,
people with ASC are at an increased risk of engaging in inappropriate sexual
behavior for reasons other than pedophilia. Individuals with ASC sometimes
engage in sexually inappropriate behavior for reasons different from typical sex
offender motivations and are therefore more likely to be misdiagnosed and
prosecuted for a sex crime when they may not have intent to offend and simply
do not understand social and sexual norms (Gritfiths, 2007).

**Page 5/9: Sutherin**
**Special Note Regarding Autism Spectrum Condition (continued):**

However, it is particularly important to consider the behavioral implications of a diagnosis of ASC (ASD) and distinguish between sexual behaviors that can have either an "adolescent onset, non-paraphilic" motivation and those that have "adolescent onset, paraphilic" motivation for inappropriate sexual behavior (Abel, Wiegel, & Osborn, 2007; Attwood, 2013). The first of which ("adolescent onset, non-paraphilic" motivation) refers to individuals engaging in sexual behavior without full recognition of the consequences and often in response to difficulties establishing age-appropriate relationships as with those with ASC.

The latter ("adolescent onset, paraphilic" motivation) refers a pedophilic interest simply for sexual gratification and does not appear to be the key motivation in understanding Mr. Sutherin's sexual behavior.  The differentiation of divergent reasons for sexual behavior (experimentation vs. pedophilic sexual gratification) is important based on the observed frequency of people with ASC having difficulty with inappropriate touch and establishing age-appropriate relationships (Bromberg & O'Donohue, 2013). Failure to understand the differences between neuro-typical and neuro-diverse individuals can lead to the later being misdiagnosed as pedophilic sex-offenders.

Regarding individuals with ASC (the American Psychiatric Association estimates their prevalence at approximately one in one hundred), they are people with sexual feelings and interests the same as all people.  There is nothing inherent in having ASC that makes a person predisposed to having sexual interests in children or make a person more inclined to sexual deviance of any kind. However, because ASC is a neurodevelopmental disorder of the brain that causes developmental delays, including social maturation, teens and young adults with ASC are typically delayed five years in their development and can often engage in behavior seen as inappropriate by others (including touching others) (Ashley, 2007).  Because of the inherent deficit in social skills, often these behaviors are engaged with younger children who are seen as peers by the individual with ASC (Ashley, 2007) and parents of teens with ASC are encouraged to repeatedly educate their child about inappropriate touch in order to avoid "becoming either a unwitting sexual offender or vulnerable to sexual victimization" (Mesibov, Shea & Adams, 2001).

General research findings on adolescent sexuality also applies to Mr. Sutherin. It is widely accepted across the fields of medicine and psychology that sexual experimentation during childhood and adolescence is quite normal (and even considered necessary) in terms of typical sexual development into a healthy adult (Levay, Baldwin & Baldwin, 2015).  As an example, the Mayo Clinic identifies healthy sexual exploration as part of normal development in their special section on "Teen Sexuality" within the Mayo Clinic Family Health Book (Litin, 2009).

**Page 6/9: Sutherin**
**Special Note Regarding Autism Spectrum Condition (continued):**

However, the increased access to explicit images on the internet has unfortunately lead to the unusual circumstances of pornography becoming a misleading (yet common) form of sex education for youth (Cooper, 2002; Peterson, Bley & Frabotta, 2019) and can lead to further risk of learning maladaptive sexual behaviors that become problematic (Bancroft 2006).

Mr. Sutherin has also subject to influences from his gender in that males are four times more likely to be diagnosed with ASC (Baio, Wiggins, & Christenson et al., 2018). In addition, adolescent boys are more likely to engage in sexually "experimental" behavior that is not considered motivated by predatory or pedophilic interests (Dubin, Henault, & Attwood, 2014; Wurtele & Kenny, 2011). Common to many adolescents (including those in their twenties) is the lack of personal sexual experience that keeps them from fully forming a mature sexual identity (Peterson, Bley & Frabotta, 2019). This is especially true of neuro-diverse individuals on the autism spectrum, such as Mr. Sutherin.

**Conclusions:**

Mr. Sutherin was referred for assessment of his mental and sexual health. Results of this evaluation support the view that, to a reasonable level of psychological certainty, Mr. Sutherin does not have sexual interest in prepubescent children.

Thank you for the opportunity to render my professional opinion regarding Mr. Sutherin's circumstances. If you have any questions regarding this report (and have a signed ROI), please contact me through the Delong, Peterson & Associates (937-479-0008).

**DISCLOSURE STATEMENT**

*The statements above are a summary of the psychological evaluation concerning this individual. These statements are a summary of interpretive psychological data and are based upon a reasonable degree of psychological probability. This evaluation consists of the clinical interview of Mr. Sutherin. The undersigned reserves the right to amend any and all opinions in this case should further evidence presents itself after the fact following the submission of this report. This author would be willing to re-evaluate any additional evidence that may come forth if requested to do so. Finally, it should be underscored that the conclusions of this assessment addressing this individual's issues are not offered as an opinion concerning a statement of law, guilt, or innocence, but a statement of the psychological issues of Mr. Sutherin.*

**Page 7/9: Sutherin**

Respectfully submitted,

*Docpete*

Dr. Frederick L. Peterson                    Date: February 10, 2020

Clinical Psychologist & Sexual Health Consultant
Director, Sexual Health Program
DeLong, Peterson & Associates: Clinical Consulting Specialists

Clinical Assistant Professor              Adjunct Teaching Faculty
Department of Specialty Medicine          Department of Psychology
College of Osteopathic Medicine           College of Science & Mathematics
Ohio University                           Wright State University

Innovations in Clinical Practice: Sexual Health (Professional Resource Press, 2007)
Joyful, Healthy Sex: Fundamental Education (BR Publishing Corporation, 2010)
The Gender Revolution & New Sexual Health (Cognella Academic Publishing, 2019)

**Page 8/9: Sutherin**
**References:**

### References Used in Report

Abel, G., Wiegel , M., & Osborn, C. (2007); Pedophilia and Other Paraphilias. Found in *Innovations in Clinical Practice: Focus on Sexual Health*, by VandeCreek, Peterson & Bley. Sarasota: Professional Resource Press.

American Psychiatric Association (2013): Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition. Arlington, VA: American Psychiatric Association.

Ashley, S. (2007). The Asperger's answer book: The top 300 questions parents ask. Naperville, Illinois: Sourcebooks.

Attwood, T. (2013). From Like to Love for Young People with Aspergers Syndrome (Autism Spectrum Disorder): Learning How to Express and Enjoy Affection with Family and Friends. London: Jessica Kingsley Publishers.

Baio J., Wiggins, L., Christenson, DL, et al. (2014). Prevalence of Autism Spectrum Disorder Among Children Aged 8 Years – Autism and Developmental Disabilities Monitoring Network, 11 Sites, United States, MMWR Surveili Summ, 2018;67(No. SS-6):1-23. DOI: http://dx.doi.org/10.15585/mmwr.ss6706a1externalicon.

Bancroft, J. (2006). Chapter 2: Normal Sexual Development. In *Juvenile Sex Offender* (2nd ed., pp. 19–57).

Bromberg, D. S., & O'Donohue, W. T. (2013). *Handbook of Child and Adolescent Sexuality: Developmental and Forensic Psychology.* Oxford: Academic Press.

Cooper, A. (2002). Sex and the Internet: A guidebook for clinicians. New York: Brunner-Routledge

Dubin, N., Henault, I., & Attwood, T. (2014). The Autism Spectrum, Sexuality, and the Law. London: Jessica Kingsley Publishers.

Griffiths, D. (2007). Sexual and gender identity disorders: A texkbook of diagnosis of mental disorders in persons with intellectual disability. Editor: Fletcher, R. et al. New York: National Association for the Dually Diagnosed.

LaVay,S., Baldwin, J., & Baldwin, J. (2015).Discovering Human Sexuality. Sunderland, MA: Sinauer Associates.

Litin, S. (2009). Mayo Clinic Family Health Book. Des Moines, IA: Time Inc. Home Entertainment.

**Page 9/9: Sutherin**
**References (continued):**

Mandy, W., Clarke, K., McKenner, M., Strydom, A., Crabtree, J., Lai, M., Allison, C., Baron-Cohen, S. & Skuse, D. (2018).  Assessing autism in adults: An evaluation of the developmental, dimensional and diagnostic interview – adult version (3Di-Adult).  Journal of Autism and Developmental Delays (48: 549-560).

Mesibov, G., Shea, V. & Adams, L. (2001). Understanding Asperger syndrome and high-functioning autism. New York: Kluwer Academic Plenum Publishers.

O'Sullivan, L., & Thompson, A. (2014). Chapter 15: Sexuality in Adolescence. In *APA Handbook of Sexuality and Psychology* (Vol. 1, pp. 433–486). American Psychological Association.

Peterson, F. Bley, J., & Frabotta, R. (2019). The Gender Revolution and New Sexual Health. San Diego: Cognella Academic Publishing.

Stokes, M., Newton, N., & Kaur, A. (2007). Stalking, and social and romantic functioning among adolescents and adults with autism spectrum disorder. Journal of Autism & Developmental Disorders, 37 (10): 1969-86. Epub 2007 Feb 2.

Wurtele, S. K., & Kenny, M. C. (2011). Normative sexuality development in childhood: Implications for developmental guidance and prevention of childhood sexual abuse. Journal of Multicultural Counseling and Development, 43(9), 1–24.



THE NORTH CAROLINA STATE BAR

# JOURNAL

WINTER
2009

IN THIS ISSUE

An Interview with Our New President *page 10*

Access to Civil Justice in North Carolina *page 12*

Judicial Independence *page 16*

EXHIBIT E                    Page 1 of 6

# Autism in the Criminal Justice System

By Judge Kimberly Taylor, Dr. Gary Mesibov, and Dennis Debbaudt



Autism Spectrum Disorder (ASD) diagnoses are increasing at an alarming rate in North Carolina, across the country, and around the world. This increase in the incidence of ASD suggests that the criminal justice system (CJS) will certainly see increased contact with individuals with autism as victims, witnesses, and/or offenders. All criminal justice professionals who have contact with individuals who have ASD need to establish clear and consistent communication methods, verify facts, make appropriate accommodations, and ensure fair justice and consequences for all concerned.

Communications, behaviors, intent, and ability levels of people with autism vary greatly and present challenges for even the most experienced criminal justice professionals. Attorneys and judges must avoid misinterpretation of behaviors and characteristics typical of those with autism since these behaviors and characteristics could be misinterpreted as evidence of guilt, indifference, or lack of remorse.[1]

## What Is Autism?

Autism is defined as a neuro-developmental disability, meaning that it involves the brain and starts very early in life when the brain is still forming and still changeable. Autism involves differences and difficulties in several areas: social interaction; communication; the presence of narrow, repetitive behaviors; and adjusting to change. ASD occurs more frequently in males than females—usu-ally a four-to-one ratio. Additionally, there is a wide range in intellectual ability for individuals with ASD where IQs span from below 25 to above 150.

## Low-Functioning Individuals

The term "low-functioning" may be used to describe persons with lower IQs. These per-sons have difficulty with basic life skills such as safely crossing a street, negotiating a

financial transaction, and making sense of social interactions. They typically have a caregiver with them at all times. Oftentimes, these low-functioning individuals are also nonverbal. Those who are nonverbal may use alternative communication such as American or other sign language, Picture Exchange Communications Systems (PECS), or computers that can speak for them.

Although individuals with ASD could commit a criminal offense, their intent to do so could be difficult to determine, questionable in court, and their competency may not reach the level of responsibility for an offense. Also, in most circumstances, individuals would be greatly compromised in their ability to assist in their own defense.

As crime victims rather than criminal offenders, individuals with ASD present the perfect victim. People with ASD have great difficulty communicating details and experiences of their victimization, thus resulting in a lack of credibility in interview and courtroom situations. This reality creates major issues regarding time and resource considerations for investigators and attorneys.

Investigators and attorneys should consider the following accommodations and guidelines in preparation for the victim-witness interview of a person with ASD:

■ Interview the care provider, parent, or person who first heard the disclosure of victimization.

■ Investigate the possibility of multiple victims by interviewing all persons with whom the perpetrator had contact.

■ Review all records of assessment.

■ Discover the person's communication strengths and deficits.

■ Interview care providers and persons who know the individual with ASD to discover how he or she best receives and provides information.

■ Consider videotaping all interviews.

■ Plan questioning based on the person's ability level.

■ Use the person's first name.

■ Speak to adults as adults; children as children.

■ Use simple, direct language.

■ Deal with one issue at a time.

■ Have the individual recreate events in his or her own words—a narrative interview.

■ Make sure both your word choice and the individual's word choice have the same meaning to each person.

■ Make sure all individuals understand to whom a pronoun refers when using pronouns.

■ Ensure question length is short, direct, and concise.

■ Utilize maximum patience, as formulating answers takes longer for individuals with ASD.

■ Ask for and get permission before repeating questions.

■ Become convinced of the person's ability to tell the truth.

■ The person may have short attention span; take frequent breaks.

■ Be alert to nonverbal cues indicating the person is confused or does not agree to your statements or questions. Get confirmation through direct questions.[2]

## High Functioning Individuals

"High-functioning autism" or "Asperger syndrome" are terms describing persons who are verbal, may hold jobs, and live semi- or fully independent lives. Currently, no statistics have been developed about the rate of contacts young people on the autism spectrum will have with the criminal justice system, although research indicates that people with autism spectrum disorders and other developmental disabilities will have up to seven times more contacts with law enforcement during their lifetimes than members of the general population.[3] While there is no evidence to suggest that they will commit crime at a higher rate than the general population, those that do and can be held responsible for their acts will typically be the more independent, so-called higher functioning persons with autism or Asperger syndrome.[4]

Persons with ASD often get into trouble without even realizing they have committed an offense. Offenses such as making threatening statements; personal, telephone, or internet stalking; inappropriate sexual advances; downloading child pornography; accomplice crime with false friends; and making physical outbursts at school or in the community, would certainly strike most of society as offenses which demand some sort of punishment. This assumption, though valid at face value, may not take into account the particular issues that challenge the ASD individual. Problems with sensory overload, poor social awareness, semantic misunderstandings, inability to deal with changes in routine or structure, and little to no understanding of nonverbal communication, are the very kinds of things that make more appropriate responses to society very difficult

for someone with ASD. For example, what appears as antisocial behavior to the "regular" world is often simply the manifestation of the ASD person's social misunderstandings. While most would see too many phone calls in the middle of the night as aberrant phone stalking, the ASD person might well view the situation as one friend wanting to talk to another, no matter the time or frequency of calls. And a physical outburst at school might well be related to the ASD person's sensory dysfunction, inability to deal with interruptions in the daily routine, or emotional liability. Emotional liability means to be susceptible to change, error, or instability and stems from its Latin roots meaning prone to slip. This often presents itself in individuals with ASD—their emotions can change quickly and they can become upset, scared, or anxious very quickly. They may also be extremely anxious one minute, and then calm the next, or vice versa. So, while the individual with ASD might have committed the offense in question, the intent might well have been anything other than to do harm.[5]

The offender may appear as normal, be more able academically and more independent than a person with classic or low-functioning autism. Yet, these strengths can mask social and communication deficits that go unseen or misunderstood by those with whom they have contact.

Their communication difficulties include hardships in making sense of the verbal and body language of others. Their difficulty in maintaining eye contact or insistence on changing the subject of conversation to a topic of their choice—all typical diagnostic behaviors of a person with autism—can mislead an investigator, attorney, or judge. They may appear to lack respect and be a "rude, fidgety, and belligerent" person who, by nature of his lack of eye contact and evasive conversation, appears to have something to hide. Standard interrogation techniques that utilize trickery and deceit can confuse the concrete-thinking person who has autism or Asperger syndrome into producing a misleading statement or false confession. They can become overly influenced by the friendly interrogator. Isolated and in a never-ending search for friends, the person can easily be led into saying whatever his new friend wants to hear.[6]

What are ASD dilemmas for prosecutors, defense attorneys, probation officers, and judges? Left unexplained, the person's courtroom displays of laughing or giggling, their

loud vocal tone, and aloof body language—also inherent to the condition of ASD—could lead many judges to conclude that this is, indeed, a guilty and remorseless person. Everything in the suspect's demeanor says so. The person may very well have no idea of the effect their behavior is having on a judge, jury, or even his or her own defense attorney. Even the best defense attorney might see guilt in his client's display of behaviors.

During questioning, initial contact, or in a courtroom setting, a person with ASD might display these additional behaviors and characteristics:

■ An inability to quickly process and respond to requests, commands, and questions.

■ Be a poor listener, may not seem to care about what you have to say.

■ Be unable to deduce what others are thinking and why they are thinking it.

■ Repeat the words, statements, body language, and mannerisms of the investigator.

■ Make statements that seem tactless or brutally honest. If you are overweight, bald, or smell of smoke or perfume, they may bluntly remind you.

■ Have difficulty recognizing slang terms, innuendo, colloquialisms, figures of speech, or jokes. Ask, "What's up your sleeve?" and the concrete answer may be, "My arm."

■ The ASD person might have difficulty understanding communications such as rolling of eyes, raised eyebrows, and other nonverbal signs of your frustration and disbelief.[7]

Situations can arise for individuals with autism where their logic does not work or where their ability to integrate different sources of information is more limited. Even when it may seem to you that your question is clear, misinterpretations can occur.

What they have trouble doing is conceptualizing—putting together information in complicated situations. So they have trouble with context and figuring out how things get connected and what they mean. They look at one situation, they look at it concretely, and don't always look at it in the context of trying to figure out what would be the different connections in that situation. This can impact legal situations with which you may be involved. One criteria is, what would a normal person do in this situation? A person with autism is not necessarily normal in the way that they process the information and put together the different parts. Thus, that standard may need to be modified a bit in order to understand them. And what is a person who thinks like this per-

son expected to do? And what might they not be expected to be able to do? All of this needs to be considered.

Criminal justice professionals should be aware that a person with autism has less ability to understand verbal communication. The simplest thing professionals can do to be helpful is to speak slowly. Individuals with ASD process information much more slowly than typical people who have their same intelligence level and skills.

Another helpful tool is to always have a pen and paper available. If in doubt, write it down. If they are in doubt, let them write it down. Their visual skills are much stronger than their auditory skills.

Individuals with ASD are a concrete group; therefore, criminal justice professionals must not mistake their concreteness for making a wise-crack. One child with autism was given an intelligence test in which he had to take felt pieces and put them together to make a another child's face. The child made a face with a big smile. The child with autism was then asked, "How does the child feel?" and he responded, "Soft." A teenager with autism was asked by a questioner who knew he had recently turned fifteen, "How old are you?" The teen replied, "Fifteen." The questioner then asked, "When was that?" "On my birthday," he replied. Somebody could take this type of response as a wise-crack because most people would understand what the questioner meant. However, very often people with autism have trouble with the context, connotation, and/or the meaning of the sentence. For this reason, professionals must be very direct and very concrete in their language choice when interacting with individuals with autism, and they must never rush to judgment concerning the responses of people with autism. Frequently, their responses seem to be disrespectful, "smart aleck," and off topic, but this behavior is normal for the autism spectrum.

Weak verbal abilities often mask much higher intelligence levels in people with autism. For example, a lot of times individuals with ASD don't understand what a teacher is saying. That gets them into trouble because the teacher thinks they're not listening and not obeying. Very often, to get out of this situation, they'll just agree. As a result, the teacher says, "Do you hear me," "Do you understand me?" They don't understand, but they can tell the teacher is getting annoyed. Finally, they just say, "Yes." They have learned that an affirmative answer gets them out of

the situation. Thus, in interview settings, the effects of pushing too hard or too intensely for answers will generate affirmative answers from individuals with autism which do not necessarily reflect any truth.

People with autism have reported that it is really hard for them to concentrate and understand what they are saying when they are looking directly at somebody. Many people in society see this as rude behavior. A judge or attorney who asks questions and then observes that the person with autism is looking off into the distance may assume this reflects a lack of respect. In reality, this is normal behavior for the individual. When interviewed, one young man with autism made the point, "I keep telling people 'I'm looking at you. I'm looking at you. I'm looking at you. I'm looking at you. I don't understand a word that you're saying, but I'm looking at you. I'm looking at you.'" And some people with autism have actually said, "You can have your choice with me. You can have me look at you or you can have me understand what you're saying. I can't do both."

## Interview/Interrogation Techniques

So, what can the criminal justice professional do to prepare for interactions with persons with ASD? Try to avoid jumping to conclusions or making attributions based on unusual or "inappropriate behaviors." Remember that autism is a social impairment. A component of the social impairment is that individuals with autism may appear to be impolite or disrespectful.

Criminal justice professionals who interact with and question people with autism or Asperger syndrome will enjoy the best opportunity for success by incorporating the following strategies:

■ Approach in a quiet, non-threatening manner.

■ Talk calmly in a moderate voice.

■ Do not interpret limited eye contact as deceit or disrespect.

■ Avoid metaphorical questions that cause confusion when taken literally (i.e., a hard time, Are you pulling my leg?, Cat got your tongue?, What's up your sleeve?, spread eagle, or You think you are cool?).

■ Avoid body language that can cause confusion. Be alert to a person modeling your body language.

■ Understand the need to repeat and rephrase questions.

■ Understand that communications will

**EXHIBIT E**

take longer to establish.

■ Use simple and direct instructions and allow for delayed responses to questions, directions, and commands.

■ Seek assistance from objective professionals who are familiar with ASD.[8]

The interviewer should develop a plan of action that incorporates patience and persistence on his or her part. The interviewer is interacting with somebody who might not always get the message, question, or concept straight. Much patience is necessary because impatience may make them very anxious. They really do want to please; they just don't know how to do that all the time. But they can sometimes tell if they're doing it successfully or not. Therefore, practice patience in all situations when dealing with individuals with autism or Asperger syndrome. Interviewers must understand they will not necessarily get the answer the first time or during one modality of questioning because of the person's understanding of the context, and your speed and pacing is going to affect it. They are inconsistent processors sometimes. So, they might understand one question perfectly well and then understand the next question not at all. Sometimes interviewers may have to write something down or draw it out and let them look at it. The key is being patient so you don't get them emotionally aroused and upset. Being supportive and continuing to try different methods of communication will help the person with autism to answer in a way that can be understood and make sense to all involved parties.

## Environmental Accommodations

People with autism may have more difficulty in that they are overstimulated by the sensory environment—the sights and sounds that will distress them. Noises are louder for them. Normal background noise that may seem negligible to the average person can be completely overwhelming or overpowering to this population. When this occurs, not only can they not hear what people are asking them, but they can sometimes become very anxious and even terrorized by the situation or by the noise.

Additionally, lights are often brighter for those with ASD. For example, when a person with autism is outside on a sunny day—which in North Carolina most of us love—the light may be very overstimulating, like somebody shining a very bright flashlight right in their eyes. Therefore, in many environments, the lighting itself causes distress.

Intense sensitivity can extend to any of the senses and interrupt functioning on many levels. Many very capable people with autism will score high on an IQ test, but can have horrible school records. The common noise, disruption, and movement in a typical classroom can be so disruptive that they cannot focus on that one thing in the classroom on which they are supposed to focusing. The same situation may exist in a courtroom or interview room.

As a result, adjustments in the environment can be crucial to a successful interview. Consider making accommodations to the sensory environment when interacting with a victim, witness, or offender who has autism or Asperger syndrome. Keep lighting low; use subdued colors; limit distracting images or pictures; eliminate the presence of non-essential personnel; avoid using perfume, aftershave, or scented soaps; and avoid touching the person with autism.

## Sentencing Considerations

In those cases where it has become clear that the person has committed the crime and qualifies for a diversion or probation program, the offender may be further stymied by his autism. Traditional options might include group therapy with other offenders. Meeting with strangers, group discussions about personal feelings, sharing personal information or contributing comments about others may be difficult conditions for the person with ASD to meet.[9]

Corrections professionals can find success with the ASD population when they create diversion or probation programs that:

■ Use language and terms the person will understand.

■ Avoid the use of technical terms.

■ Involve persons who the individual knows and trusts.

■ Describe (use photographs) beforehand the persons the individual will work with and venues in which they will meet.

■ Assure the individual that the new persons are safe.

■ Utilize the individual's strong rote memory skills.

■ Teach the rules of program with visual aids.

■ Use pictures to describe actions and situations.

■ Create a chronological list of the program, develop a poster with bullet points.

■ Discover what is important to the person with ASD. Avoid trying to make them fit into

what is important to you.[10]

If an individual with autism is taken into custody, alert jail authorities. This person may be at risk in the general jail population. For short-term custody, consider segregation, monitoring, and a professional medical and development evaluation.

Incarceration will be fraught with risk for the person and anyone in contact with him or her. Their direct manner, offbeat behaviors, and characteristics may be read by other inmates as an invitation to exploit and control. Corrections professionals may see a rude, incorrigible person. Good behavior privileges will be hard to earn. Correctional professionals who work with the incarcerated ASD population will benefit greatly from comprehensive training, at the least a good briefing and access to ongoing assistance from a professional who is familiar with autism.[11]

## Conclusion

Some people have described autism as a culture. Consider the need for a translator when dealing with a person who speaks little or no English. Working with someone with autism is analogous to that situation in that successful communication is blocked, but not as easily overcome. Autism, as a culture, is an analogy that emphasizes the very different ways the affected person processes information and understands things—very much as people from different cultures view things differently.

We are obligated by our profession to understand that those cultural differences may loom larger in a person with autism than most cultural differences stemming from language, tradition, or history. The cultural differences of autism come from the way the brain actually works, requiring a total difference in understanding and perception. Our role becomes one of translator. The quality of our translation is dependent upon our resourcefulness, knowledge of autism, patience, and understanding. We can and must meet the challenges of this growing population by embracing our roles in the process.

Consider utilizing as a resource an objective autism professional who can act as a "friend of the court." This person can help interpret the behaviors and communications of persons with autism and can help people understand what the person with autism understands. He or she can also advise about the impact of the language the questioner is using. Each case will be different, each fact pattern is different, and the ability of people

# Joint Legislative Study Committee on Autism Spectrum Disorders

Citizens with autism should feel safe, understood, and supported in their communities by public authorities who protect and serve them in the same ways as the general population. That has not always been the case.

As a result of a tragic case in Statesville, North Carolina, involving a low-functioning man with autism who tragically died while in custody of the police, a Joint Legislative Study Committee on Autism Spectrum Disorder, Law Enforcement, Public Safety, and First Responders was established in 2005 and reappointed in 2007 by the president pro tempore of the Senate and the Speaker of the House of Representatives. The committee was authorized to study the availability and appropriateness of autism-specific training and education for law enforcement personnel, community colleges, public safety personnel, first responder units, judges, district attorneys, magistrates, and related organizations.

The charge of the committee was to make recommendations to the General Assembly based on their findings. Several recommendations were adopted and implemented; additionally, the General Assembly appropriated a grant to fund a training video to raise awareness of autism within the judicial system.

The article in this edition of North Carolina State Bar *Journal* is written to supplement the information and illustrations of the video *Autism In The Criminal Justice System*, which was produced for use by the University of North Carolina School of Government and other legal organizations in consultation with UNC Division TEACCH (The Treatment and Education of Autistic and Communication-Handicapped Children), UNC School of Medicine, Carolina Institute of Developmental Disabilities, to develop continuing legal education training regarding the identification, safety, and needs of those with autism in their communities.

For more information and to view *Autism in the Criminal Justice System*, please visit www.lewisdaggett.com/autismawareness. ■

*Dennis Debbaudt is the proud father of Brad, a young man who has autism. A professional investigator and law enforcement trainer, Dennis has authored or co-authored over 30 autism safety-related articles and books including* Autism, Advocates, and Law Enforcement Professionals: Recognizing and Reducing Risk Situations for People with Autism Spectrum Disorders *and* Contact with Individuals with Autism. *Debbaudt is co-producer of the* Autism in the Criminal Justice System *video.*

### References:

1. D. Debbaudt (2004), *Beyond Guilt or Innocence*, The Developmental Disabilities Leadership Forum (a project of the UCE at the Shriver Center—a division of the University of Massachusetts Medical School).

2. Farrar, P. (1998) 'Preparing for the Interview.' In L. Hutchinson MacLean (ed) Admissible In Court: Interviewing Witnesses Who Live With Disabilities. Lethridge, Alberta, Canada. Hutchinson MacLean Productions.

3. Curry, K., Posluszny, M and Kraska, S. (1993) Training Criminal Justice Personnel to Recognize Offenders with Disabilities. Washington, DC: Office of Special Education and Rehabilitative Services News In Print.

4. D. Debbaudt (2004), *Beyond Guilt or Innocence*, The Developmental Disabilities Leadership Forum (a project of the UCE at the Shriver Center—a division of the University of Massachusetts Medical School).

5. *Id.*

6. *Id.*

7. D. Debbaudt (1996), *Educating the Public and Law Enforcement: A Handout for the Detroit-Wayne County Community Mental Health Agency Law Enforcement Training Workshop Series*.

8. D. Debbaudt (1996), *Educating the Public and Law Enforcement: A Handout for the Detroit-Wayne County Community Mental Health Agency Law Enforcement Training Workshop Series*.

9. D. Debbaudt (2004), *Beyond Guilt or Innocence*, The Developmental Disabilities Leadership Forum (a project of the UCE at the Shriver Center—a division of the University of Massachusetts Medical School).

10. A. Nightingale (2003), Asperger Syndrome and the Law Workshop, Hampshire Autistic Society.

11. D. Debbaudt (2004), *Beyond Guilt or Innocence*, The Developmental Disabilities Leadership Forum (a project of the UCE at the Shriver Center—a division of the University of Massachusetts Medical School).

with ASD to form intent and to control actions certainly differs from one individual to the next. All concerned parties should consider choosing an expert who can both interpret and testify in court if needed. There are so many things in life that the person with autism can misunderstand even though they are trying hard and doing their best. The world is just complicated for them. ■

*Kimberly Taylor is a retired resident superior court judge for the 22nd Judicial District. She is also a national board member of the Autism Society. Her middle son was diagnosed with autism at age three.*

*Dr. Gary Mesibov is a professor of psychology in the departments of Psychiatry and Psychology at the University of North Carolina at Chapel Hill. He has also served as director for the past 16 years of Division TEACCH, North Carolina's statewide program serving children and adults with autism and their families. He has 35 years of professional experience working in the field of Autism Spectrum Disorders (ASD).*

---

## Access to Civil Justice (cont.)

10. Bruce Boyer, *Access to the Courts, the Continuing Scourge of Lassiter*, 36 Loy.Chi.L.J. 363 (2005).

11. *See, Brown v. Division of Family Services*, 803 A.2d 948 (Del. 2002).

12. *See, Sheedy v. Merrimack County Sup.Ct.*, 509 A2d. 144 (NH 1986).

13. *See, N.C. Gen. Stat. 7A - 451 (a)(parole, involuntary

commitment, incompetency, parental rights, abuse, and neglect, etc.).

14. *See, Wake Cty. ex rel Carrington v. Townes*, 293 SE 2d 95 (1982); *In re HB*, 644 Se2d 22 (NC App., 2007); *State v. Adams*, 483 Se2d 156 (1997); *In re Pittman*, 561 SE2d 560 (2002); and *King v. King*, 547 SE2d 846 (NC App. 20010).

15. *See, Alaska Civil Liberties Union v. State*, 122 P.3d 781 (Ak. 2005)(Alaska constitution more robust than federal counterpart).

16. *See, Griffin v. Illinois*, 351 U.S. 12, 19 (1956).

17. *Powell v. Alabama*, 287 U.S. 45 (1932).

18. *Gideon v. Wainwright*, 372 U.S. 335 (1963).

19. *Id.*

20. ABA Resolution 112A, House of Delegates, Aug. 7, 2006; *See, Airey v. Ireland*, 2 Eur.Ct.H.R. (Ser.A) 305 (1979).

21. *Steel & Morris v. United Kingdom*, 41 E.H.R.R. 22 (2005).

22. NC Const. Art I, sec. 35.



EXCERPT

<u>Neutral Citation Number: [2018] EWHC 172 (Admin)</u>

<u>Case No: CO/5994/2016</u>

**<u>IN THE HIGH COURT OF JUSTICE</u>**
**<u>QUEEN'S BENCH DIVISION</u>**
**<u>ADMINISTRATIVE COURT</u>**

<u>Royal Courts of Justice</u>
<u>Strand, London, WC2A 2LL</u>

<u>Date: 05/02/2018</u>

**Before**:

**<u>THE RIGHT HONOURABLE THE LORD BURNETT OF MALDON</u>**
**<u>THE LORD CHIEF JUSTICE</u>**
**and**
**<u>THE HONOURABLE MR JUSTICE OUSELEY</u>**

- - - - - - - - - - - - - - - - - - - -
**Between:**

**LAURI LOVE**        **<u>Appellant</u>**
**- and -**
**THE GOVERNMENT OF THE UNITED STATES**        **<u>Respondent</u>**
**OF AMERICA**
**- and -**
**LIBERTY**        **<u>Interested</u>**
**<u>Party</u>**

- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -

**MR EDWARD FITZGERALD QC AND MR BEN COOPER**
(instructed by **KAIM TODNER SOLICITORS LTD**) for the **Appellant**
**MR PETER CALDWELL** (instructed by **CPS EXTRADITION UNIT**) for the **Respondent**
**MR ALEX BAILIN QC AND MR AARON WATKINS**
(instructed by **LIBERTY**) for the **Interested Party**

Hearing dates: 29 and 30 November 2017
- - - - - - - - - - - - - - - - - - - -
# Approved Judgment

**THE LORD CHIEF JUSTICE AND MR JUSTICE OUSELEY :**

1.      This is the judgment of the Court.

2.      Lauri Love appeals against the decision of District Judge Tempia, sitting at Westminster Magistrates' Court on 16 September 2016, to send his case to the Secretary of State for the Home Department for her decision whether to order his extradition to the United States of America, under Part 2 of the Extradition Act 2003 ["the 2003 Act"]. The USA is a category 2 territory under that Act. On 14 November 2016, the Home Secretary ordered his extradition.

3.      The principal issues before this court are:

   i)      whether the judge was wrong to hold that the forum bar in section 83A of the 2003 Act, introduced by the Crime and Courts Act 2013, did not prevent Mr Love's extradition;

   ii)     whether his extradition would be unjust or oppressive by reason of his physical or mental condition, and so required his discharge under section 91 of the 2003 Act; and

   iii)    whether various rights guaranteed by the European Convention of Human Rights ["ECHR"] would be breached, notably article 3, in the light of his health and the conditions he would face in the United States, and article 8 in the light of those factors, his home support and treatment, and the possibility of criminal proceedings being taken against him in the UK for the offences for which his extradition is sought.  These are all issues for this Court and not for the Home Secretary. Her decision on the specific issues she had to consider is not challenged.

4.      Mr Fitzgerald QC for Mr Love was at pains to emphasise that Mr Love did not seek impunity for the acts alleged against him, but contended that he should be tried and, if convicted, sentenced in the United Kingdom.

*The Facts*

5.      We take the background from the judgment of the judge:

> "8. Mr Love is accused in three indictments that between the period October 2012 to October 2013, he, working with others, made a series of cyber-attacks on the computer networks of private companies and United States Government agencies (including the US Federal Reserve, US Army, US Department of Defence, Missile Defence Agency, NASA, Army Corps of Engineers, Department of Health and Human Services, US Sentencing Commission, FBI Regional Computer Forensics Laboratory, Deltek Inc, Department of Energy, Forte Interactive, Inc) in order to steal and then publicly disseminate confidential information found on the networks, including what is referred to as personally identifiable information ….

bar. The 2003 Act spells out the role of the prosecutor in issuing a certificate and its consequences. A certificate is challengeable on judicial review grounds only. The court is not a substitute prosecutor. There is provision for the prosecutor to express a belief that the United Kingdom is not the most appropriate jurisdiction for a prosecution. We agree with what *Shaw* decided about how a belief should be considered and reasoned for those purposes, if it is to be given weight. It should be a belief expressed for the purposes of the forum decision, by a properly authorised prosecutor who knows what the expression of belief is to be used for. It would not be appropriate for a court to consider the sort of criticism which Mr Bailin levelled at the 8 September 2015 letter where the letter has not been written with a decision by the court on a forum bar in mind. Indeed, the forum bar was not addressed in that letter.

55. There is however simply no provision entitling a judge to <u>require</u> the expression of a belief by the prosecutor, and one cannot be manufactured by interpretation. But, as we have stated, the absence of such an expression of belief is not neutral to the forum bar issue in the scheme of the legislation. It is up to the prosecutor to decide whether and how it will participate in the issue. But it should also be borne in mind that success for a requested person on the forum bar is likely to have assumed that prosecution will ensue in the UK, and to create an expectation that the prosecutor will so act, in the absence of any expression of belief to the contrary. The vague references to transparency of prosecutor decisions in the materials adduced by Liberty do not amount to an admissible aid to interpretation, and in so far as they identify a mischief, the language of the 2003 Act must be taken to have met it as far as Parliament thought fit. It is not for this court to express a view on whether the operation of the Act according to its terms has met the aspirations of all those who have expressed views about what form the legislation should take.

## Oppression

56. Sections 91(2) and (3) of the 2003 Act require the judge to order the requested person's discharge if it appears to the judge at the extradition hearing "that the physical or mental condition of the person is such that it would be unjust or oppressive to extradite him." This was not a case for adjournment of the extradition hearing until the condition of the person had improved so that extradition would cease to be oppressive, an alternative allowed by the statute. The focus of Mr Fitzgerald's argument was on oppression, to which the prospect of prosecution in the United Kingdom was also relevant, rather than injustice.

*The judge's assessment*

57. The judge dealt with this alongside Article 3 ECHR. She said at [96]:

> "A high threshold has to be reached to satisfy the court that Mr Love's mental condition is such that it would be unjust or oppressive to extradite him. As I have already found (para 79 – 81 above) I am satisfied that there is substantial risk Mr Love will commit suicide. The evidence of Professor Baron-Cohen and Professor Kopelman is clear; Mr Love's mental condition is such that it removes his capacity to resist the impulse to commit suicide. There will be a high risk he will commit suicide if extradited. This will be prior to removal, in transit

and on arrival in the United States. Professor Baron-Cohen warns that to dismiss this would be "a fantasy" (para 28 above). The key issue then is what measures are in place to prevent any attempt at suicide being successful. In the United Kingdom that risk would be lessened if Mr Love were on bail with his parents. If in custody I have heard of the holistic approach of the United Kingdom prison system from the Reverend Love."

The United States Marshals Service would be responsible for transporting Mr Love to the United States. She concluded on their evidence that safeguards were in place which would ensure that Mr Love did not commit suicide in transit, or transfer to the place where he would be detained pending any bail decision, and pending trial were he remanded in custody. Once in America, she was satisfied that the preventative measures in place would be effective in preventing suicide; she drew on the evidence of Dr Kucharski that no one committed suicide on suicide watch. She accepted the evidence of Dr Lyn that he would receive dedicated mental and physical health care. Assurances from the United States authorities as to his care were not necessary.

58. She also accepted that the sentencing regime in the United States was harsher than in the United Kingdom for these offences, but considered both that the American courts could depart from the sentencing range for health reasons, and that American sentencing policy was not disproportionate, even though consecutive sentences could be imposed by each District in which he was convicted.

*Submissions of the parties*

59. Mr Fitzgerald attacked these conclusions on the grounds that: (1) the mere fact of extradition and detention in the United States would be likely to lead to a serious deterioration in the mental health of Mr Love; (2) to the extent that suicide was prevented by Mr Love being placed on suicide watch, the conditions in which he would be held on suicide watch, or in segregation, would lead to a serious and permanent deterioration in his mental health, which was also related to his physical health; (3) if he were in the general prison population, in which he would be a very vulnerable prisoner because of his mental health with Asperger's, depression and severe eczema, he would be able to commit suicide, which was a very high risk; (4) if in segregation but not on suicide watch, the same high risk would apply; (5) there was too much of a contrast between the bland statements of policy and intent, which the judge had accepted, and the practical reality of conditions and medical treatment in the United States prisons to which Mr Love would go pending trial or after conviction.

60. Mr Caldwell contended that the judge was entitled to reach the conclusions she did on the evidence. She had considered it very carefully. The British courts should trust the United States to provide what it said it would provide.

61. For these purposes, it is necessary to set out rather more about Mr Love's medical circumstances. His father, a prison chaplain, gave measured evidence. He had described his son as an exceptionally gifted child, who had gone downhill at the age of 13. His behaviour deteriorated, he became distracted, "he and the real world just did not connect." By 16, he had hacked into computers, and knew more about computers than his teachers. To keep his dual Finnish-British nationality, he did

military service in Finland. He simply could not manage, and came home in 2004 suffering from "terrible depression." In 2005, at Nottingham University, he became depressed, and came home "in a terrible state", "a physical and mental wreck." In 2006, he was referred to local mental health services for treatment. He is being treated at the moment. In 2008, he went to Glasgow University, but his second year did not go well, and in his third year he was "sucked into a world of protest about this or that cause", as his father put it. He developed throat abscesses, shingles and scarlet fever. He came home to live with his parents in 2012. For the last few years, the prospect of Mr Love killing himself has always been at the forefront of his parents' minds, and they have rushed him on occasions to the doctors when they thought he had suicidal thoughts.

62.     His father described him in this way:

> "He is a nightmare to live with. It is like living with a continuous explosion the way he is. It is like he is caged up and caught up in world that he does not fit into. His eczema is still very bad and causes him huge problems. Lauri struggles with what is possible or real. He is very principled. His whole attitude is that the world is wrong and "I am going to fix it". He has no malice in him but he has no regard for the consequences of his actions. He just has an element of not seeing things in the right way."

He continued:

> "I don't think that he could live anywhere other than being at home with us so that we can take care of him. The only thing that keeps Lauri from killing himself is me and my wife and having him at home with us. He has told me very clearly that he would kill himself if there was an Order for Extradition. I genuinely believe he means it. It is not a threat; it is a statement of fact which I believe."

63.     Mr Love, before his arrest, was on the computer day and night. "He cannot function without us." His despair "began to grip him deeper and deeper." His eczema led to daily scratching so hard that he drew blood, and he said on more than one occasion that "he could kill himself." Only his parents' support prevented it. His father thought that they were the only ones who could cope with Mr Love.

64.     He was now very up and down. His parents worried about suicidal thoughts. "He is alright at home but he is frustrated with the position that he is in….We organise his life and look after him…He…gets distracted by things and then he just forgets what he is doing. His sleeping pattern is very bad…" sometimes not sleeping for days, and then sleeping for days. Mr Love has very bad asthma, and his severe childhood eczema, treated with medication, really came back when he was in Glasgow, and went downhill physically and mentally. This all affected his social confidence.

65.     His parents needed to care for him, because they saw him still as a child. Were he elsewhere "he would just not survive…If [he] goes to prison in America he will die. I am quite sure of that." He would have no support network, family or friends or his

culture, but instead he would be isolated and alone. His father's experience led him to believe that people kill themselves in prison when they minimise what may be possible in the future, and decide that the pain of living is not worth the price. Positive family or other relationships can make all the difference.

> "Judging by all that Lauri has said to me about his intentions, I believe that he will take his own life. Now you may think that I say that just as a father, but I wish to emphasise that if I were dealing with someone like Lauri in a professional capacity, in a prison, I have no doubt I would arrive at the conclusion that he is a very high suicide risk."

66. In cross-examination before the judge, he said that Mr Love would not commit suicide to make his parents feel guilty, but because despair would grip him deeper. But the Rev. Love hoped that in prison in England he would "get through it." Although he deteriorated whenever he was away from his parents, they could help him through any criminal prosecution, and he could live with them, if bailed, pending trial. If sent to prison in England they would be available to help him cope. His experience as a prison chaplain led him to believe that the system of interaction and communication with vulnerable prisoners through a multidisciplinary team was "excellent". The possibility of bringing in the prisoner's family was crucial.

67. Mr Love's eczema was exacerbated by emotional anxiety, and had worsened over the months leading to the extradition hearing. His mental health had also deteriorated.

68. The judge did not expressly comment on this evidence but in the light of what she said about the experts, we have no reason to doubt that she accepted it. Her principal concern was with measures that might be in place to prevent suicide.

69. His parents provided a joint statement for the purposes of the appeal, which we admit, as it provides up to date information on Mr Love's mental and physical condition. His eczema requires seven different medications, and the sores sometimes need antibiotics, long baths are soothing. He is usually extremely withdrawn and reluctant to socialise. He has been suspended from his studies, in electrical engineering, at the University of Suffolk until January 2018 because of the extradition proceedings. This led to him spending even more time on the laptop, and on social media, obsessively and indiscriminately. He is on medication for depression which appears to have little effect. His sleep pattern, often insomniac, is irregular. He now has a girl friend who supported him, staying at the house a lot.

70. The judge summarised Mr Love's own evidence about his history, depression, breakdown at Glasgow where he spent months, homeless living in a tent in the park, and his eczema. It led to skin infections and to his skin falling off. The pain caused him stress which exacerbated the inflammation. She said this, largely quoting from Mr Love on the interaction between his eczema and depression:

> "He is unable to resist the need to scratch, "every day I try my utmost to tear apart the skin in my body. Every day I fail to control this urge. If sent to the United States of America those conditions, urges to die would be stronger than my urge to scratch every day. My degree of control is already impaired

because of these proceedings. The urge, the despair, feeling of helplessness will result in my ending my life"."

71. In his January 2016 statement, Mr Love said that his skin condition severely affected all aspects of his life; it made him self-conscious of his appearance, and that made it hard to engage in social activities, It was "agonisingly painful", and made it difficult to sleep "because of a constant burning and itching all over" his body.

72. Mr Love worked as a volunteer teaching assistant at the University of Suffolk, and also worked during weekends at Hacker House, a body which aims at "ethical hacking", where he advises on computer security systems. He explained that the internet was such an important part of his life, in constant use: "It would be devastating if I could not access it anymore."

73. The judge accepted his evidence about his mental and physical conditions.

*Evidence of the medical impact of extradition*

74. We turn now to the medical evidence, which was accepted by the judge. But the measures required and their effect need to be considered in the light of the medical evidence as to the severity and interaction between his three major conditions: Asperger Syndrome , depression and eczema, and the consequent risk of serious deterioration in his mental and physical health, or suicide, or both. The evidence needs to be set out also because of its significance for the conditions in which he would be detained in the United States.

*Professor Baron-Cohen*

75. Professor Baron-Cohen, Professor of Developmental Psychopathology at Cambridge University, Director of the Autism Research Centre, and an NHS consultant specialising in the diagnosis of Asperger Syndrome, in adults provided three reports. He was the first to diagnose Mr Love's Asperger Syndrome. It did not come with learning disabilities, attention deficit or language difficulties; Mr Love was "high functioning." However, his Asperger Syndrome "is a very severe disability" causing him to become so absorbed in his interest that he neglects other areas of life, including his health, to the point that he becomes physically unwell. The realisation that others did not share his total commitment to any given current obsession led to severe depression, along with difficulties in social relationships.

76. Mr Love talked openly about feeling suicidal "triggered by the threat of extradition"; the risk of suicide was "very high". He had said that he would commit suicide rather than be extradited, and was very clear about that. "The risk would be present both whilst he is in the UK, should extradition be enforced; and/or whilst in transit and/or in the US in prison." Prison would be "entirely the wrong place for a man with his disabilities and vulnerable mental health…because he would not cope socially, and his previously very severe depression would be highly likely to recur."

77. Mr Love was however capable of effective participation in a trial, though reasonable modifications to the usual processes might be required.

78.　A second report, of February 2016, considered his suicidal thoughts in greater detail. Mr Love said that he had them 50 times a day; it was his preferred alternative to extradition which would be "the end of existence." When pressed, he appeared to have a concrete method of committing suicide in mind, so that the United States could not "control my destiny", but rather it would be in his own hands. Mr Love "has clinical levels of severe anxiety and depression, and is at very high suicidal risk, all of which are directly attributable to his fear of extradition." His eczema "is a partly stress-related physical condition in that it is exacerbated by his current mental health issues." His depression would worsen were he extradited, and his depression and suicide risk would worsen if imprisoned in America. "He is a very vulnerable young man with a very high risk of suicide, and remains of the belief that he would prefer to die at his own hand than to go to an American prison."

79.　In his third report, of June 2016, Professor Baron-Cohen took issue with the sufficiency of the protocols operated in America, to support prisoners with Asperger Syndrome, depression and at high suicidal risk, as described by Dr Lyn, Psychology Services Branch Administrator of the Federal Bureau of Prisons ("BOP"), and others. They were not satisfactory for a patient with the unique combination of depression, Asperger Syndrome and eczema. Non-emergency mental health services are voluntary but his Asperger Syndrome would be likely to prevent Mr Love seeking regular psychiatric help, so he would not receive treatment for clinical depression until it reached "crisis/suicidal" level.  He would be unlikely to be allowed to see a private physician, who could be better qualified to help. Mentally ill inmates were often put in solitary confinement where they cannot access mental health services, with especially negative consequences for Mr Love.

80.　Once the severity of a person's mental illness had driven them to suicide, "it is virtually impossible to prevent that person from going through with it. It is unlikely that someone of his extremely high intelligence could be prevented from committing suicide as he has thought out all possible scenarios and researched the most effective methods for doing so." It was also his opinion that Mr Love would commit suicide at the point he was to be handed over for extradition, and before he was in the hands of the US Marshals Service. Mr Love, highly intelligent as he was, had anticipated security measures and had found ways to evade them, and would find ways to evade the BOP protocols.

81.　The BOP protocols for supporting those with Asperger Syndrome did not address the complexity of the problems.　The programme seemed to be based on those with educational impairments, which was not Mr Love. His issues would include not being able to share a cell, sensory hyper-sensitivity, difficulties adjusting to unexpected change, risk of being bullied and obsessive interests. He needed to be in an environment which understood Asperger Syndrome. "Depression in someone with Asperger Syndrome is very different from depression in someone without Asperger Syndrome." His unique combination of mental and physical conditions "makes him much more high-risk than prisoners who only suffer from one of these conditions." Professor Baron-Cohen also expressed concern about the effect of overcrowding and staff shortages reducing Mr Love's ability to access mental health services. There was a real risk that the BOP's suicide prevention programme would not be adequate to prevent suicide by someone with Mr Love's intellect and who had declared his

suicidal intent as clearly as had Mr Love, and if suicide were prevented, the means of doing so would exacerbate his mental illnesses.

82.     His painful combination of severe depression, Asperger Syndrome, and severe eczema increased his risk of completing suicide, a risk which would increase further if separated from his family or if put into solitary confinement in detention in America; his depression and eczema would also worsen. In his oral evidence to the judge, Professor Baron-Cohen said that Mr Love's expression of suicidal intent was not a reflection of a voluntary plan as he did not want to die, but his mental health was so dependant on being at home with his parents and not being detained for an indefinite period, that he could not impose restraint on himself to stop his suicide. The judge accepted this evidence. The Professor agreed that he had changed his mind about the care in the United States for prisoners with mental health issues in the light of a report by Dr Kucharski on the realities of the availability of such care.

*Professor Kopelman*

83.     Professor Kopelman, an Emeritus Professor of Neuropsychiatry, prepared two reports for the judge and also gave oral evidence which she accepted, subject to one important point. Much of what Professor Kopelman had to say was in line with the evidence of Professor Baron-Cohen. Mr Love's depression had become less severe but was still moderately severe. Mr Love told him that he was less likely to commit suicide in the United Kingdom in prison than in America, because he anticipated that any sentence would be less severe. Professor Kopelman was of the opinion that there would be a high risk of a suicide attempt were Mr Love to face extradition at the end of these proceedings, during transition to the United States and on arrival there. If he were remanded in custody pending trial and was sent to prison on conviction,

> "his mood state certainly would plummet further, resulting in severe clinical depression, and exacerbation of his eczema and asthma, and a very definite increase in suicide risk (from 'high' to 'very high')."

84.     Mr Love was currently fit to be tried in the England but it was more difficult to anticipate the situation in America, because he expected a "severe worsening of Mr Love's clinical depression" there. Remand in custody in the United States, causing a severe worsening of his depression, could affect his fitness to be tried, but would certainly affect his ability to give evidence in a satisfactory manner. Extradition itself would result in very severe psychological suffering profound mental deterioration and a very much increased suicidal risk.

85.     Professor Kopelman's second report stated that Mr Love had told him that suicidal ideas were likely to become "overwhelming" if extradition became imminent when he would become actively suicidal. He had "no intention of being kidnapped". What Mr Love had read about American suicide prevention conditions would, he thought, make him even more suicidal, forcing him to pretend that he was not suicidal when he still was.

86.     Professor Kopelman drew upon reports from Mr Love's consultant dermatologist, who had said that the eczema was a chronic condition often exacerbated by stress and anxiety, to point out that there was a two-way interaction whereby severe eczema

worsened Mr Love's mental state and stress worsened the eczema. He also took his medication more erratically when severely stressed.

87.     The BOP suicide prevention programme involved an inmate on suicide watch being put into a suicide prevention room, wearing a suicide smock and being monitored for 24 hours a day, without any unapproved personal items.  That would leave Mr Love feeling extremely isolated in the absence of an internet connection and undoubtedly would have a severe adverse effect on his mental state. Social isolation was known to precipitate psychotic experiences, including psychotic depression, and increase suicidal ideas. A severe deterioration in clinical depression, a likely recurrence of psychotic ideas, a severe deterioration in his physical health with an exacerbation of eczema and asthma, should be anticipated in such circumstances. Suicidal risk would increase to 'very high' in consequence, exacerbating rather than reducing the risk of suicide.  His mental condition would remove his mental capacity to resist the impulse to commit suicide. His ability to cope with the trial would be severely compromised.

88.     Mr Love's Asperger Syndrome made his social interaction very difficult, and his clinical depression would greatly exacerbate it. He would suffer from being removed from his family and support network and would need to access appropriate psychiatric care.  The evidence Professor Kopelman had seen did not reassure him. Mr Love was already reluctant to engage with supporting psychiatric or psychological treatment in the United Kingdom, and in prison or under coercion, Mr Love would be unwilling or unable to seek treatment, particularly because of his Asperger Syndrome.

89.     Professor Kopelman produced a third report, dated 29 October 2017, for this appeal. We are prepared to admit it so that we have an up to date picture of Mr Love's mental state. Mr Love now had a quite serious relationship with a student girlfriend. His eczema fluctuated but was manageable. He had been particularly depressed at the beginning of 2017 when he feared that he might be extradited at any time.  Not for the first time, he had experienced "a vocalisation of thoughts telling him to kill himself." He was taking his anti-depressant medication regularly. Professor Kopelman assessed him as being currently severely depressed. Were he extradited, Mr Love feared "being below the red line in terms of what is the point of living".  He feels this whenever he experiences setbacks, which is a prelude to "frank suicidal ideas and plans." Although he worried about the effect which his suicide would have on his grieving parents and girlfriend, this barrier would be removed were he extradited, and Mr Love regarded it as highly likely that he would commit suicide, and it "would be vital to prevent… by any means necessary" his being taken into custody and placed on a plane for America. He could face the prospect of a trial in England, with his family nearby and could survive a "short" sentence in a British prison.

90.     He commented on the new "open source" material served by the appellant for the appeal. We have already set out part of this when dealing with fitness to plead. Even were suicide prevented, those factors would produce "a very high risk of persisting or permanent psychological damage" through a worsening of all his disorders. The maximum point of suicide risk would be immediately following discharge from suicide watch, when the risk would be extremely high whatever further preventative measures had been implemented.  After release from prison, the persisting and permanent psychological damage and losses would result in a permanent high risk of impulsive suicide which would be extremely difficult for (family or professional) carers to anticipate or prevent.

*Evidence from the United States on conditions*

91.     We turn from the medical evidence to what the United States authorities had to say about what would happen to Mr Love, were he to be extradited, once responsibility for him had passed to their hands. This was important evidence. The judge accepted it with the result that the risks to Mr Love which, as we read her judgment, would otherwise have precluded his extradition, would be sufficiently diminished.

92.     The judge accepted the written evidence of Mr Panepinto of the Marshals Service, and it appears that of Mr Wolf, a licensed physician detailed to the Marshals Service. Mr Love would be restrained and escorted by Marshals, who would observe him within close proximity during the flight, having checked him for anything he might be able to use to harm himself. Someone from the Operational Medical Support Unit would be in attendance if necessary. He or she could dispense and administer prescription medicines, and would have additional paramedic skills. The Marshals Service would maintain custody of Mr Love until his initial district court appearance or, if not released, until delivery to the pre-trial detention facility. The Marshals Service routinely transported prisoners with mental or physical health problems. This evidence persuaded the judge that any risk of suicide in transit could be ameliorated.

93.     Mr Wolf added that the Marshals Service would decide where Mr Love would be detained, if remanded in custody pending trial. Were he prosecuted in the Southern District of New York, he would be detained at a BOP facility, either the Metropolitan Detention Center ("MDC") in Brooklyn, or in the Metropolitan Correctional Center ("MCC") in New York. The likely places of detention in relation to custody in the other two Federal Districts where Mr Love was indicted were also identified. At his initial intake in court cells, non-medical staff would complete a special notice if he had a medical condition, including suicidal ideation, or any serious mental illness. This alert would be provided to the prison. At the prison, he would be screened by correctional and health care personnel, followed by a full medical and mental appraisal by a licensed health care provider who could be a nurse or a physician. Urgent or chronic health concerns would be further evaluated and addressed inside the prison or through referral to outside specialists. Psychiatric medication management was often dealt with in the prison or by consulting psychiatrists, particularly in severe cases. Emergency care could be sought at a local hospital. Requests by prison healthcare providers for non-urgent medical care were evaluated by medical staff of the Marshals Service. They would decide what is medically necessary. Were Mr Love detained in a non-BOP facility, their suicide prevention programs included risk assessment, suicide watch in the medical department or a special housing unit with 24 hour continued observation as required. Prisoners there wear a suicide smock and have a tear resistant blanket. Psychiatrists and licensed clinical social workers specifically trained in mental health needs are either directly available or through local arrangements. Mr Wolf believed that any of the pre-trial facilities were capable of providing adequate medical care for Mr Love.

94.     The judge also accepted the written evidence of Dr Lyn, the BOP's Psychology Services Branch Administrator. Her evidence about MDC and MCC was to the same effect as Mr Wolf's. Following arrival, there would be medical screening within 24 hours of arrival, psychological medications would be noted and continued (or replaced with equivalents). Imminent risk of self-harm would be assessed, a questionnaire on suicidal ideation completed and assessed followed by comprehensive

examination if suicidal or mentally ill. Psychology Departments at MDC and MCC were available for all inmates with a full range of services and responsibilities for identifying inmates at various risks, advising on transfers, and providing individual treatments. The two prisons shared a full-time psychiatrist. BOP policies governed the treatment of inmates on conviction. They went to the prison appropriate for them, in the least restrictive setting possible. BOP operated a mental and medical health classification system to identify inmates with problems, to utilise resources effectively and to place them where best suited for them. Policies governed their treatment. On arrival, Mr Love would be screened. It was not unusual for BOP to receive inmates with mental illnesses and to treat them. It had over 600 doctoral level psychologists and over 600 mental health specialists, a wide variety of therapies and standard medications. It could provide appropriate treatment for asthma and eczema. The BOP housed inmates with Asperger Syndrome. Mr Love would be assisted to adjust to incarceration. He would be assigned a Correctional Counsellor, Case Manager and Unit Manager, and a variety of Psychology Service programs was available. They include programmes to address deficits in social skills in a specific unit, a "modified therapeutic community." BOP also had a "Suicide Prevention Protocol" and "Program Statement" to identify and manage suicidal inmates, involving supervision or suicide watch, where they would have a tear-resistant gown and blanket. Counselling was available for those at risk of suicide. Private physicians were not permitted, unless they were treating the inmate before incarceration, and permission to be treated by a specific physician would be infrequent. Conditions of confinement could be challenged in court. Overall, Mr Love's needs could be provided for.

*Dr Kucharski*

95.    The primary medical response to this evidence came from Dr Kucharski, a very experienced forensic psychologist, who had worked at a BOP medical facility, had been a forensic psychologist, and ultimately Chief Psychologist at MCC. He had also been to MDC, where he thought it most likely that Mr Love would be sent. He gave oral evidence in the course of which he gave an answer on which the judge put considerable weight: "no one commits suicide on suicide watch," finding at [98] that the "preventative measures in place in the United States are effective in preventing suicide."

96.    The judge correctly records the chief theme of his evidence as being that what Dr Lyn said, whilst true in terms of numbers and policies, did not reflect the reality of the services available in BOP prisons. In reality, in view of their other functions, only two or three psychologists were available in each institution for direct inmate health care. Positions were often kept vacant because of cost, and the ratio of inmates in need of care for significant psychological difficulties to staff psychologists was about 100/130:1. And that one had other tasks to fulfil as well. Court ordered evaluations were the major part of the workload. But it happened sometimes that they had to act as correctional guards because of shortages. Most inmates were only treated by way of medication. The psychologists had to respond to crises all the time, and a high level of arrivals and turnover.

97.    At MDC/MCC, the number of inmates likely to have significant psychiatric difficulties yielded a caseload of nearly 500 inmates out of 2461. If all were seen weekly, the workload would be 12 inmates per hour, or half that if seen every other week. These institutions were "difficult to navigate"; they were high-rise buildings in

which inmates were moved, secured, in lifts. That was a cumbersome process which limited the number who could be seen in a day.

98.   Upon conviction the judge could recommend that Mr Love should go to a medical centre which provided inpatient psychiatric services. The BOP might accept that recommendation, but thereafter he could be transferred at any time to a non-medical facility if BOP thought hospitalisation unnecessary. If an inpatient, Mr Love would be likely to be one of 1000 or more inmates in one of four medical facilities, and most of those beds were not available for sentenced inmates to receive medical care. There were therefore significant resource constraints on the delivery of inpatient mental care facilities for sentenced inmates. Mr Love was unlikely to be transferred to one of them. Programmes for low functioning inmates were irrelevant to Mr Love's needs. Dr Kucharski was not aware of any BOP program specially designed for those with Asperger Syndrome. BOP facilities were seriously over-crowded, straining the medical resources further, and increasing the stress on inmates.

99.   Dr Kucharski drew upon the evidence of Professor Kopelman, Professor Baron-Cohen, and Dr Jenkins, Mr Love's dermatological consultant, to conclude that, complex and difficult as Mr Love's various conditions were to treat in the community, they would be even more difficult to treat in prison, with serious adverse consequences. The stress of incarceration would significantly worsen his eczema. His physical symptoms would lead to agitation, which would be poorly tolerated by prison authorities and would be likely to lead to his spending significant time in segregation. Time on suicide watch or on segregation would be time spent in isolation. He added in his oral evidence that suicide watch was a device to prevent suicide and not a form of treatment. Treatment would be minimal, but the international nature of the case and its notoriety would add significant pressure to keeping Mr Love on suicide watch. He would place Mr Love on suicide watch immediately on arrival at MCC/MDC. This in turn would be likely to exacerbate his depression and substantially increase the risk of suicide. Dr Kucharski concluded:

> "I would be very cautious given Mr Love's history, his intellectual capacity and his high profile ordering him released from suicide watch. This is likely to have a significant adverse effect on his psychological wellbeing further compounding the depression and risk of suicide."

Inmates, intent on committing suicide, could do so by not being forthcoming about their suicidal intent. His oral evidence, as noted by Mr Love's trainee solicitor, included the observation that the harm for anyone in segregation or isolation, was magnified for those with psychiatric disorders.

100.  Mr Love would be prosecuted in three different districts, which would mean transfer from Oklahoma, where inmates usually arrive, to at least three different BOP facilities which might not appreciate equally Mr Love's suicide risk. Dr Kucharski had experience of transit itself causing those restored to competency to stand trial, then to lose that competence because their medication had not been available.

101.  The effectiveness of anti-depressant medication on Mr Love remained uncertain, and facilities for thoughtful trials of medication were limited. The BOP chronic care model for conditions such as asthma was likely to have difficulty treating Mr Love

successfully because it was complicated by stress which incarceration would exacerbate. The combination of special expertise with Asperger Syndrome and intensive cognitive behaviour therapy with dermatology treatment was not available at MCC or MDC or post-sentence facilities on a regular basis. The BOP did not provide the level of comprehensive care needed.

> "The failure to provide Mr Love with comprehensive mental health and medical care, in the context of the enhanced stress of incarceration and removal of his social support system, will likely result in a deterioration of his psychological condition and significantly increase the risk of suicide."

*Other evidence*

102. The District Judge did not refer specifically to the evidence of Mr Zachary Katznelson, an American lawyer (and barrister called in England and Wales) and a former Legal Director of Reprieve, on the practical experience of those with mental health problems and Asperger Syndrome in the United States prison system. He, like Dr Kucharski, said that "the actual delivery of care frequently fails to meet BOP's aspirations." He summarised the failings brought to light in a report of December 2014 commissioned by the BOP itself: a very high proportion of errors in diagnosis and treatment, very little follow up, and very heavy caseloads for psychologists so that only the most unstable cases were seen. Those on suicide watch were treated in the same way as those on segregation except for the watcher who would or could be outside the cell. He said that attorneys at MCC report clients waiting months for care, often ultimately inadequate, or inadequate because of intervening deterioration.

103. He thought that Mr Love was unlikely to be considered ill enough to be housed in a specialised unit. Even low security prisons, where on a ten year sentence Mr Love was most likely to be placed, were overcrowded with all that entailed, including limitations on medical care, recreational activities leading to frustration and violence.

104. Asperger Syndrome, as described by Professor Baron-Cohen, would make him extremely vulnerable in prison because he could not read cues in social behaviour, or understand other people's behaviour or expectations, or conform to social norms. He would be socially naïve, obsessive, poor in decision-making so as to make it difficult for him to cope with prison hierarchies, personalities, gangs and the prison system more generally. He could not avoid interaction with other prisoners at meals or in recreation. His Asperger Syndrome would reduce the prospect of his being able to develop relationships with them. A violent reaction is more common in prison in response to those who do not conform to the expectations of other inmates, especially from a foreigner in an American gaol. He quickly would be recognised as vulnerable, not least because of his visible eczema, making him an easy target for abuse. He would face unrelenting stress. He therefore bore a greater risk of segregation whether for his own safety or for repeated breaches of prison rules, with ever more severe punishments. Protective custody prisoners were often mixed with those being disciplined. He would have no external support structure; visits from his family would be rare because of expense; telephone calls were limited and expensive, and his internet access could well be limited in view of the offences alleged or found against him.

105.   Tor Ekelund, Mr Love's United States lawyer, gave some evidence to the same effect, which was also not referred to by the judge, on the topic of prison conditions but it is markedly less persuasive. Joshua Dratel, another United States criminal defence attorney of 30 years' experience, gave evidence which covered, among other matters, treatment in prison which the judge did refer to. But it does not add to what has been set out above.

106.   Mr Fitzgerald sought to adduce further evidence about the conditions and treatment which Mr Love would be likely to experience in either MDC or MCC. We admit this evidence in the light of the witness statement from Kaim Todner on when the information came to light and could be obtained for presentation usefully to a court. It is also relevant to have up to date information for the purposes of reaching a judgment on whether extradition would be oppressive by reason of physical and mental condition. The two items of primary note were first a report of a Federal Magistrate describing conditions for female defendants at MDC as "unconscionable" because of the absence of sunlight, fresh air, air conditioning in the heat, outdoor exercise, and receiving very poor food and medical treatment. The women's prison is on an upper floor in the same building which houses male prisoners at MDC. Second, there was a report of a visit in June 2016 by the National Association of Women Judges to the MDC that made the same points.  It noted that the BOP then said that it could [not] find physicians willing to work in a New York prison. Conditions had been "unconscionable" for three years.

107.   There is no reason, in our view, to suppose that the conditions attributable to the state of the building are better on the men's floors or that men would be better treated in other respects. In the light of those materials, we are prepared to give greater weight than we would otherwise have done to the Complaint dated 27 October 2016 in the Class Action brought by Podius and other male inmates at MDC against the Department of Justice in the District Court for the Eastern District of New York. The allegations, which nonetheless require real caution in view of their source and the absence of response, make the same sort of points, add colour to them through examples of inadequate medical treatment and of problems created for those on suicide watch.   The point is that the nature of the complaints, ignoring much of the colourful detail, chime with the observations of the National Association of Women Judges.  All this emphasises the need to consider the actual conditions in which inmates will be held, and not just the policies and programmes which are in place.

108.   The Office of the Inspector General ("OIG"), in the Department of Justice reported critically in July 2017 on segregated solitary confinement, termed "Restrictive Housing" in BOP prisons.  It concluded such confinement could harm any inmate and particularly those with mental illnesses. It made many recommendations, all accepted by the BOP, most of which were "resolved" by October 2017.

109.   We found the evidence of Mr Dratel on conditions in MDC/MCC of no real help, as it was largely commentary on what could be found in material already before us.

110.   Mr Lara, an Assistant Director in the BOP, responded to some of the new evidence. Segregation in a "Special Housing Unit" in a BOP facility did not necessarily mean that a prisoner was in solitary confinement. An inmate could be placed there for his own protection, for disciplinary reasons or because of the threat they pose to others or to the good order and discipline of the prison. The BOP Program Statement required

conditions in them which were healthy and humane. There was a review every 30 days by medical staff including mental health staff and necessary medical care was provide daily. Inmates were released from that unit when they no longer needed to be there.

111.  Ms Lowry, Chief of the Office of Detention Operations in the Marshals Service, elaborated on how the facilities where Mr Love would be likely to be detained in New Jersey and Virginia operated their Special Housing Units. Mr Pecoraio, of the External Auditing Branch of the BOP, also gave evidence in reply to Mr Love's further evidence, dealing with the OIG report. He said that "substantial steps to comply with each OIG's recommendations" had already been taken, which he set out. BOP was "working diligently to hire and retain mental health staff" where there were insufficient.

*Evidence about the likely prosecutions*

112.  The judge accepted that there was nothing "unlawful or improper" in proceedings being undertaken in three separate jurisdictions in the United States. The prolific criminal activity alleged against Mr Love had occurred in three separate jurisdictions, leading to three separate investigations. She also rightly accepted the good faith of the prosecutors in the light of some unwarranted and unevidenced allegations by Mr Dratel, about why three prosecutions were being brought. In certain circumstances, were Mr Love to plead guilty to the charges and waive trial in each district where he had not yet been convicted, and the United States attorneys in those districts consented, the matters could all be dealt with by a single judge, but not otherwise. The evidence she accepted also showed that substantive offences had to be tried in the district where those crimes occurred. Mr Love could waive venue, but for there to be one trial, each of the three courts would have to agree that neither side would be prejudiced. The outcome of any joinder request was difficult to predict.

113.  There was also a debate before the judge about the sentences which Mr Love could expect following convictions. The judge accepted that the relevant Sentencing Guidelines permitted departures from the range to which mental health could be relevant, but Mr Love could also receive enhancements to his sentence under them. The Guidelines advised concurrent sentences, albeit that the different courts could impose consecutive sentences, and that it was possible for one court to sentence for all matters. However, she accepted that the United States sentencing regime for these offences was "certainly harsher" than in England and Wales. The judge did not come to a particular conclusion on the likely level of sentencing, but concluded more generally that the United States sentencing regime was not disproportionate. We agree with that judgment. But some view on the likely range is necessary for deciding the issue of oppression. Mr Fitzgerald submitted that it would be realistic to expect a sentence in America of the order of 10 years, which we accept as a realistic estimate on all the evidence which we have seen, and one which respects the conclusions of the judge.

114.  The judge considered evidence about the circumstances in which prisoners could be transferred after sentence from the United States back to the United Kingdom pursuant to an extant prisoner transfer agreement. Although she decided which evidence she preferred, she reached no particular conclusion on whether or when Mr Love might be transferred or under what conditions. The possibility of transfer did

not play any explicit part in her decisions. It is not necessary for us to decide whether Mr Love would be successful in any transfer request. The reality is that he might or might not be. Nor is it is possible to determine when, hypothetically, it might occur or subject to what conditions, a wide variety of which (including restitution) might be imposed.

*Conclusion on oppression*

115.    We come to the conclusion that Mr Love's extradition would be oppressive by reason of his physical and mental condition. In this difficult case, and in the course of an impressive judgment, we conclude that the judge did not grapple with an important issue. She accepted the ability of the BOP to protect Mr Love from suicide, on the basis of Dr Kucharski's comment that "no one commits suicide on suicide watch". It was implicit that measures could be taken in America which would prevent Mr Love committing suicide even though he might be determined to do so and have the intellect to circumvent most preventative measures. The important issue which flows from that conclusion is the question whether those measures would themselves be likely to have a seriously adverse effect on his very vulnerable and unstable mental and physical wellbeing? We consider that they would, both on the evidence before the judge, and on the further evidence we have received.

116.    We also consider, and this is reinforced by the further evidence, that the evidence adduced by the BOP as to its policies and programmes could not be treated as resolving the issue as to his medical treatment in favour of the United States, without deciding that the practical evidence on behalf of Mr Love was not worthy of any real weight, which is what the judge does appear to have decided. We, however, judge that the evidence as to conditions and treatment in practice is rather weightier than she did, and that, in Mr Love's rather particular circumstances, what is likely to happen in practice has to be given decisive weight. Dr Kucharski's evidence was particularly important in view of his experience.

117.    We have set out the material evidence very fully, because we are differing from the District Judge in her careful judgment, and can now set out our conclusions from it shortly.

118.    We accept that the evidence shows that the fact of extradition would bring on severe depression, and that Mr Love would probably be determined to commit suicide, here or in America. If the judge is right in concluding that the high risk of suicide can be prevented, notwithstanding Mr Love's determination, planning and intelligence, about which we have real doubts, on her findings it is only because of the evidence that no one has committed suicide on suicide watch in the care of the BOP. Yet one stratagem identified by Professor Kopelman and Dr Kucharski was that Mr Love would present himself as no longer suicidal for sufficiently long to be removed from suicide watch, precisely so that he could then commit suicide.

119.    If he were kept on suicide watch, and reviewed every 30 days or so, he would be in segregation, with a watcher inside or outside the cell for company, and with very limited activities. All the evidence is that this would be very harmful for his difficult mental conditions, Asperger Syndrome and depression, linked as they are; and for his physical conditions, notable eczema, which would be exacerbated by stress. That in turn would add to his worsening mental condition, which in its turn would worsen his

physical conditions. There is no satisfactory and sufficiently specific evidence that treatment for this combination of severe problems would be available in the sort of prisons to which he would most likely be sent. Suicide watch is not a form of treatment; there is no evidence that treatment would or could be made available on suicide watch for the very conditions which suicide watch itself exacerbates. But once removed from suicide watch, the risk of suicide as found by the judge, cannot realistically be prevented, on her findings.

120. Were Mr Love not to be in segregation, his Asperger Syndrome and physical conditions would make him very vulnerable. He would be a likely target for bullying and intimidation by other prisoners. The response by the authorities would be segregation for his own protection, which would bring in all the problems of isolation to which we have already referred. He would have no support network available in prison in the United States. There is no basis upon which we could conclude that the severity of the problems would be brought swiftly to an end by early transfer to the United Kingdom.

121. Mr Love already experiences severe depression at times. It is very difficult to envisage that his mental state after ten years in and out of segregation would not be gravely worsened, should he not commit suicide. Professor Kopelman's evidence was that he would be at a permanent risk of suicide.

122. Oppression as a bar to extradition requires a high threshold, not readily surmounted. But we are satisfied, in the particular combination of circumstances here, that it would be oppressive to extradite Mr Love. His appeal is allowed on that ground as well.

## Articles 3 and 8 ECHR

123. In the light of the conclusions to which we have come, consideration of Articles 3 and 8 ECHR is unnecessary.

## Conclusion

124. This appeal is allowed and the Appellant is discharged.

125. We emphasise however that it would not be oppressive to prosecute Mr Love in England for the offences alleged against him. Far from it. If the forum bar is to operate as intended, where it prevents extradition, the other side of the coin is that prosecution in this country rather than impunity should then follow, as Mr Fitzgerald fully accepted. Much of Mr Love's argument was based on the contention that this is indeed where he should be prosecuted.

126. The CPS must now bend its endeavours to his prosecution, with the assistance to be expected from the authorities in the United States, recognising the gravity of the allegations in this case, and the harm done to the victims. As we have pointed out, the CPS did not intervene to say that prosecution in England was inappropriate. If proven, these are serious offences indeed.

127. If convicted and sentenced to imprisonment, Mr Fitzgerald accepted that the experience of imprisonment in England would be significantly different for Mr Love