United States District Court
Southern District of Ohio
Columbus Division
Case No: 19-CR-174

United States of America,

Plaintiff

vs

Michael Sutherin,

Defendant

**Reply to Government's
Sentencing Memorandum:**

Dated: May 21, 2021

Mark J. Mahoney (*Pro Hac Vice*)
Harrington & Mahoney
70 Niagara Street, 3rd Floor
Buffalo, NY   14202-3407
Tel: 716-853-3700
Fax: 716-853-3710
Email: mjm@harringtonmahoney.com

Attorneys for *Michael Sutherin*

# Contents

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Michael did not appreciate the wrongfulness of his conduct and did not intend to cause harm. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

The agreed-upon sentence under Rule 11(c)(1)(C) is 144 months. . . . . . . . . . . . . . . . 2

Michael has no deviant interest in children and did not appreciate the illegality of his conduct. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    *1.*   *The government ignores empirical proof that Michael is not a pedophile* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    *2.*   *Michael followed the conventions of online roleplay in his chats with minors, and was seeking out sexual encounters in an environment for which he was immature and unprepared.* . . . . . . . . . . . . . . . . . . . . 4

    *3.*   *"Hundreds of 'underage' girls"* . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    *4.*   *"Providing financial incentive"* . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    *5.*   *The limited relevance of Michael's admission of contact offending* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    *6.*   *The government repeatedly recognizes the defendant's disability, but simply refuses to countenance it* . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    *7.*   *Statements to law enforcement; internalization of guilt* . . . . . . . . 10

        Michael's concerns over parents' knowledge of his activities . . . . 11

    *8.*   *The government's claim that Michael was a "functioning member of society" is patently false* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    *9.*   *Autism is not a risk factor* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    *10.*  *The government has not accommodated this disabled accused* . . . 14

    *11.*  *Sex offender treatment* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Objections. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Restitution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

# Introduction

The government's reply [62] to defendant Michael Sutherin's sentencing memorandum [59] ignores the preeminent fact of Michael's autism and harps on unsubstantiated or factually incorrect assumptions. For the reasons outlined below, it should be disregarded.

# Michael did not appreciate the wrongfulness of his conduct and did not intend to cause harm

First, the government's reply tries to paint Michael as the architect of our defense of him. *We,* his attorneys, have demonstrated that without autism, he would not be here. His autism *is* to blame. Michael has never conceptualized this, and the suggestion that he is himself "coming up" with this is a transparent attempt to avoid the issue and to paint him with competencies he does not have, while also undermining his clear acceptance of responsibility. This is the only reference by the government to his autism.

The government then insists that "nothing that [Michael] has presented to the Court can negate the harm his crimes have cause to numerous young girls, many of whom have serious mental health conditions that were exacerbated by their interactions with the defendant." 62 at 1.

"Harm" is not a factor under 18 U.S.C. § 3553(a). Intent is what the Court must consider. This is why, for example, all homicides are punished differently, according to degree of *mens rea*, even where the harm is the same. Michael had no idea of the harm he would cause because his autism left him unable to appreciate the moral framework by which he would be judged in this case. This moral framework was complicated by the fact that the victims' conduct in this case is hardly "innocent." There is no victim impact statement for any of the three chat victims. The grandmother of Jane Doe # 2 even went so far as to say that "[a]lthough she is concerned with her granddaughter's behaviors, Jane Doe #2's grandmother does not believe the defendant's actions have had a severe impact." PSR [54]

1

at ¶ 47. "Behaviors" here is in reference to her granddaughter's own online activities.

Where is the "generosity" in the government insisting on two additional, tortuous years in prison, over the ten years mandatory minimum offered before indictment, merely because we, as his attorneys, insisted on giving the government empirical information about autism and its effect on Michael, which, under law, they were supposed to take into account in resolving the case in the first place?

The government is also trying to get the Court to ignore autism too, which is contrary to its duty, not only under § 3553(a), but also under the Rehabilitation Act and judiciary policy.

## The agreed-upon sentence under Rule 11(c)(1)(C) is 144 months

The government flagrantly risks breaching the plea agreement by repeatedly asking for a 15-year sentence in its filing. *See* [62] at 1, 5, 11, and 14. This is likely a careless mistake on the part of government counsel, but there has been to-date no attempt to retract the error, which occurs several times. The government has no power now to alter the plea, and should state on the record that what it actually offered and agreed to was 144 months.

## Michael has no deviant interest in children and did not appreciate the illegality of his conduct

The government claims that Michael's conduct shows "that he has a deeply-rooted sexual interest in minors and that he has repeatedly shown a willingness to act out on this interest." [62] at 5. The government's fails to differentiate between three very different behaviors: sexting, viewing child pornography, and sex play. The government obscures these by using loaded phrases like "acting out." Viewing child pornography is not "acting out." There are well-defined differences between different types of child pornography offenders,

as we have shown. *See* Def. Sentencing Mem. [59] at 25, fn. 26. Sexting is commonplace among teenagers and cannot be compared to "acting out" against pre-pubescent children. Sex play is different in character from the others; it is a transient behavior, not predictive of future offending, but especially not of "acting out" on any interest in children. Dr. Peterson noted that because of the inherent deficit in social skills in those with ASD, they sometimes engage in these behaviors with younger people who are seen as peers by the individual with ASD, but without any underlying paraphilic interest in children. [59-1 Ex. D at 5]. There is no foundation offered to support these broad statements.

### 1. *The government ignores empirical proof that Michael is not a pedophile*

The government's claim is contradicted by unrebutted evidence and argument the defense presented about counterfeit deviance. [59] at 28-30. As the expert psychological reports show, particularly the empirical measures in Dr. Peterson's sexual interest assessment ([59], Ex. D), Michael has no deviant sexual interests. His actual sexual interests are normal. This is consistent with what has been seen in others with autism in similar situations. Rather, Michael's conduct is indicative of "deeply-rooted" – as in neurologically based – social immaturity and social learning deficits. These deficits resulted in the failure to intuit social norms, like the taboo on viewing child pornography, or the age of consent. It derives from the lack of ability to appreciate how differences in age can give rise to serious moral condemnation of behaviors that are normative among adolescents.

The government offers nothing to rebut this evidence. It has not sought to have its own evaluation of Michael. It cites no research or literature. It does not articulate any fault with any point we have made. It only offers conclusory rhetorical jabs and the government counsel's own uninformed assumptions about what Michael's true psychological makeup must be. The government's assertions do not rise to the level of argument and should be disregarded.

3

2.     *Michael followed the conventions of online roleplay in his chats with minors, and was seeking out sexual encounters in an environment for which he was immature and unprepared*

As shown in our memorandum [59 at 47-52], Michael was engaging in online behavior that he had seen modeled for him by others. So, his behavior appeared far more mature and sophisticated than the empirical testing shows he is actually capable of. *See* Report of Dr. Peterson [59 Ex. D]. There is nothing inherent in having ASD that makes a person predisposed to having sexual interests in children or make a person more inclined to sexual deviance of any kind. *Id.* at 5.

General research findings on adolescent sexuality also applies to Michael. It is widely accepted across the fields of medicine and psychology that sexual experimentation during childhood and adolescence is quite normal (and even considered necessary) in terms of typical sexual development (Levay, Baldwin & Baldwin, 2015). For example, the Mayo Clinic identifies healthy sexual exploration as part of normal development in their special section on "Teen Sexuality" within the Mayo Clinic Family Health Book (Litin, 2009). It is important to remember that Michael's psychological age is far behind his biological age. According to the psychological reports, he is, developmentally speaking, more like a young teenager than a young adult. Again, the government has not (and can not) dispute these findings.

Increased access to explicit images on the internet has made pornography a common (but obviously misleading) form of sex education for youth (Cooper, 2002; Peterson, Bley & Frabotta,m2019). This can lead to learning maladaptive sexual behaviors that become problematic (Bancroft 2006).59, Ex. D at 5-6. In other words, Michael was a socially immature man who, because of his autism, was so delayed that he saw underage girls online–girls who, it must be noted, were engaging in flagrantly sexual and solicitous behavior themselves[1]–and responded as a much younger person might have. Michael engaged in

---

[1] This was noted in our objections, where we explored some of these exchanges in detail. *See* [54] at 3.

4

frankly consensual "role-play" with these girls, many of whom addressed Michael with sexually explicit language without prompting and were up-front in their willingness to provide images of themselves in exchange for favors or other attention.

A quick analysis of the messages sent *to* Michael can easily demonstrate how involved and reciprocating these girls were in the messages with him. The following words were said by others *to* Michael in their conversations, including by the victims and others whom the government identifies as "underage" in this case:

| Word: | No. of times others used it in conversations with Michael: |
|---|---|
| Daddy: | 1,124 |
| Fuck: | 193 |
| Fucktoy: | 31 |
| Horny: | 99 |
| Kitten: | 5,360 |
| Master: | 30 |
| Panties: | 11 |
| Princess: | 5,516 |
| Pussy: | 32 |
| Rape: | 2 |
| Roleplay: | 2 |
| Roleplaying: | 1 |
| Secret: | 38 |
| Sex: | 46 |
| Sub: | 43 |
| Submissive: | 72 |
| Swallow: | 2,464 |

Words like "daddy," "master," and "princess" clearly illustrate the roleplaying aspect of these exchanges. Because Michael was dealing with others who, despite their age, were more sophisticated than him, he responded as he had seen others respond–by using stock phrases, rote responses, and rigid and formulaic sexual tropes (as in Michael's repeated questions

5

about whether his respondents are interested in anal intercourse), none of which Michael understood completely.

The government, however, ignores all of these realities, claiming [62 at 6] that he manipulated the girls by earning their trust and offering to purchase gift cards for them. In fact, as shown below (at p.7), in one of the exchanges in question, the victim herself immediately responded to Michael's suggestion of exchanging nudes for gift cards with such apparent familiarity and ease that it leaves little doubt that she had done this before. A typical defendant might have realized this was wrong, but for one as naive and socially undeveloped as Michael, this deepened his impression that this behavior was acceptable.

### 3.      *"Hundreds of 'underage' girls"*

The government claims that Michael's behavior also involved interactions "with hundreds of social media users who informed the defendant they were underage." [62] at 6. Only a handful of these correspondents actually used the term "underage" and the government's claims are extremely exaggerated and false.[2] The government fails, however, to dispute that Michael did not understand the social or legal implications of age or the specific meaning of "underage" in this context.  "Underage" could refer to under the age of the "age of consent" for having actual sex, meaning that there would be no defense available on the basis of "consent."  But "consent" is not a "defense" to receiving or soliciting self-produced sexual images. Others told Michael their age, of course, but again the socio-legal implications of this were not apparent to Michael.

---

[2] According to a breakdown of all the messages sent to the "Subtamer69" Instagram account, the word "underage" or "underaged" were used only 11 times out of literally thousands of messages Michael sent and received over the course of over a year. There is no indication, in any instance, that Michael actually understood what this term meant. When it does appear, it is not in reference to exchange of pictures, nor is it always clear that the individual to whom Michael speaks is *actually* or *apparently* underage.

### 4.    *"Providing financial incentive"*

The government turns reality on its head in asserting that Michael was "providing financial incentive" to the victims." [62] at 6. The government cannot dispute, and well knows, that certain adolescents using the internet for sexual experiences also use it to make money by selling sexual images and videos of themselves.  The government does not dispute that those with autism, like Michael, are particularly susceptible to this.

Jane Doe #4 advertised her interest in finding a "sugar daddy" on Instagram and proceeded to negotiate the exchange of gift cards for nudes with Michael casually and directly. This is shown in the discovery provided by the government.

| | |
|---|---|
| SUTHERIN: | You looking for a sugar daddy? |
| JANE DOE #4: | lmao yeah i am |
| SUTHERIN: | Mind if I help with that? |
| JANE DOE #4: | absolutely!! |
| JANE DOE #4: | what are you looking for? pictures and videos or? |
| SUTHERIN: | Either really. |
| SUTHERIN: | Videos mostly. |
| JANE DOE #4: | i have some but mostly pics, i can take new ones if you'd like!! you can ask me to see specific things too :p |
| SUTHERIN: | Mind if I see what you're talking about? |
| JANE DOE #4: | well what would you like to see? I'm not going to send a lot of photos because i don't want to give them out for free ya feel? |
| SUTHERIN: | No I get it. |

The Court should note that this victim did not file a claim for restitution. She is clearly and comfortably in the business of offering pictures of herself for exchange. Michael was an immature and developmentally disabled man responding to a frank solicitation for these kinds of favors.

5. *The limited relevance of Michael's admission of contact offending*

The government states that "[t]he defendant's years-long, hands-on abuse of a minor victim further confirm that his sexual interest in minors is the motivating force for his charged conduct" [#62 p. 8], as if there was some support for this, or as if it were undisputed. First, the assumption of "sexual interest in minors" is refuted by the empirical testing and clinical findings to which the government has no apparent answer.[#59 p. 13, 59-1, Ex D, at 2].  Dr. Peterson says "people with ASD are at an increased risk of engaging in inappropriate sexual behavior *for reasons other than pedophilia*," [#59-1 Ex D p. 4-5](emphasis added), an indisputable fact that is acknowledged by the Department of Justice itself. [3]

Second, the government ignores the distinctness in character and cause between the charged online behavior and what Dr. Peterson refers to as "experimentation" [#59-1 Ex D p. 5-6]  and we describe as "age discordant sex play." [#59 p. 44-45]

As in our memorandum, Dr. Peterson cites peer-reviewed research support for all this. This uncharged behavior is definitely not on some continuum with, or relevant to, the charged online behavior. The government's mere contrary supposition does not support or respect the obligation of the Court to make evidence-based decisions regarding the significance, or  relevance under the Guidelines, of this behavior.

---

[3] It is well understood that that viewers of child pornography are not monolithic.  The Department of Justice identified three different psychological "typologies" of viewers of child pornography, including "Recreational users" who were not considered problematic, and  "At-risk users" who would never have looked at child pornography but for the Internet, and "sexual compulsives." Only the last category was identified as "hav[ing] a specific interest in children as sexual objects." (Wortley, Smallbone, 2012). The U.S. Sentencing Commission observed that "not all child pornography offenders are pedophiles, and not all child pornography offenders engage in other sex offending," (U.S. Sentencing Commission, Report to Congress 2012). Even the discredited "Butner Report" noted that it "is indisputable that certain factors (e.g., psychiatric disorders, developmental and psychological vulnerabilities)" may be at work in some cases, and recognizes that some child pornography offenders "are motivated by non-sexually deviant interests." (Bourke & Hernandez, 2009). The best research available, (Babchishin, et al., 2015), indicates that those offenders  most likely to be in the completely nonproblematic "child pornography only" viewers are the developmentally disabled. And autism provides an especially strong and scientifically based explanation as to why autistic individuals are in this group that might be looking at child pornography without being motivated by deviant sexual interests. The government simply ignores the science and established knowledge, and relies on its own intuitions.

6.     *The government repeatedly recognizes the defendant's disability, but simply refuses to countenance it*

Based on these counterfactual assumptions, the government declares:

> All of the foregoing refutes the crux of the argument put forth in the defendant's sentencing memorandum: that he really is not blame worthy for his criminal conduct. According to the approximately 75 pages of the defendant's sentencing memo, his actions are the result of his inability to understand social cues that would tell him his actions were wrong or illegal or to engage in... As the defendant sees it, his conduct is not a sign of sexual deviance, but rather misunderstanding of social-sexual norms and the readily accessible nature of child pornographic materials and overly-sexualized teenage girls on the internet. As the foregoing summary of the defendant's offense conduct and history of hands-on sexual abuse shows, these arguments just do not square with reality.

[62] at 9. Here again the government uses the conceit that Michael Sutherin himself is making these arguments, perhaps to excuse for failing to actually confront what we, his counsel, have demonstrated with expert reports and established science. Instead, the government simply supposes a "reality" that everyone who looks at child pornography must have deviant sexual interests. This is far from "reality," as demonstrated in the previous section.

When it comes to the internet "sexting" behavior, the government does not dispute that seeking sexually explicit encounters, and exchanging photographs, is normative behavior for typically developed adolescents, including the individuals identified as victims here.[4] The government does not dispute anything about how impaired an autistic person fitting Michael's profile would be, if not explicitly taught, in figuring out his catastrophic difference his age makes in this situation. It ignores our survey data ([#59 at 37 et seq.] demonstrating that 25% of autistic male respondents, from high school graduates to those

---

[4] We do portray theses adolescents at "overly-sexualized teenage girls." Indeed we suppose that many have serious problems that make this behavior appealing. The problem is that this would be very difficult for the defendant to comprehend. The government does not want to talk about this because it wants to pretend that it is the defendant's behavior that might be causing problems for these girls.

9

with doctorates, were unaware of the impropriety of receiving such images from an underage person. The government also ignores the fact that, involving adolescents, and not pre-pubertal children, the defendant's attraction to this behavior is not corroborative of a deviant sexual interest.[5]

So, the government can say that our "arguments just do not square with reality." However, without being able to point to scientific literature or expert reports contrary to, for example, the empirical reality of the internet milieu and the defendant's developmental disability, this is not "refutation," it is mere foot-stomping. It is nothing upon which a due process sentencing determination can rest.

The government refuses to understand the pervasiveness of the effects of ASD or the fact that the social learning problems are independent from intelligence. The problem is not merely about being able to "understand social cues," in the present. It is about a brain which, from early childhood, was neurologically diverted from "social visual engagement" with the world. *Id.* at 1, 14-28. This results in a failure to develop social intuition and an inability to intuit the norms that the government mistakenly assumes are part of everyone's "reality." *Id.* And this case is typical. The government ignores that other judges, where this issue has been raised, have agreed that autism dramatically diminishes culpability, and the need for the unnecessary and excessive sentence the government has imposed on the Court.[#59-1,Exhibit B].

## 7.   *Statements to law enforcement; internalization of guilt*

In a typical effort to find any little "fact" that provides associative coherence[6] for its

---

[5] Dr. Peterson's report makes it clear that an attraction to post-pubertal individuals is normal for adult males. [#59-1], Ex. D p. 2.

[6] Nobel Prize winner Daniel Kahneman, in the same seminar referred to in our Sentencing Memorandum [#59 at p. 21, n. 17], and throughout his book. "Thinking, Fast and Slow," describes the flaws in the kind of intuitive thinking that dominates the government's argument and rigid enforcement policy. Kahneman notes that the brain is marvelous at unconsciously helping us decide our courses of action intuitively – "fast thinking" – but only up to a point.  While this leads to a seemingly coherent view of reality, these intuitions are often unempirical, or purely ideological, and may not suit accurate

"reality," the government claims that "the first time that agents arrived at his residence to see if the defendant would engage in a consensual interview, the defendant said that he knew he was being interviewed because of the chats he was engaging in with children." [62, at 10]. This is not true. Michael's first interview, which happened on April 26, 2019, is described in the complaint, at ¶7: "At the beginning of the interview, agents explained to SUTHERIN that they were trying to determine if he was engaged in illicit sexual activities with children, either in person or via social media platforms, including but not limited to the Instagram account "SuperSmashCandy." [#1 p. 4]

### Michael's concerns over parents' knowledge of his activities

For similar "associative coherence" effect, the government claims that Michael repeatedly asked agents not to tell his parents of his activities, as if he really did understand the enormous social opprobrium for his online behavior. [#62 at 10] As noted in the PSR ([54] at ¶ 131), Michael's parents knew that he had viewed pornography in the past, and had taken steps to reduce his exposure to it out of concern that he was too young for it (he was first exposed in Fourth Grade), and that Michael had been forbidden from viewing it. Moreover, as noted in the sentencing memo, those with ASD understand that masturbation is embarrassing and do not want their parents to know they are doing it and internalize guilt or shame over this disapproved behavior. Moreover, Michael had, by the time of the second interview, internalized assumptions that he has done *something* wrong, even if he didn't understand what, or why. [#59 at 27]So, there is no surprise in Michael's desire to keep this from his parents, a fact which hardly supports the insinuation that about *child* pornography, or his "sexting" or understood that these activites were any more reprehensible than pornography.

---

decision-making. Kahneman's Nobel prize was in recognition of his identification of the glaws in intuitive thinking. Intuition ignores conflicting or ambiguous information, and it seeks confirmation in what psychologists call "associative coherence": looking for facts, however minor or trivial, that seem to support the intuitive response. The result is excessive confidence in what we believe we know, and the inability to acknowledge the full extent of our ignorance, all of which is evidenced by the government's argument here and its refusal to take Michael's disability into account, despite guidance by DOJ's own Civil Rights Division.

What really *is* significant here is ignored by the government. Michael's naivete in thinking that his parents would not necessarily find out everything, which directly demonstrates his complete and child-like lack of understanding of the seriousness and consequnces of these behaviors.

Oblivious, the government doubles down on this mistaken argument: "[s]imilarly, his interactions with law enforcement, already detailed in this memorandum and in the PSR, indicate that he knew what he was doing was wrong. In other words, the defendant cannot establish that any alleged disorder is responsible for his offense." [#62 at 11]. As we have shown above, the government's conclusion fails because its premise fails. But we add that even if one could say that Michael knew looking at pornography or talking sexually to minors was "wrong" in the sense that it would be disapproved by his parents, is a far cry from the knowledge of serious wrongdoing that Congress assumed on the part typically developed offenders[7] to justify the horrific sentences that may be imposed or mandated.

### 8. The government's claim that Michael was a "functioning member of society" is patently false

Similarly seeking "associative coherence" for it "relity" the government turns to other contrived "facts." The government claims that Michael "was a functioning part of society" and that as such, "he cannot float in and out of culpability." 62 at 11. The government does not pause to explain what it means here by "functioning," and does not dispute the many ways in which, from early childhood our memorandum and clinical report establish severe deficits in functioning. Most particularly, unchallenged empirical testing demonstrates that in the areas functioning most essential to seeing, and understanding, the social world and its implicit sexual norms, he functions at the level of a small child. This is consistent with a central diagnostic consideration in autism: the impairment of understanding of social norms. The

---

[7] Congress included no *mens rea* element, such as "willfully," requiring knowledge of wrongdoing as an element that the offense, because "everyone knows" the extreme social opprobrium and harm associated with child pornography and sexual exploitation of children. Everyon, except, that is peole with utism or severe intellectual disbilities.

government does not, trouble itself to address these facts, though we did. *See* [59] at 19-31, 60.

Michael actually *exemplifies* the deficits that are at the core of ASD in a very severe way. The point of the defense explaining ASD, and how it manifests in Michael, was to ensure that the Court understands that we are not merely dealing with personality quirks, but rather a very clear syndrome that consists of traits that can severely impair social learning even in intellectually intact people who are "functioning" at some level, though most, like Michael, will never even be able to live independently.

The government goes on to claim that Michael's "interactions with the minor victims in this case indicate that he knew what he was doing, and that he was a savvy communicator online." *Id.* We already dispelled this in our memorandum [59] at 24.

## 9. *Autism is not a risk factor*

Careful not to appear to concede what it cannot refute, the government says,

> Secondly, even if the defendant's ASD were somehow to blame, in part, for his conduct, this is not a helpful fact for the defendant. To the extent that the defendant has acted on sexual interests that he cannot control, or to a devotion to child pornography that he cannot keep in check, that places the public at greater risk. As the defendant's hands-on conduct with a minor victim demonstrated, the defendant has admitted that he knew he had deviant interests yet could not control them. This places all children who may come into contact with him at risk. [#62 at11]

There is nothing suggesting that Micheal cannot control his "sexual interests," or stop looking at child pornography. There is likewise no suggestion that autism involves "losing control" (cf. [59] at 24). Likewise, we have demonstrated that sexual experimentation, including "age discordant sex play," is episodic, and not indicative of pedophilia or a romantic pattern. [59] at 44 and [59-1], Ex. C, at 52, Ex. D, at 5.

As a person who has been empirically determined *not* to have an interest in sex with children, and one who can be taught the sociosexual rules he missed in development, one can say with *certainty* that if Michael had been normally developed, this case would never have

happened. We have presented data, which the government does not dispute, directly supporting our conclusion that Michael will not offend again. This relates *directly* to the need for very little supervised release.

### 10. *The government has not accommodated this disabled accused*

The government's pretense that it has accommodated Michael's disability is a cruel deception.[#62 p.11] While the government's first offer may have been to a cap of the mandatory minimum of 15 years, on a plea to the top count, limiting the period of torture and grave danger for an autistic person to 15 years (for conduct whose wrongfulness he did not understand, and which he could not have conceived as harmful), is hardly an accommodation. For an authoritative understanding of what is an accommodation in this context we have referred the Court to the DOJ's own guidelines, which the government ignores. But at least this would involve not insisting on a mandatory minimum sentence and depriving the Court of the ability to independently determine whether incarceration was "necessary." But here again the government ignores that, having later agreed to a plea to solicitation, with a mandatory minimum of 10 years, the government then insisted on *raising* that amount to a *minimum of 12 years*, to punish Michael with two more years of his life in prison, because his counsel took the time needed to throughly evaluate and explain to the government the nature and effect of his disability, which it was actually the government's lawful obligation to do!

Moreover, the government refused to agree to an 11(c)(1)(C) cap even to that 12 years, reneging entirely on what it now suggests was its "accommodation" or removing the reisk of a life sentence.

### 11. *Sex offender treatment*

The government urges that Michael would "benefit from participating in a lengthy program of sex offender counseling and treatment, and this would best be done within the confines of a [BOP] facility." [62] at 12. This is an utterly groundless statement. The defense

14

explained at length ([59] at 58-62), without dispute, why this would be unnecessary *and actually harmful* to Michael. Such programs are designed for typically developed persons, with completely different causes for offending, and learning styles, and social abilities, and distinctly different therapeutic needs. The government's suggestion is simply another indication of its obdurate refusal to acknowledge or even try understand the implications of this specific developmental disability.

In fact, given that such programs are designed for those with genuine sexual pathologies, which Michael lacks, and because no programs are offered through any BOP facility for someone with Michael's specific disabilities. Only two facilities even approach the kinds of programming Michael would benefit from: FCI Danbury and FCI Coleman. The Court should recommend a program that actually suits Michael, rather than merely treating him like "every other person."

# Objections

The government notes ([62] at 3-4) that the sentencing memorandum makes no mention of Michael's previous objections to the PSR, "and it is therefore unclear whether the objections remain unresolved."

The defense maintains its objections, specifically with regard to improper enhancement for use of a computer [54-3 at 8]; count-grouping [54-1 at 6, 54-3 at 8-10]; statements to law enforcement about whether Michael's parents were aware of alleged contact abuse [54-1 at 7-10; 54-3 at 10-13]; whether Michael can afford the JVTA assessment (which is separate from the question of whether or not he will pay it, which he has agreed to do under the plea); what Michael understood about what he was doing (Objection No. 4; *see* Memorandum [59] at 47-52); about his susceptibility to being manipulated online by others (Objection No. 5; [59] at 57); about the fact that the number and content of images is unrelated to his risk of future offending, because Michael is not genuinely attracted to children (Objection No. 6; [59] at 13); and others issues.

The defense asks for pre-sentence argument to resolve these issues.

15

# Restitution

The defense previously objected to the premise in the PSR that Michael agreed to pay any and all amounts demanded by the government on behalf of the victims, when the plea in fact clearly states that the payments must be made pursuant to 18 U.S.C. § 2259. *See* [54-1] at 2, 12). Specifically, § 2259(b) requires claimants to make an accounting of their damages and the amounts they have already been paid by other defendants. The government's response to our initial objections mis-characterized this as an attempt to bypass the plea–the plea agreement itself says claims must be made subject to the provisions of § 2259, meaning that the defense is actually trying to honor the agreement.

The government reiterates in its submission that there are claims for restitution for Jane Does # 1, 3, and 5, listing specific amounts for each. [62] at 13. The defense has seen victim impact statements for the other claimants, though none of these appear to provide the kind of financial reporting that § 2259 requires. The government claims otherwise, *but we have not been provided with any statements for the Jane Does*. The defense would need to know the extent of these claimants' involvement in internet chat sites and their role playing activities; by whom else they may have been paid for similar cases; and actual information about their underlying problems and why, as the government claims, they were "exacerbated" by Michael's conduct as opposed to the mere discovery of their online activity. The defense raises this only to alert the Court to issues which may need resolution at a restitution hearing, and which may be resolved by communication with the U.S. Attorney's Office before that time.

The government ignores what was articulated by the Supreme Court in *Paroline v. United States*, 572 U.S. 434 (2014). In that case, the majority (Kennedy, J.) reasoned that for the purposes of restitution, harm in child pornography cases is related to what a defendant could have reasonably foreseen as a result of his actions. Since those who view child pornography do not, in a vast majority of cases, actually physically harm those depicted, the "harm" is tied by proximate causation to the foreseeable result that the victims will be, in a sense, "re-victimized" by the images being shared online.

Michael did not appreciate the nature of the harm he was causing by viewing these

16

images, nor did he understand that he was causing harm to the victims he was chatting with online. The sentencing memorandum makes it abundantly clear, drawing on observations by Drs. McConnell and Peterson, that Michael failed to appreciate the illegality or immorality of his actions because he was oblivious to the moral and legal taboos against this behavior, and that he did not intend to commit these acts in an anti-social or pathological manner. See, e.g., [59] at 15, 35, 47.

The government has argued in other cases that revisions to the restitution statute have foreclosed the issues of *Paroline,* but this is not the case; the statute still requires the claimants to submit accountings of their damages, what they have been paid by other defendants in other cases, and for the Court to assess what is appropriate in this case.

17

# Conclusion

The government relies, at the last phase of this case, on inflammatory and frequently inaccurate claims about who Michael Sutherin is, all while flagrantly ignoring and downplaying the severity of his disability. Thus, the government's arguments are not merely insensitive and bigoted against Michael's disability, but they also fly in the face of extensive empirical, scientific evidence proffered by the defense about Michael's condition and how it impacted his behavior. The government offers nothing beyond rhetorical jabs, arguing again and again that Michael's behavior "speaks for itself," all while failing to consider or even recognize that Michael's autism left him vulnerable to engaging in this behavior without any understanding of its moral or legal opprobrium. The Court, however, has no doubt armed itself with the information the defense has provided, and can see past the government's parting shots. The Court should disregard the government's claims and should grant the requested objections while also imposing those conditions of sentencing which best suit Michael's unique and pervasive disability.

May 21, 2021

Mark J. Mahoney (Pro Hac Vice)
Harrington & Mahoney
70 Niagara Street, 3rd Floor
Buffalo, NY   14202-3407
Tel: 716-853-3700
Fax: 716-853-3710
Email: mjm@harringtonmahoney.com

*Attorneys for Michael Sutherin*

18